No. 22-13135

# In the United States Court of Appeals for the Eleventh Circuit

HONEYFUND.COM, INC, *et al.*,

*Plaintiffs–Appellees*,

v.

GOVERNOR, STATE OF FLORIDA, *et al.*,

*Defendants–Appellants*.

## BRIEF OF DEFENDANTS-APPELLANTS

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
No. 4:22-CV-227-MW-MAF

Henry C. Whitaker
*Solicitor General*
Timothy L. Newhall
*Special Counsel*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, FL 32399-1050
Tel: (850) 717-9310
henry.whitaker@myfloridalegal.com

Charles J. Cooper
John D. Ohlendorf
Megan M. Wold
John D. Ramer
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
Telephone: (202) 220-9660
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Defendants-Appellants*

*Honeyfund.com, Inc. v. Ron DeSantis,*
*Governor of Florida*, 22-13135

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Defendants-Appellants certify that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1:

1.  Agarwal, Shalini G., *Attorney for Plaintiffs-Appellees*

2.  American Civil Liberties Union Foundation, *Attorney for Plaintiffs-Appellees*

3.  Cepero, Monica, Commissioner of the Florida Commission on Human Relations, *Defendant-Appellant*

4.  Chimene-Weiss, Sara, *Attorney for Plaintiffs-Appellees*

5.  Cooper & Kirk, PLLC, *Attorneys for Defendants-Appellants*

6.  Cooper, Charles J., *Attorney for Defendants-Appellants*

7.  DeSantis, Ron, Governor of the State of Florida, *Defendant-Appellant*

8.  Farmer, Libby, Commissioner of the Florida Commission on Human Relations, *Defendant-Appellant*

9.  Florida Attorney General Service, *Attorney for Defendant-Appellant Moody*

10. Garza, Mario, Commissioner of the Florida Commission on Human Relations, *Defendant-Appellant*

*Honeyfund.com, Inc. v. Ron DeSantis,*
*Governor of Florida*, 22-13135

11.    Goodman, Rachel E., *Attorney for Plaintiffs-Appellees*

12.    Hallward-Driemeier, Douglas H., *Attorney for Plaintiffs-Appellees*

13.    Hanson, Dawn, Commissioner of the Florida Commission on Human Relations, *Defendant-Appellant*

14.    Hart, Larry, Commissioner of the Florida Commission on Human Relations, *Defendant-Appellant*

15.    Honeyfund.com, Inc., *Plaintiff-Appellee*

16.    Langford, John T., *Attorney for Plaintiffs-Appellees*

17.    Longo, Amy Jane, *Attorney for Plaintiffs-Appellees*

18.    Margulis, Sara, *Declarant*

19.    McBroom, Antonio, *Declarant*

20.    McGhee, Darrick, Senior Chair of the Florida Commission on Human Relations, *Defendant-Appellant*

21.    Moody, Ashley, Attorney General of the State of Florida, *Defendant-Appellant*

22.    Moye, Kenyatta, Commissioner of the Florida Commission on Human Relations, *Defendant-Appellant*

23.    Myrtetus, Vivian, Commissioner of the Florida Commission on Human Relations, *Defendant-Appellant*

24.    Newhall, Timothy L., *Attorney for Defendant-Appellant Moody*

*Honeyfund.com, Inc. v. Ron DeSantis,*
*Governor of Florida*, 22-13135

25.    Office of the Attorney General of the State of Florida, *Attorneys for*

       *Defendants-Appellants*

26.    Ohlendorf, John D., *Attorney for Defendants-Appellants*

27.    Orrin, Chevara, *Plaintiff-Appellee*

28.    Payne, Pamela, Commissioner of the Florida Commission on Human

       Relations, *Defendant-Appellant*

29.    Pichard, Jay, Commissioner of the Florida Commission on Human

       Relations, *Defendant-Appellant*

30.    Primiano, Angela, Vice Chair and Commissioner of the Florida

       Commission on Human Relations, *Defendant-Appellant*

31.    Primo Tampa LLC, *Plaintiff-Appellee*

32.    Protect Democracy, *Attorneys for Plaintiffs-Appellees*

33.    Ramer, John D., *Attorney for Defendants-Appellants*

34.    Ropes & Gray, LLP, *Attorneys for Plaintiffs-Appellees*

35.    Whitespace Consulting LLC, d.b.a. Collective Concepts LLC, *Plaintiff-*

       *Appellee*

36.    Wold, Megan M., *Attorney for Defendants-Appellants*

Apart from undisclosed members of Appellees, no publicly traded company

or corporation has an interest in the outcome of this case or appeal.

*Honeyfund.com, Inc. v. Ron DeSantis,*
*Governor of Florida*, 22-13135

Dated: November 14, 2022                    Respectfully submitted,

                                            /s/Charles J. Cooper
                                            Charles J. Cooper
                                            *Counsel for Defendants-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

This appeal concerns important constitutional questions under the First Amendment and Due Process Clause involving the distinction between speech and conduct and the nature and importance of the State's interest in preventing racial discrimination in the workplace. Appellants believe oral argument would assist the Court in deciding these consequential issues.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION .............................................................................. 1

JURISDICTIONAL STATEMENT ..................................................... 5

ISSUES PRESENTED ....................................................................... 5

STATEMENT OF THE CASE ............................................................ 6

I.      Florida's Individual Freedom Act. ........................................ 6

II.     Proceedings Below. .............................................................. 8

STANDARD OF REVIEW ................................................................ 12

SUMMARY OF THE ARGUMENT .................................................. 13

ARGUMENT ................................................................................... 16

I.      The Act's Employment Provisions Do Not Violate the First
        Amendment .......................................................................... 16

        A.      The Employment Provisions Govern Conduct, Not Speech. .............. 16

        B.      In Any Event, the Employment Provisions Also Survive Heightened
                Scrutiny. ....................................................................... 32

II.     The Act's Employment Provisions Are Not Unconstitutionally Vague. ...... 44

III.    Any Unconstitutional Provisions Are Severable. ........................... 50

IV.     The District Court Erred in Granting a Preliminary Injunction. ............ 51

CONCLUSION ................................................................................ 52

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page**

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986).......................................35

*Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) .......................26, 27, 33, 38

*Brown v. Board of Educ. of Topeka*, 349 U.S. 294 (1955).......................................1

*Brown v. Hartlage*, 456 U.S. 45 (1982)...................................................................23

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
    142 S. Ct. 1464 (2022)........................................................................................24

*Cohen v. California*, 403 U.S. 15 (1971)............................................................24, 25

*Dana's Railroad Supply v. Attorney General*, 807 F.3d 1235
    (11th Cir. 2015) ..................................................................................................28

*Daniels v. Essex Grp., Inc.*, 937 F.2d 1264 (7th Cir. 1991) ...................................40

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) .............................34, 35, 37

*Frisby v. Schultz*, 487 U.S. 474 (1988).........................................................34, 36, 37

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) .............................................................27

*Gonzalez v. Governor of Ga.*, 978 F.3d 1266 (11th Cir. 2020)...................12, 13, 52

*Hall v. Gus Constr. Co.*, 842 F.2d 1010 (8th Cir. 1988) ........................................40

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)...................................38, 39, 40, 42

*Heyman v. Cooper*, 31 F.4th 1315, 1323 (11th Cir. 2022)......................................44

*High Ol' Times, Inc. v. Busbee*,
    673 F.2d 1225 (11th Cir. 1982) ..........................................................................45

*Hill v. Colorado*, 530 U.S. 703 (2000) .............................................3, 24, 26, 34, 35

*Jones v. Gov. of Fla.*, 975 F.3d 1016 (11th Cir. 2020) .....................................44, 45

*Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974)........................................35

*Locke v. Shore*, 634 F.3d 1185 (11th Cir. 2011)....................................................18

*Loving v. Virginia*, 388 U.S. 1 (1967) ...............................................................1, 33

*Maryland v. King*, 567 U.S. 1301 (2012) ...............................................................52

*Miller v. Johnson*, 515 U.S. 900 (1995).................................................................1

*National Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018)........................................................................................17

*NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969) .................................................36

*Norwegian Cruise Line Holdings Ltd v. State Surgeon Gen.*,
    50 F.4th 1126 (11th Cir. 2022)....................................................16, 17, 18, 20,
    23, 29, 30, 39

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) ..........................................18

*Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020)....................................21

*Regan v. Taxation With Representation*, 461 U.S. 540 (1983)...............................24

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ....................................................33, 34

*Robinson v. Jacksonville Shipyards, Inc.*,
    760 F. Supp. 1486 (M.D. Fla. 1991) ......................................................34, 40

*Rowan v. United States Post Off. Dep't*, 397 U.S. 728 (1970).........................34, 35

*Rumsfeld v. FAIR, Inc.*,
    547 U.S. 47 (2006)...................................................................18, 19, 22, 27,
    29, 30, 31, 32

*Rust v. Sullivan*, 500 U.S. 173 (1991)....................................................................27

*School Dist. of Abington Twp. v. Schempp*,
    374 U.S. 203 (1963)..............................................................................49, 50

*Shaw v. Reno*, 509 U.S. 630 (1993) .......................................................................33

*Siegel v. LePore*, 234 F.3d 1163 (11th Cir. 2000)............................................12, 51

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ..................................17, 18, 27, 28

*Tracy v. Florida Atl. Univ. Bd. of Tr.*,
    980 F.3d 799 (11th Cir. 2020) ...............................................................44, 46

*United States v. Barbour*, 420 F.2d 1319 (D.C. Cir. 1969) ...................................50

*United States v. Paradise*, 480 U.S. 149 (1987) ....................................................34

*United States. v. Williams*, 553 U.S. 285 (2008) ...................................................45

*Village of Hoffman Est. v. Flipside, Hoffman Est., Inc.*,
    455 U.S. 489 (1982)..................................................................................45

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015)..................................................................................27

*Waltman v. International Paper Co.*, 875 F.2d 468 (5th Cir. 1989) ......................40

*Williams-Boldware v. Denton Cnty.*, 741 F.3d 635 (5th Cir. 2014)......................31

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993) .........................................................27

*Wollschlaeger v. Governor of Florida*,
848 F.3d 1293 (11th Cir. 2017) ....................................................21, 22, 50, 51

## **Constitutional and Statutory Provisions**

5 U.S.C. § 4302(c)(1) ........................................................................................49

15 U.S.C. § 77k ................................................................................................47

18 U.S.C.
§ 247 .........................................................................................................27
§ 249 .........................................................................................................27

26 U.S.C.
§ 501 ...................................................................................................47, 48
§ 501(c)(3) ..........................................................................................23, 24

28 U.S.C.
§ 1292(a)(1) ................................................................................................5
§ 1331 ..........................................................................................................5

29 U.S.C. § 1108(b)(19)(H) ..............................................................................49

42 U.S.C. § 7705c(b) .........................................................................................49

47 U.S.C. § 1425(b)(1) ......................................................................................49

52 U.S.C. § 30116 ..............................................................................................48

29 C.F.R. § 1910.30 ...........................................................................................31

Fla. Const. art. I, § 2 .....................................................................................1, 6

Fla. Stat.
§ 760.01 .......................................................................................................6
§ 760.10 ...........................................................................................1, 2, 6, 7
§ 760.10(1)–(8) .........................................................................................7, 8
§ 760.10(8)(a) ............................................................................2, 10, 17, 18,
33, 37, 42, 49
§ 760.10(8)(a)(1) .....................................................................................2, 47
§ 760.10(8)(b) ...................................................................................8, 33, 49
§ 1000.05(4)(a) ............................................................................................2

2022 Fla. Laws 72 ...............................................................................................6

## <u>Other Authorities</u>

*Endorse*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY 470
(4th ed. 2002)....................................................................48

MODEL PENAL CODE § 5.03(1) (Am. Law. Inst. 1985).....................................23, 26

*Moral*, MERRIAM-WEBSTER'S DICTIONARY (last visited Oct. 14, 2022)
https://bit.ly/3v4kc9h.........................................................46

*Objective*, MERRIAM-WEBSTER'S DICTIONARY (last visited Oct. 14, 2022),
https://bit.ly/3zcLbB1 .......................................................48

*Superior*, MERRIAM-WEBSTER'S DICTIONARY (last visited Oct. 14, 2022),
https://bit.ly/3AZWxuz..........................................................46

## INTRODUCTION

"At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (cleaned up). There are no "if, ands, or buts" to this principle. "All provisions of federal, state, or local law requiring or permitting such discrimination must yield to this principle." *Brown v. Board of Educ. of Topeka*, 349 U.S. 294, 298 (1955).

Impelled by the fundamental moral principle at the root of the Equal Protection Clause—that discriminating against people solely because of their race, sex, or other immutable characteristics is "odious to a free people whose institutions are founded upon the doctrine of equality," *Loving v. Virginia*, 388 U.S. 1, 11 (1967) (cleaned up)—the Florida Legislature enacted the statute at issue in this case, the Individual Freedom Act (the "Act"), to prevent employers and educators from forcibly indoctrinating Florida's workers and students into eight "concepts" it deems antithetical to the fundamental constitutional mandate that "[a]ll natural persons . . . are equal before the law," FLA. CONST. art. I, § 2. Among the eight are concepts such as "[m]embers of one race . . . are morally superior to members of another race . . ."; "[a]n individual, by virtue of his or her race . . . is inherently racist, . . . whether consciously or unconsciously"; and "[m]embers of one race . . . cannot and should

1

not attempt to treat others without respect to race . . . ." FLA. STAT. § 760.10 (as amended by the Act). Believing the forced indoctrination of these ideas to be repugnant and inherently discriminatory, the People of Florida, through their elected representatives, thus directed that those concepts cannot be "espouse[d], promote[d], advance[d, or] inculcate[d]" in the educational instruction provided to students in their public schools and universities, nor in the job training mandated by Florida employers for their workers. *See* FLA. STAT. §§ 1000.05(4)(a); 760.10(8)(a).

Plaintiffs in this case challenge only the employment-related provisions of the Act, contending that they violate their right to freedom of speech under the First Amendment. But the Act does not limit Plaintiffs' speech at all. Anything that a Florida employer could say (or could hire consultants to say) before the Act took effect can still be said today. What the Act does—all it does—is prevent employers from *conscripting their employees*, against their will, into the audience *as a condition of their employment*. The First Amendment may well protect the right of employers (and their paid consultants) to *espouse* the idea that "[m]embers of one race . . . *are* morally superior to members of another race," FLA. STAT. § 760.10(8)(a)(1) (emphases added), and the other concepts proscribed by the Act. And it may protect the right of employees to seek out, listen to, and share those views. But it does *not* protect the ability of employers to use their economic leverage over their workers to *force them*, on pain of losing their jobs or other sanction, to

2

attend training sessions advocating such views. The Act thus reaches only employer *conduct*, not speech, and the First Amendment has nothing to say about it.

The court below thought otherwise, but its analysis was based on a series of wrong turns. Its principal reason for rejecting this argument was the following chain of reasoning: because the Act's regulation of employer conduct (mandating attendance at certain training sessions) is triggered, in some sense, by looking at the content of speech (the instruction that goes on in those sessions), then the Act must "regulate[ ] speech." App.117. The district court's conclusion does not follow from its premises. As the Supreme Court has explained, it has "never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct." *Hill v. Colorado*, 530 U.S. 703, 721 (2000). There is an obvious difference between a law that looks at the content of speech to determine whether to *restrict that speech*, and a law that looks at the content of speech to determine whether to restrict certain *non-speech conduct*. The former law burdens speech itself and is subject to First Amendment analysis; the latter does not burden speech at all and is thus entirely outside the Amendment's ambit.

Even if the Act did burden speech, however, it easily passes any level of heightened constitutional scrutiny, given the State's unquestionably compelling interests in (1) protecting employees from being conscripted into an audience for the

3

advocacy of views they find invidiously discriminatory, and (2) eliminating open racial discrimination and hostility in the workplace. Acceptance of Plaintiffs' First Amendment claim would enable employers to force their employees to attend trainings endorsing white supremacy no less than white privilege. Indeed, the court below *specifically held* that the State *does not have a compelling interest* in preventing employers from requiring their workers to listen to them advocate the idea "that '[m]embers of one race, color, sex, or national origin are morally superior to members of another race, color, sex, or national origin.' " App.126. That cannot be the right answer to the questions presented in this case.

The implications of the decision below are startling. For if the Act must be understood as a regulation of speech because one must look at the content of speech to see whether it applies, then employers have a First Amendment right to force their employees to be indoctrinated into, for example, the tenets of white supremacy. And if the State truly lacks a compelling interest in keeping even the most egregious racially discriminatory speech out of the workplace, then it is difficult indeed to see how Title VII's protection against hostile work environments—which are, as the district court conceded, often based on "mostly speech," App.123—can possibly be constitutional. The district court strained to resist this conclusion, but it is one that follows quite inescapably from its reasoning. Plaintiffs have not shown that they are likely to succeed in showing that the entire edifice of hostile environment doctrine

4

is unconstitutional, and so they have also not shown that they are likely to succeed on their First Amendment challenge to the Act. The preliminary injunction entered below was entered in error and should be reversed.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this constitutional challenge under 28 U.S.C. § 1331. The District Court entered the preliminary injunction that is the subject of this appeal on August 18, 2022. Defendants filed a timely notice of appeal on September 16, 2022. This Court has jurisdiction over the interlocutory order granting a preliminary injunction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

(1)    Whether the First Amendment applies to an employer's conduct of mandating, on pain of termination or other sanction, that its employees attend certain training sessions or other required workplace activity;

(2)    Whether the Act is narrowly tailored to advance the State's compelling interests in preventing Florida employers from requiring their workers, as a condition of employment, to attend training sessions advocating concepts that invidiously discriminate on the basis of race, color, sex, or national origin;

(3)    Whether the challenged provisions of the Act are unconstitutionally vague;

(4)    Whether any unconstitutional provisions are severable from the remainder of the Act; and

(5)    Whether the district court erred in granting Plaintiffs preliminary injunctive relief.

## STATEMENT OF THE CASE

## I.    Florida's Individual Freedom Act.

The People of Florida enshrined in their Constitution certain fundamental principles that lie at the bedrock of our Nation and the State of Florida. Article I, § 2, of the Florida Constitution enumerates these "Basic Rights":

> All natural persons, female and male alike, are equal before the law and have inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, to be rewarded for industry, and to acquire, possess and protect property. No person shall be deprived of any right because of race, religion, national origin, or physical disability.

In furtherance of these principles, Florida's elected officials have prohibited discrimination in the workplace through the Florida Civil Rights Act of 1992. *See* FLA. STAT. § 760.01 *et seq.* This legislation, among other things, bars "employment practice[s]" that discriminate on the basis of race, sex, national origin, and religion. *Id.* § 760.10.

Earlier this year, the Florida Legislature passed the Individual Freedom Act (the "Act"). *See* 2022 Fla. Laws 72. As relevant in this case, Section 1 of the Act amended the Florida Civil Rights Act to enumerate several employment practices

6

that constitute "discrimination based on race, color, sex, or national origin" under FLA. STAT. § 760.10. Specifically, the Act makes it unlawful for any employer to "[s]ubject[] any individual, as a condition of employment, membership, certification, licensing, credentialing, or passing an examination, to training, instruction, or any other required activity that espouses, promotes, advances, inculcates, or compels such individual to believe any of the following concepts":

1. Members of one race, color, sex, or national origin, are morally superior to members of another race, color, sex, or national origin.

2. An individual, by virtue of his or her race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

3. An individual's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, sex, or national origin.

4. Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to race, color, sex, or national origin.

5. An individual, by virtue of his or her race, color, sex, or national origin bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, sex, or national origin.

6. An individual, by virtue of his or her race, color, sex, or national origin, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7. An individual, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of

7

actions, in which the individual played no part, committed in the past by other members of the same race, color, sex, or national origin.

8.     Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin.

FLA. STAT. § 760.10(1)–(8) (as amended by the Act).

The Act draws a clear distinction, however, between *advocacy* and *discussion* of these concepts as part of required job training. Specifically, the Act directs that it "may not be construed to prohibit discussion of the concepts listed therein as part of a course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." *Id.* § 760.10(8)(b).

## II.     Proceedings Below.

Plaintiffs—two Florida businesses, a DEI consultant, and her consulting firm—brought suit against Governor DeSantis, Attorney General Moody, and the members of the Florida Commission on Human Relations, challenging the Act's employment provisions under the First Amendment and the Due Process Clause. The two business plaintiffs claim that they would like to espouse propositions that allegedly fall within one or more of the Act's eight prohibited concepts at mandatory employee training events and that by barring them from doing so, the Act violates their First Amendment rights. Both also claim that the Act's language is

8

unconstitutionally overbroad and vague under the Due Process Clause. The consultant plaintiff claims that she offers mandatory employee training sessions that espouse propositions that allegedly fall within one or more of the Act's eight concepts, that the Act violates the First Amendment and Due Process Clause, and that the Act has harmed, and will continue to harm, her business.

A little over a week after filing their complaint, Plaintiffs filed an amended complaint and a motion for a preliminary injunction. Defendants opposed the requested injunction, and they simultaneously moved (1) to dismiss Governor DeSantis under the Eleventh Amendment and for lack of standing, and (2) to dismiss all of Plaintiffs' claims on the merits, under Rule 12(b)(6). On August 18, 2022, the district court, Judge Mark A. Walker presiding, denied the motion to dismiss and entered a Preliminary Injunction barring Defendants from enforcing the Act's employment provisions. The court, likening itself to "the heroine" in the popular Netflix series *Stranger Things*, concluded that its task was "to pull Florida back from the upside down," the series' fictional "parallel dimension containing a distorted version of our world." App.101.

The court began by assessing Plaintiffs' standing. It concluded that each of the Plaintiffs had adequately alleged injury in fact. App.107, 111. However, it declined to issue any injunction as to Governor DeSantis, concluding that under the standard for a preliminary injunction, the plaintiffs had not sufficiently shown the

specific enforcement authority necessary to make their injuries "traceable to Governor DeSantis or redressable by an injunction against him." App.113, 114.[1]

On the merits, the district court held that the Act was likely contrary to the Free Speech Clause and unconstitutionally vague. It rejected Defendants' argument that the challenged provisions merely restrict an employer's non-speech *conduct* of mandating attendance at certain training sessions, reasoning that "the [Act] does not target trainings because they are mandatory; the [Act] targets trainings because of the speech delivered at them." App.122. It did not explain how this conclusion could possibly be squared with the express statutory language limiting the Act's employment provisions to those "required activit[ies]" that an employee is forced to attend "as a condition of employment." FLA. STAT. § 760.10(8)(a). Because it nonetheless interpreted the Act as imposing a "viewpoint-based restriction on speech," the court applied strict scrutiny and held the Act likely unconstitutional under that standard. App.123. It concluded that the State's interest in protecting employees from being forced to attend mandatory instruction inculcating views that the People of Florida have determined to be invidiously racially discriminatory is not a compelling one. App.125. And it further concluded that the Act is not narrowly

---

[1] In its simultaneous ruling denying Defendants' Motion to Dismiss, however, the court found that Plaintiffs had met their lesser burden under Rule 12(b)(1) to allege sufficient facts to support a reasonable inference that "Governor DeSantis has the requisite connection to the [Act]" to satisfy both Article III and the Eleventh Amendment. App.146.

tailored to serve that interest, principally because other anti-discrimination laws addressing the State's concerns already exist. App.126.

Finally, though it rejected Plaintiffs' overbreadth claim, the district court alternatively held that the Act is unconstitutionally vague. While it conceded that "Defendants may be right that some of the prohibited concepts are not vague," it concluded that three features of the Act "certainly are":

- Concept 1's bar on mandatory speech advocating that members of one race are "morally superior" to others;

- Concept 4's bar on mandatory speech advocating that individuals "cannot and should not attempt to treat others without respect to race, color, sex, or national origin," which the Court faulted as "bordering on unintelligible," largely for "feature[ing] a rarely seen triple negative;" and

- The Act's exception allowing "discussion" of the enumerated concepts "as part of a course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts," which the court—relying on such authorities as Immanuel Kant's *Critique of Practical Reason* and Friedrick Nietzsche's *On the Genology of Morals*—held impermissibly relied on the "inherently vague" distinction between discussing a concept "in an objective manner" and endorsing it.

App.131, 132, 135, 137. Finally, because the exception for objective "discussion" of the concepts "commands the entire statute," the court concluded that the *Act as a whole* "is impermissibly vague." App.137.

Accordingly, after briefly discussing the remaining injunction factors—and after contrasting the Act's enumerated concepts to a 2015 Title VII hostile-

environment claim involving "a white woman in a black gorilla suit" who subjected employees attending a mandatory training session to a variety of racially derogatory slurs and actions, App.142—the court granted a preliminary injunction barring enforcement of the Act's employment provisions.

## STANDARD OF REVIEW

"In this Circuit, a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (cleaned up). Those prerequisites are that "(1) [the movant] has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270–71 (11th Cir. 2020). This Court "review[s] the grant of a preliminary injunction for abuse of discretion," and "any underlying legal conclusions *de novo*." *Id*. at 1270. "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner,

. . . or makes findings of fact that are clearly erroneous." *Id*. (quotation marks omitted).

## SUMMARY OF THE ARGUMENT

I.A.   The First Amendment does not apply at all to the Act's employment provisions because they do not regulate speech. Instead, the Act regulates non-speech conduct: an employer's action of mandating attendance at certain training sessions or other required employment activities and sanctioning employees who disobey. And under binding Supreme Court precedent, regulation of conduct, even if it incidentally burdens speech, does not implicate the First Amendment. The district court's reasons for concluding otherwise are unpersuasive.

The court held that the Act must regulate speech because one must look at the content of the speech to determine whether the Act's restriction on employer conduct applies. But a threshold inquiry into the content of speech is not itself a regulation of speech. If enforcement of a law requires an inquiry into the content of speech to *restrict or burden that speech*, then of course the First Amendment applies. But if the purpose of looking at the content of speech is to *restrict non-speech conduct*, there is no First Amendment problem. Indeed, such content-based threshold inquiries are common throughout the law—from criminal conspiracy law to the tax code. Nor does the conduct regulated by the Act qualify as constitutionally protected *expressive* conduct. While some employers may *intend* to express a message by

13

mandating attendance at training seminars, that conduct does not *inherently* convey any message. For the conduct could just as easily be based on any number of non-speech reasons.

B.    Even if the Act were subject to First Amendment scrutiny, it would pass it. The Act serves two compelling state interests: (1) protecting Florida's workers from being conscripted into a captive audience and forced to listen to speech they do not want to hear, and (2) protecting the workplace from speech that invidiously discriminates on the basis of race, color, sex, or national origin. The Act is narrowly tailored to advance these interests, since it only applies when *both* interests are united: the workplace where an employer requires its employees, as a condition of keeping their jobs, to involuntarily attend training sessions advocating views that the employees, like the State of Florida, believe are invidiously discriminatory. The district court's conclusion that the Act is not narrowly tailored to advance these compelling interests was deeply flawed, and it necessarily implies that speech-based Title VII hostile environment claims violate the First Amendment—no matter how the district court strained to disown that implication.

II.    None of the Act's provisions are unconstitutionally vague; they are expressed in terms that are commonly used and readily understood in everyday discourse. The meaning of the concept that one race or sex is "morally superior" to others is easy for anyone to discern. So is the concept that individuals must not try

14

to treat others "without respect to race, color, sex, or national origin." Indeed, while the district court assailed this provision's supposedly inscrutable "triple negative," the court's discussion of the concept shows that it in fact it had no difficulty grasping its plain meaning. And while the line between "endors[ing]" the concepts and "discuss[ing]" them "in an objective matter" may have perplexed Eighteenth and Nineteenth Century German philosophers, it is apparent to ordinary people. Indeed, the whole concept of the rule of law *is built* on this distinction.

III.    To the extent any provision of the Act is unconstitutional, it should be severed from the remainder of the Act under settled principles. The district court thought otherwise because, in its view, the vagueness of the Act's exception for "objective" discussion of the concepts infected the entire Act. But even if this exception is unconstitutionally vague (and it is not) because the meaning of *objectivity* is purportedly "impossible" to discern, that does not mean that the Act's general rule is *also* unconstitutionally vague—for surely no one can genuinely fail to understand what it means to *endorse* the enumerated concepts.

IV.    The remainder of the preliminary injunction factors weigh against the relief granted below. The only irreparable harm alleged by Plaintiffs—the infringement of their constitutional rights—collapses along with the merits of their claims. And the district court's injunction harms the State's strong interest in the continued enforcement of its anti-discrimination laws.

15

## ARGUMENT

## I.    The Act's Employment Provisions Do Not Violate the First Amendment.

The challenged provisions of the Individual Freedom Act do not violate the First Amendment, and Plaintiffs' claims challenging these employment provisions are thus unlikely to succeed.

### A. The Employment Provisions Govern Conduct, Not Speech.

Plaintiffs' First Amendment challenge to the employment provisions collapses in the starting gates because these provisions do not regulate speech. Rather, the employment provisions regulate pure conduct: an employer's non-expressive, commercial action of imposing "a condition of employment" that requires its employees to attend, on pain of termination or other sanction, certain instruction or training activities. Defendants do not dispute that the instruction and discussion that *occurs during* workplace training sessions constitutes speech. But *that* speech remains as free and unrestrained as it was before the passage of the Act; all the Act says is that employers cannot engage in the action of *forcing their employees to attend such sessions and sanctioning them if they disobey*. Accordingly, the Act regulates conduct, not speech, and "[s]tatutes that regulate non-expressive conduct do not implicate the First Amendment at all even if they incidentally burden speech." *Norwegian Cruise Line Holdings Ltd v. State Surgeon Gen.*, 50 F.4th 1126, 1135 (11th Cir. 2022) (cleaned up).

16

1.    While drawing the line between speech and conduct may at times be difficult, the Supreme Court's precedents "have long drawn it, and the line is long familiar to the bar." *National Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2373 (2018) (internal quotation marks and citations omitted). "[R]estrictions on protected expression are distinct from restrictions on economic activity," and "the First Amendment does not prevent" the latter. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). "Anti-discrimination statutes ordinarily regulate non-expressive conduct," *Norwegian Cruise Line*, 50 F.4th at 1136, and that is the case here: the Act's provisions regulating Florida employees are antidiscrimination provisions that lie safely on the "conduct" side of line.

Yes, workplace "training" and "instruction" events necessarily involve speech. But the Act does not restrict that speech in the slightest. Employers remain free under the Act to arrange, sponsor, and pay for training events advocating, for example, that members of one race are morally superior to members of another and/or that certain employees, by virtue of their race or sex, are "inherently racist, sexist, or oppressive," FLA. STAT. § 760.10(8)(a).[2] Consultants remain free to espouse these ideas and to collect fees for doing so, and employees who wish to attend such training events remain free to do so. The *only thing* that the Act prohibits

_____

[2] Subject, of course, to any other relevant principles of federal or state anti-discrimination law not challenged here.

17

is this: an employer may not make attendance at training events or sessions designed to indoctrinate employees to believe those concepts a mandatory "condition of employment." *Id.*

The Act's employment provisions thus do not impose even an incidental burden on speech. Again, everything that could be said on the topic of race, color, sex, or national origin *before* the Act goes into effect can *also* be said *after*. But even if the Act's limits did somehow *incidentally* burden speech, heightened constitutional scrutiny would still not apply. For "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell*, 564 U.S. at 567; *see also Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 62 (2006); *Norwegian Cruise Line*, 50 F.4th at 1138–39; *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978); *Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011).

After all, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *FAIR*, 547 U.S. at 62 (internal quotation marks omitted). A legislature, for example, can prohibit racial discrimination in hiring without violating the First Amendment, even though such a prohibition would require an employer to take down a sign reading "White Applicants Only." *FAIR*, 547 U.S. at 62. And here, the

Individual Freedom Act does not even impose *that* much of a burden on speech. Rather, the Act's employment provisions are akin not to a prohibition on a "White Applicants Only" sign, but rather to a prohibition on an employer's practice of *forcing all employees to look at it*.

The Supreme Court's decision in *Rumsfeld v. FAIR* conclusively shows that the First Amendment offers no resistance to Florida's regulation of employer conduct. *FAIR* concerned the constitutionality of the Solomon Amendment, which required law schools to provide military recruiters equal access to students as any other recruiter. The Court concluded that the Solomon Amendment regulated conduct, not speech: "It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id.* at 60. Any speech that was affected by the Amendment—such as "send[ing] e-mails or post[ing] notices on behalf of the military"—was "plainly incidental to the Solomon Amendment's regulation of conduct." *Id.* at 61–62.

So too here. Just as the Solomon Amendment "affect[ed] what law schools must *do*," *id.* at 60, the Act's employment provisions solely affect *the conduct* of employers: mandating attendance at training sessions espousing the invidiously discriminatory principles at issue, on pain of losing your job. And just as "[l]aw schools remain free under the statute to express whatever views they may have on the military's congressionally mandated employment policy," *id.*, employers,

19

employees, and consultants, remain free under Florida's Act to express whatever views they may have, including those pertaining to matters of race, color, sex, religion, or national origin. The only thing employers may not do is force, on pain of sanction, their employees to listen to those views if they do not wish to.

This Court's recent decision in *Norwegian Cruise Line* further confirms that the Act does not implicate the First Amendment. That case concerned a Florida law barring businesses from requiring, as a condition of service, documentation that a prospective patron had received the COVID-19 vaccine. Norwegian sued, claiming that this rule violated the First Amendment by "restrict[ing] the free flow of vital, potentially life-saving information by targeting only one type of *written* information exchange." 50 F.4th at 1137. This Court found that claim unlikely to succeed because it concluded—without dissent, as to this issue—that the Florida law was a regulation of conduct, not speech. The law, the Court reasoned, "limits no communications between customers and businesses." *Id.* Instead, it prohibited *conduct*: "What businesses may *not* do is close their doors to customers who decline to present private medical documentation." *Id.* And *that* restriction "does not implicate the First Amendment at all." *Id.* (cleaned up). As in *Norwegian*, so too here: The Act "limits no communications" between employers and employees; all "businesses may *not* do" is *require their employees to attend* training sessions or activities where the prohibited ideas are espoused. *Id.*

20

Finally, this Court's en banc decision in *Wollschlaeger v. Governor of Florida*, 848 F.3d 1293 (11th Cir. 2017) (en banc), is to the same effect. *Wollschlaeger* held that a provision of Florida's Firearm Owners' Privacy Act ("FOPA") prohibiting doctors from discriminating against patients for owning firearms did not implicate the First Amendment because it could be construed "to apply to non-expressive conduct such as failing to return messages, charging more for the same services, declining reasonable appointment times, not providing test results on a timely basis, or delaying treatment because a patient . . . owns firearms." 848 F.3d at 1317. Based on that construction, the court concluded that "there is no First Amendment problem." *Id.* Here, a saving construction is unnecessary: the Individual Freedom Act's employment provisions, by their plain terms, apply only to the non-expressive conduct of *requiring* employees to attend training sessions where the kind of speech identified by the Act occurs.

To be sure, *Wollschlaeger* also held that other provisions of that law were subject to heightened scrutiny because the Court found them to be "speaker-focused and content-based restrictions" on speech. *Id.* at 1307; *see also Otto v. City of Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020) (similarly characterizing a restriction on the type of therapy a professional could provide). Here, however, no one, not even Plaintiffs, disputes that an employer's action of sanctioning an employee for refusing to attend a training session is conduct, not speech.

21

2.    The district court attempted to distinguish *FAIR*, *Wollschlaeger*, and the similar cases on the basis that those cases did not deal with a regulation of conduct that is triggered by looking to the content of certain speech. While the Solomon Amendment, the court reasoned, "can be understood without reference to speech," the Act "cannot be understood without reference to the underlying speech's content." App.120. The court also rejected the argument that the Act merely imposes an incidental burden on speech, reasoning that "where the only conduct which the State seeks to punish is the fact of communication, the statute regulates speech, not conduct." App.119 (cleaned up).

This analysis is fundamentally misguided. To begin, its necessary premise—that "the only conduct which the State seeks to punish is the fact of communication," *id.*—is clearly mistaken. Instead, what the Act punishes is conduct that is *quite readily* "separately identifiable" from speech, App.119: *mandating attendance* of unwilling employees at the sessions where the speech occurs. Thus, the district court's repeated insistence that "the problem" under the Act "is not that Plaintiffs wish to hold mandatory trainings," *id.*, is simply wrong. If Plaintiffs did not wish to hold trainings that were mandatory, *the Act would have no application whatsoever* to them.

To be sure, the Act's regulation of conduct is triggered, in part, by the expression of speech with a particular content. But that poses no First Amendment

problem, because what *results* when the Act is triggered is *not* any restriction or burden on *the speech*, but a restriction on *the conduct*. This type of content-based threshold inquiry is common throughout the law. Indeed, it was present in *Norwegian*. There, to decide whether business had violated the statute, a person would need to determine why the business refused service to a patron. *Norwegian*, 50 F.4th at 1137. That inquiry would often (if not always) require an inquiry into the business' speech. *Id.* (explaining that businesses could have discussions with customers about vaccine status). But this Court found that the statute regulated only conduct. *Id.* at 1137–38. Likewise, the crime of conspiracy requires, as an element, an *agreement* to commit a crime. *See* MODEL PENAL CODE § 5.03(1) (Am. Law. Inst. 1985). Accordingly, to determine whether someone has engaged in a conspiracy, one typically must look at the content of their speech to see whether it constitutes such an agreement. But because conspiracy law burdens *the conduct* and not *the speech* (at least in those cases where the underlying crime does not itself involve speech), there is no First Amendment problem. *See Brown v. Hartlage*, 456 U.S. 45, 55 (1982) ("The fact that such an agreement necessarily takes the form of words does not confer upon it, or upon the underlying conduct, the constitutional immunities that the First Amendment extends to speech.").

The tax code provides another example. To determine whether a charitable organization qualifies for certain tax benefits, one must look at *the content of their*

*speech*. *See, e.g.*, 26 U.S.C. § 501(c)(3). But again, the fact that the tax law is triggered by the content of speech poses no First Amendment difficulties, because when the trigger is pulled, the result is not a cognizable burden on that speech. *See Regan v. Taxation With Representation*, 461 U.S. 540, 549–50 (1983). The Supreme Court has explained the principle that unites these examples in unmistakable language: "We have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct." *Hill*, 530 U.S. at 721. That is the complete answer to the district court's view that the Act "[p]lainly . . . regulates speech" because one must "look at [the] speech" to "determine whether the [Act] bars a mandatory activity." App.117; *see also City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1474 (2022) (rejecting "the view that *any* examination of speech or expression inherently triggers heightened First Amendment concern").

The court relied on the Supreme Court's decision in *Cohen v. California*, 403 U.S. 15 (1971), as support for its reasoning. That landmark case involved the prosecution of Cohen for disturbing the peace by wearing, into a courthouse, a jacket bearing the words "F[---] the Draft." While California's law regulated conduct creating a disturbance as a general matter, its application to Cohen was based solely on his speech: "The only 'conduct' which the State sought to punish is the fact of

communication." *Id.* at 18. The Supreme Court thus struck down the statute's application to Cohen under the First Amendment.

*Cohen* has no application here. This case does not involve a generally applicable conduct regulation that happens to restrict the content of Plaintiffs' *speech*; it involves a conduct regulation that *restricts Plaintiffs' conduct*. Again, Plaintiffs identify no speech, writing, or expression of any type that they were free to communicate before the Act took effect but can communicate no longer. The whole point in *Cohen*, by contrast, was that California's law restricted his speech. *Id.* at 19. Indeed, the district court's own discussion of *Cohen* shows why it does not apply here. "[I]n *Cohen*," it explained, "the problem was not that the defendant wore a jacket to court (conduct), but that the jacket said 'F[---] the Draft' on it (speech)." App.119. Correct. Cohen's *conduct* was irrelevant to his offense: he would have been just as guilty of breaching the peace if he had *shouted* his message in the courthouse. But here, Plaintiffs remain free to engage in any speech they wish (including holding training sessions endorsing the Act's eight concepts), so long as they refrain from the prohibited conduct (sanctioning employees for refusing to attend such sessions).

3.    The district court also offered an alternative theory for its result: that the Act is triggered not only by an inquiry into *content*, but an inquiry into *viewpoint*. The Act "does not ban all mandatory employee trainings," it noted, nor all

"mandatory trainings addressing certain concepts," but only those "trainings that *endorse* the covered concepts." App.117. And, according to the district court, the Supreme Court's statement in *Hill* that a law does not implicate the First Amendment simply because one must "look at the content" of speech "in order to determine whether [it] applies," *Hill*, 530 U.S. at 721, does not apply where the law "turn[s] on . . . the viewpoint . . . of th[e] speech." App.120 n.6; *see also* App.118 n.4.

This line of reasoning fails too, and for the same reason. For while one must look at the viewpoint expressed in a mandatory training seminar to determine whether the Act applies, *if it does* apply, the result is *not* a *restriction on the speech expressing that viewpoint.* That speech, to belabor the point, remains just as uninhibited as if the Act did not exist at all. Instead, what results from the inquiry into the *speech's viewpoint* is a restriction on the *conduct*: the employer's act of making employees, on pain of sanction, attend a seminar designed to inculcate the identified concepts in employees. And again, this type of viewpoint-based threshold inquiry is common throughout the law, as can be seen from the examples discussed above. They also involve a threshold inquiry not only into the *content* of speech but the *viewpoint* expressed. In the example of conspiracy law, it is only *agreement* with the proposed criminal act, not disagreement or discouragement of the crime, that triggers the application of the law. *See* MODEL PENAL CODE, *supra*, at § 5.03(1). And the tax law governing charitable organizations, too, inquires into the viewpoints the

26

organizations express, not just the content of their speech, when determining their tax status. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 586–92 (1983).

The permissibility of such a threshold inquiry into the viewpoint expressed by certain speech—so long as the law imposes no *burden* on the expression of that viewpoint—follows from the basic principles of First Amendment jurisprudence. Where a law regulates conduct, not speech, the Free Speech Clause simply *has no application at all*—and the First Amendment doctrine prohibiting viewpoint-based discrimination, *a fortiori*, also has no application. That is why the government may more heavily punish racially motivated crimes, *Wisconsin v. Mitchell*, 508 U.S. 476, 487–88 (1993); 18 U.S.C. § 249; 18 U.S.C. § 247, and discriminate based on viewpoint when it is speaking itself, *see Garcetti v. Ceballos*, 547 U.S. 410, 417–19 (2006); *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015), or when it is subsidizing the speech of others, *see Rust v. Sullivan*, 500 U.S. 173, 194 (1991). And that is why, while "a sign reading 'White Applicants Only' " obviously expresses a particular *viewpoint*, if a prohibition on such a sign qualifies as "incidental to the . . . regulation of conduct," the First Amendment—and its doctrine prohibiting viewpoint-based discrimination—pose no obstacle. *FAIR*, 547 U.S. at 62.

The precedents cited by the district court do not support its theory. *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), struck down a Vermont law barring drug

manufacturers from obtaining certain prescription information for marketing purposes. Because "the creation and dissemination of information are speech within the meaning of the First Amendment," the purported *conduct* at issue in *Sorrell*— the sale of the prescription information in question—*was itself protected speech*. *Id.* at 570. Accordingly, the Court concluded that the law "on its face and in its practical operation . . . imposes a burden based on the content of speech." *Id.* at 567. As discussed, that is simply not the case here.

Similarly, in *Dana's Railroad Supply v. Attorney General*, this Court found a First Amendment violation because the Florida law at issue—which allowed merchants to offer *discounts* to customers using cash rather than credit cards but barred them from calling them a "surcharge" on the use of credit cards—could only be understood as "target[ing] expression alone." 807 F.3d 1235, 1245 (11th Cir. 2015). The law thus left employers free to engage in the *conduct* at issue (charging differential amounts for cash and credit transactions), but not the *speech*. This case presents the precisely opposite scenario. Accordingly, neither *Sorrell* nor *Dana's Railroad Supply* support the district court's conclusion that the First Amendment does not allow the law to *examine* the viewpoint expressed by speech *even when it imposes no burden on the expression of any viewpoint*.

4.    As a last resort, the district court suggested—in a footnote—that even if the Act regulates conduct, rather than speech, "[t]he act of holding a mandatory

28

training . . . appears to be *expressive* conduct." App.120 n.7 (emphasis added). This argument also fails.

While the First Amendment applies by its terms only to "speech," the Supreme Court has held that it also protects conduct that constitutes "symbolic speech." *FAIR*, 547 U.S. at 65. But the Court has "rejected the view that conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea. Instead, [the Court has] extended First Amendment protection only to conduct that is *inherently* expressive." *Id.* at 65–66 (cleaned up) (emphasis added). And to determine whether conduct meets this standard, the Court asks whether a reasonable "observer" who sees the purportedly expressive conduct—but is not acquainted with any "speech explaining" the message that the actor engaging in the conduct was intending to express—would nonetheless necessarily conclude that conduct was meant to express some message. *Id.* at 66; *see also Norwegian Cruise Line*, 50 F.4th at 1139.

Under this test, the familiar examples of symbolic speech obviously qualify as expressive. A reasonable observer viewing the ostentatious public burning of a draft card, or of the American flag, would need no further explanation to conclude that the conduct expressed a message of some kind. But in *FAIR*, the Supreme Court rejected the argument that a law school's refusal to allow military recruiters to interview students on campus was necessarily expressive. For while many law

29

schools no doubt *intended* to send a message through that conduct, "these actions were expressive only because the law schools accompanied their conduct with speech explaining it." 547 U.S. at 66. And we know that is so, the Court explained, because "[a]n observer who sees military recruiters interviewing away from the law school"—but who is unacquainted with the law schools' speech explaining their reasons for that differential treatment—"has no way of knowing whether the law school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else." *Id.*; *see also Norwegian Cruise Line*, 50 F.4th at 1139 ("An observer who sees a patron board cruise A instead of B has no way of knowing whether B is expressing its disapproval of the unvaccinated passengers, all B's rooms are full, or the patron decided for reasons of their own that they would rather go on A." (cleaned up)).

On this point, too, *FAIR* controls this case. True, some, perhaps many, employers may "intend the trainings [prohibited by the Act] to send a message about their values," App.120 n.7. But as in *FAIR*, a reasonable observer—unacquainted with any actual speech explaining those values—who observes a workplace training session would "ha[ve] no way of knowing," 547 U.S. at 66, that the employer, in holding that training, was "sending a message about the company's priorities," App.120–21 n.7, because there are many other entirely plausible non-expressive

reasons that the employer may be engaging in that conduct. The employer may, for example, be mandating attendance at the training because it is required to do so by law. *See, e.g.*, 29 C.F.R. § 1910.30 (requiring employers to provide certain mandatory safety training). Or the employer may require certain types of training to reduce the risk of legal liability. *See Williams-Boldware v. Denton Cnty.*, 741 F.3d 635, 640, 641 (5th Cir. 2014) (no Title VII liability where the employer took "prompt remedial action," including mandating diversity training). Because an observer viewing a training session would "ha[ve] no way of knowing," *FAIR*, 547 U.S. at 66, whether the employer was conducting it to "send a message about [its] priorities," App.120–21 n.7, or for one of these non-expressive reasons, that conduct is not "inherently expressive," *FAIR*, 547 U.S. at 66, and the First Amendment does not protect it.

The district court attempted to brush aside these alternative explanations for the conduct in question, arguing that in each of these alternative scenarios, "the employer has little choice but to hold the training," and an employer's choice "to require trainings even though they do not need to . . . is what renders [the] conduct expressive." App.121 n.7. But in *FAIR*, the Court treated the reasonable observer as one who saw the recruiters interviewing off campus, not one who knows about why the law school has its policy. *See* 547 U.S. at 66. The district court's analysis would make the reasonable-observer test tautological. One cannot begin the inquiry by

31

informing the hypothetical reasonable observer that all of the plausible non-expressive explanations for the conduct *are not* the real explanation. After all, if the actor's "choice" to engage in the conduct "even though they do not need to . . . renders [the] conduct expressive," *id.*, and the reasonable observer is informed that the actor voluntarily chose to engage in the conduct, then the inquiry *will always* yield the conclusion that the conduct at issue is inherently expressive.

Once again, *FAIR* is the clincher. There, in both of the alternative explanations hypothesized by the Court—no vacancy on campus or the choice by the Military to "interview somewhere else"—the school would effectively have had no choice but to engage in the conduct of relegating the interviews to an off-campus location. But that did affect the Court's conclusion that this conduct was not inherently expressive, for the purpose of the inquiry is to determine how a reasonable person would view the matter after observing *only the conduct* at issue—and not the actor's explanation that it is *choosing* to engage in the conduct to send a message. Under the district court's reasoning, *FAIR* would have necessarily come out the other way.

### B. In Any Event, the Employment Provisions Also Survive Heightened Scrutiny.

Even if the Act's employment provisions were subject to First Amendment scrutiny, they would survive it, and so Plaintiffs' challenge would still be unlikely to succeed. The district court erred in concluding otherwise.

1.    The Act serves an interest that is unquestionably of the highest import: stamping out invidious discrimination in the workplace. By enacting the Act, Florida deemed the forcible workplace indoctrination into certain concepts—*e.g.,* espousing the moral superiority of one race over another, or proclaiming that an individual, by virtue of his or her race, is inherently racist, or endorsing the racially discriminatory treatment of individuals because of past racist acts in which they played no part— to constitute "discrimination based on race, color, sex, or national origin." FLA. STAT. § 760.10(8)(a). While employers remain free to conduct trainings that discuss those concepts, and even to force their employees to attend trainings discussing them as a condition of employment, it will not allow the endorsement of these discriminatory concepts at those trainings. *Id.* § 760.10(8)(b). The compelling nature of the State's interest in preventing such invidious discrimination is beyond dispute. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983). Indeed, it is so fundamental that it is embodied in our highest law. The Equal Protection Clause "prevent[s] the States from purposefully discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642 (1993). Such discrimination is "odious to a free people whose institutions are founded upon the doctrine of equality." *Loving*, 388 U.S. at 11.

These interests plainly extend into the workplace. The Supreme Court has recognized the "compelling state interests" in "[a]ssuring women equal access" to

33

"business contacts and employment promotions," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984), and Florida's interest in eradicating discrimination in the workplace based on race, color, national origin, or religion is, if anything, even more weighty, *see United States v. Paradise*, 480 U.S. 149, 170 (1987) (recognizing "compelling interest in remedying the [racial] discrimination that permeated entry-level hiring practices and the promotional process" by state agency); *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1536 (M.D. Fla. 1991) (collecting cases).

2.    Moreover, Florida's compelling interest in preventing race or sex discrimination, under the Act, is united with another: "protect[ing] its citizens against unwilling exposure to materials that may be offensive" in those situations where "the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 208–09 (1975).

The Supreme Court has long held, in a variety of contexts, that the States have a "substantial and justifiable interest" in protecting individuals in a "captive audience" from being forced to listen to speech when they "are presumptively unwilling to receive it." *Frisby v. Schultz*, 487 U.S. 474, 487–88 (1988). For "the protection afforded to offensive messages does not always embrace offensive speech that is so intrusive that the unwilling audience cannot avoid it." *Hill v. Colorado*, 530 U.S. 703, 716 (2000). Instead, "the right of every person 'to be let alone' must

34

be placed in the scales with the right of others to communicate," *Rowan v. United States Post Off. Dep't*, 397 U.S. 728, 736 (1970), leaving the states with a compelling interest in protecting "[t]he unwilling listener's interest in avoiding unwanted communication," *Hill*, 530 U.S. at 716.

This interest is of course most acute in the home. *Rowan*, 397 U.S. at 737. But Supreme Court precedent also establishes that the Government has an interest in protecting unwilling listeners outside the home, in those situations where "the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." *Erznoznik*, 422 U.S. at 209. In *Lehman v. City of Shaker Heights*, for example, the Court upheld a city's rule barring the display of "paid political advertising" in its mass-transit vehicles. 418 U.S. 298, 299 (1974) (plurality). Though no single opinion commanded a majority, both the plurality opinion and Justice Douglas's concurrence emphasized the captive nature of commuters and their right to avoid unwanted speech. The City's rule, the plurality concluded, was designed to minimize "the risk of imposing upon a captive audience." *Id.* at 304; *see also Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 677-78, 684 (1986) (upholding State's authority "to protect children—especially in a captive audience—from exposure to sexually explicit, indecent, or lewd speech" at school); *Hill*, 530 U.S. at 707, 718 (upholding state restrictions on "speech-related conduct within 100 feet of [an abortion clinic]" in part based on "the interests of unwilling listeners in

situations where the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure" (quotation marks omitted)).

The Act's employment provisions apply—and only apply—in precisely such a captive audience situation. Those provisions liberate an employee from being coerced into attending an instructional event that he cannot, practically, avoid—at least not without risk to his livelihood. Other First Amendment precedents recognize that the degree of protection for "an employer's free speech right to communicate his views to his employees . . . must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969).

The district court held that the captive audience doctrine could not prevent the application of strict scrutiny because the Act regulates speech (it does not, *see infra*, Part. I.A) on the basis of the viewpoint expressed. *See* App.122 ("*Lehman* surely would have come out differently had the city banned only political advert[is]ing criticizing incumbents."). But even if the court's reasoning shows that "strict scrutiny still governs," *id.*, when it comes to the *application* of that scrutiny, nothing the district court said casts any doubt on the "substantial and justifiable" nature of Florida's interest in protecting "those who are presumptively unwilling to receive"

36

"offensive speech" from being forced to listen to it on pain of losing their jobs, *Frisby*, 487 U.S. 487–88.[3]

3.     The Act is narrowly tailored to further these compelling interests. It focuses with surgical precision on mandatory instruction that reflects invidious bias against certain employees on the basis of their race, sex, national origin, or religion; discriminatory principles that the targeted employees are forced to hear or else suffer the consequences. It is in this narrow context that Florida's interests—in (1) protecting against invidiously biased, hostile speech aimed at employees on the basis of their race, sex, religion, or national origin and (2) preventing employers from coercing their employees to hear speech that they, like the Florida Legislature, find abhorrent—unite and are at their apex. And the employment provisions are the least restrictive means of curbing this practice. They leave employers free to engage in, promote, and pay for any speech they wish, including the invidiously discriminatory speech targeted by the Act, and they leave willing employees free to hear and to join

---

[3] The court also reasoned that while "trainings are admittedly at the center of this case," the Act also bars "any required activity at which the eight forbidden concepts are discussed and endorsed," which could conceivably include "phone calls, assignments, [and] discussions." App.117. But by the Act's plain text, the one feature that unites *any* work activity that it may reach is that the activity is "required" "as a condition of employment, membership, certification, licensing, credentialing, or passing an examination." FLA. STAT. § 760.10(8)(a). And an employee who is compelled to listen to speech in any of the contexts governed by the Act, on pain of losing his or her livelihood, unquestionably faces a "degree of captivity [that] makes it impractical . . . to avoid exposure." *Erznoznik*, 422 U.S. at 209.

in it. All they prevent is the use of the employer's coercive economic leverage over its employees to make them an offer they can't refuse: Attend the company's training session to hear its advocacy of the prohibited concepts or clear out your desk. In those respects, the law is far more narrowly tailored than the categorical denial of tax exemptions to schools that engage in racial discrimination that survived strict First Amendment scrutiny in the *Bob Jones* case. *See* 461 U.S. at 604.

The district court concluded otherwise "because the [Florida Civil Rights Act of 1992] already prohibited much of what Defendants claim the [Act] aims to prohibit. For example, a diversity and inclusion training could be so offensive, and so hostile to White employees, that it could create a hostile work environment. That is already illegal . . . ." App.126. But the question for purposes of the narrow tailoring analysis is whether the Act's decision to define specific kinds of conduct as discriminatory is tailored to further its interests in protecting employees from being forced to hear their employer advocate these discriminatory ideas or risk losing their jobs. The Legislature has a compelling interest in detailing conduct that is discriminatory. That the Act also contains a more general prohibition on discrimination is beside the point.

In that regard, the district court's reasoning privileges *judicial* development of anti-discrimination law over *legislative* development. The availability of hostile environment claims under Title VII was a judicial innovation, *see Harris v. Forklift*

*Sys., Inc.*, 510 U.S. 17, 21 (1993), and the contours of the workplace conduct actionable under that doctrine have largely been developed and controlled by the courts. The Act, in contrast, represents the Florida Legislature's determination that forcing employees to hear the advocacy of certain ideas as a condition of employment constitutes actionable employment discrimination *by statute*, regardless of the ebb and flow of judicial hostile-environment case law. The district court cited no authority for the proposition that the First Amendment bars state legislatures from contributing to the development of anti-discrimination law in this way. There is none.

The implications of the district court's tailoring analysis are startling. Because the legislature acted once in 1992 to prevent workplace discrimination, it is apparently now constitutionally barred from enacting further refinements to what conduct qualifies as discrimination on the basis of race or sex. Again, we are aware of no authority for the proposition that the First Amendment creates some sort of legal straitjacket preventing Florida from expanding the protective reach of state anti-discrimination law to new practices that, in its sovereign judgment, are also discriminatory. To the contrary, as this Court has recently held, "[d]ifferent statutes can target different instances of the same kind of evil. And governments need not eliminate all discrimination whenever they wish to eliminate any." *Norwegian Cruise Line*, 50 F.4th at 1138.

4.    Even more startling, however, is the implication of the district court's reasoning that Title VII hostile environment claims may *themselves* violate the First Amendment. The court understandably disclaimed any intent to imply that conclusion, but the implication arises unavoidably from its core reasoning.

Hostile environment claims routinely arise from pure speech. In an early, well-known case in the Middle District of Florida, for example, a class of female employees prevailed in a hostile environment claim against the shipyard where they worked based on such examples of discrimination as the "pervasive posting of pictures depicting nude women," the use of sexually derogatory profanity, and the telling of "offensive joke[s]." *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1494, 1488, 1498–99 (M.D. Fla. 1991). The truly egregious speech at issue in *Robinson* was combined, in some instances, with harassment and other non-speech discriminatory conduct, but there is no question that many of the examples were comprised of pure, constitutionally protected speech, and that liability was based in part on these examples. And that result is hardly atypical. *See, e.g.*, *Daniels v. Essex Grp., Inc.*, 937 F.2d 1264, 1266 (7th Cir. 1991); *Waltman v. International Paper Co.*, 875 F.2d 468, 471 (5th Cir. 1989); *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1012 (8th Cir. 1988).

The Supreme Court has endorsed hostile environment claims, *see, e.g.*, *Harris*, 510 U.S. at 21–23, and *no* court, to Defendants' knowledge, has suggested

40

that this entire field of speech-based employment discrimination law is unconstitutional. Yet under the district court's reasoning, it is hard to see how Title VII can constitutionally reach these kinds of discrimination. The court *expressly rejected* the argument that the government can seek to prevent some speech "because it finds it 'repugnant,' no matter how captive the audience." App.125. It apparently concluded that Florida's interest in preventing racially discriminatory speech in the workplace, foisted on employees as a condition of their employment, *is not compelling. Id.* And it further expressly held that Florida *cannot*, consistent with the Constitution, even ban the practice of forcing employees to listen to their employer advocate the idea "that '[m]embers of one race, color, sex, or national origin are morally superior to members of another race, color, sex, or national origin." App.126 (suggesting that no one "could object to banning that" but immediately concluding that this concept "[is] not" "proscribable").

The district court's attempt to wall off its reasoning from extending to Title VII hostile environment claims was far from reassuring. It first suggested that Title VII is distinguishable because it "targets conduct" and "only incidentally burdens speech," while the Act "targets speech" and "only incidentally burdens conduct." App.123–24. But even if this perplexing distinction were sound in principle, the fact of the matter is that on the district court's reasoning, Title VII *does* regulate speech: for in that context, "the only conduct which the State seeks to punish is the fact of

41

communication," and a hostile-environment claim based on the pervasive presence of pornography, crude jokes, or sexually derogatory language "cannot be understood without reference to the underlying speech's content." App.118, 120. Ultimately, the court gave up on the effort to "identify the line at which an antidiscrimination law crosses from incidentally burdening speech to directly restricting speech," because it was convinced that "the [Act] sits comfortably on the direct-restriction side of that line and Title VII sits comfortably on the incidental-burden side." App.124. But the court offered scant reasoning to explain *why* the line should be drawn this way; and none is apparent.

The only point offered by the district court on this issue invoked the rule that a federal hostile environment claim will only lie where the "speech that creates this environment . . . is sufficiently severe or pervasive." App.123. This "severe or pervasive" requirement, however, is not a result of the First Amendment, but rather of Title VII's limitation to those practices that courts have concluded *impliedly* alter the terms and conditions of employment. *Harris*, 510 U.S. at 21–22. The requirement thus has little relevance here, where the Act reaches only that speech that is imposed upon an unreceptive employee as an *express* "condition of employment." FLA. STAT. § 760.10(8)(a). To the extent that the "severe or pervasive" requirement "provides shelter for core protected speech" by limiting hostile-environment claims to those contexts where the conditions of employment

42

have been altered, App.124 (quotation marks omitted), the Act's express limitation to those contexts provides *the same* shelter. And whether "severe or pervasive" or not, if the State truly lacks a compelling interest in prohibiting employers from forcing their workers to listen to speech telling them they are morally inferior because of their race, App.126, one is left with little hope that Title VII hostile environment claims can survive.

Unable to distinguish Title VII's application to discriminatory workplace speech from the Act's prohibitions, the district court amped up its rhetoric. The mere "suggest[ion] that the two are the same," the court said, "trivializes the freedom protected by Title VII." App.142 (quotation marks omitted). It then compared "two scenarios": one drawn from a hostile-environment case in the Fifth Circuit involving "a white woman in a black gorilla suit" engaging in egregious racially derogatory behavior as part of a Juneteenth celebration, and the other involving a mandatory training session politely discussing "a video about violence committed against Black people in the United States over the centuries." *Id.* And the court asserted that "Defendants say" these "two scenarios" "are indistinguishable." App.143.

Defendants said no such thing. And had we been confronted with that scenario, we would have said the opposite: a discussion of "violence committed against Black people in the United States over the centuries," is plainly allowed under the Act. *But we do say this*: The district court's conclusions that the Act

43

regulates speech, not conduct, and that the State has no compelling interest in preventing the forced indoctrination in the workplace of the offensive racially derogatory concepts prohibited by the Act, suggest that Title VII hostile environment claims are unconstitutional.

## II.    The Act's Employment Provisions Are Not Unconstitutionally Vague.

Having concluded that the Legislature lacks any compelling interest in specifying in detail the kinds of conduct it deems discriminatory beyond a vague, generalized prohibition on discrimination, the district court next concluded that the Legislature's attempt to detail that discrimination with specificity was unconstitutionally vague. App.127. That was wrong too. "Under the Due Process Clause, a law is void for vagueness if it fails to give ordinary people fair notice of the conduct it punishes or is so standardless that it invites arbitrary enforcement." *Jones v. Gov. of Fla.*, 975 F.3d 1016, 1046 (11th Cir. 2020). Neither condition is present here.

First, the Act provides fair notice because the "plain text of the [Act] sets forth clearly perceived boundaries." *Heyman v. Cooper*, 31 F.4th 1315, 1323 (11th Cir. 2022). Each of the challenged provisions uses plain, everyday language that has an "ordinary or natural meaning" that is either commonly known or can be easily discerned. *Tracy v. Florida Atl. Univ. Bd. of Tr.*, 980 F.3d 799, 807 (11th Cir. 2020) (consulting dictionary definitions to hold that a term was not unconstitutionally

vague). The "mere fact that close cases can be envisioned" in applying statutory requirements does not render a statute vague. *United States. v. Williams*, 553 U.S. 285, 305 (2008). Moreover, the Act applies solely to required employment training and is thus an "economic regulation" that "is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Village of Hoffman Est. v. Flipside, Hoffman Est., Inc.*, 455 U.S. 489, 498–99 (1982).[4]

Second, the Act's language is not "so standardless" that it invites arbitrary enforcement. *Jones*, 975 F.3d at 1046 (internal quotation marks omitted). Because Plaintiffs challenge the Act on a pre-enforcement basis, their burden to show the risk of discriminatory enforcement is much higher. *See Village of Hoffman*, 455 U.S. at 503 (in pre-enforcement context, "the speculative danger of arbitrary enforcement does not render the ordinance void for vagueness"); *see also High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1231 (11th Cir. 1982).

---

[4] The district court concluded that speech at issue "is not commercial speech," App.118 n.5, and Defendants never suggested otherwise. As the passage from *Hoffman Estates* just cited in the text explains, the rule that vagueness challenges to commercial regulations face a steeper hurdle has nothing to do with the *nature of the speech* at issue, or whether it qualifies as "commercial speech," but instead is based on those features of the relationship between regulators and commercial enterprises that are absent from the regulation of a private individual's conduct.

45

The district court rejected these arguments and held that the Act is unconstitutionally vague. Its reasoning on this score was limited to three provisions of the Act. None of them fails to provide fair notice of what the Act prohibits.

A.    The district court first held that Concept One—that "Members of one race, color, sex, or national origin, are morally superior to members of another race, color, sex, or national origin"—is "mired in obscurity" due to the indiscernible "meaning of 'morally superior.' " App.131. There is nothing to this. First, is there any plausible meaning of "morally superior" that could possibly render advocating this concept innocuous? In any event, the meaning of the term is not at all obscure. To be "superior" is to be "of higher rank, quality, or importance." *Superior*, MERRIAM-WEBSTER'S DICTIONARY (last visited Oct. 14, 2022), https://bit.ly/3AZWxuz. And to be "*morally* superior" is to be of higher quality in "conforming to a standard of right behavior." *Moral*, *id.*, https://bit.ly/3v4kc9h. Therefore, as relevant here, the Act prohibits endorsing the idea that members of one race are better than members of a different race at conforming to right standards of behavior. Of course, "the fact that the [Act] uses real words found in an English dictionary does not magically extinguish vagueness concerns." App.130. But courts routinely use dictionaries to determine that allegedly vague language in fact has an "ordinary meaning" that "is readily understandable." *Tracy*, 980 F.3d at 807. That is what the dictionary shows here, although consulting it is wholly unnecessary.

46

The district court resisted this conclusion, claiming that the plain meaning of the phrase "morally superior" in fact "further muddies the waters" because there is no way to discern whose standard of behavior should be deemed the morally "right" one: "One deemed right by the State? By an employer? By the 'morally superior' race?" App.131. The answer to this question is: *the standard of behavior held by the person claiming that one race is morally superior to another.* The Act is not an exercise in philosophy, and it does not call upon employers to ponder the unanswered questions of moral theory. Rather, it bars an employer from advocating—in a training session its employees are mandated to attend—that *it believes* the "[m]embers of one race" to be "morally superior to members of another race," FLA. STAT. § 760.10(8)(a)(1), based on whatever standard it adheres to.

B.    The district court also rejected as vague Concept Four—that individuals "cannot and should not attempt to treat others without respect to race, color, sex, or national origin." The court deemed this provision "unintelligible" because of its use of "a rarely seen triple negative," App.132, but that reasoning is little more than argument by wordplay. The concept prohibited by this provision is readily understandable—it is simply that an individual *must take a person's race or sex into account* when deciding how to treat them. If this provision is so unintelligible as to be unconstitutionally vague, one wonders what is to become of the thousands of far more intricate provisions that riddle the statute books. *See, e.g.*, 15 U.S.C. § 77k; 26

47

U.S.C. § 501; 52 U.S.C. § 30116. Indeed, the hypotheticals posed by the district court in the very next paragraph show that the court had no genuine difficulty whatsoever in cutting through the alleged "cacophony of confusion" purportedly created by the provision's "triple negative." App.132–33. Ordinary people will not have any difficulty either.

C.    The district court's final and most extended discussion concerns the alleged vagueness of the Act's exception for "discussion of the [eight] concepts . . . as part of a course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." It concluded that "objectivity" is "an inherently vague term," and that because "this 'objectivity' standard commands the entire statute," the Act is unconstitutionally vague *in its entirety*, and Plaintiffs are entitled to a blanket preliminary injunction against *all* of it. App.137 & n.13. Not so.

To discuss a concept "in an objective manner" is, obviously, to discuss it "without distortion by personal feelings, prejudices, or interpretations." *Objective*, MERRIAM-WEBSTER'S DICTIONARY (last visited Oct. 14, 2022), https://bit.ly/3zcLbB1. In contrast, to "endorse" a concept is "to give approval to" or "support" it. *Endorse*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY 470 (4th ed. 2002). Therefore, the plain meaning of the Act permits the discussion of the concepts

48

by employers in workplace training sessions—that they are views held by some—without *expressing approval* of them.

The district court insisted that "few terms are as loaded and contested as 'objective.' " App.135. And based on a citation to extended passages from Immanuel Kant's *Critique of Practical Reason* and Friedrich Nietzsche's *On the Genealogy of Morals*, the court suggested that "it is *impossible* to discuss a concept—or anything for that matter" in an "objective" manner. App.135 & n.12. But while Eighteenth and Nineteenth Century German philosophers may have debated and analyzed the concept of objectivity, ordinary people understand its plain, everyday meaning. Indeed, the *entire American legal framework* is built upon the belief that it is possible—and indeed, critically necessary to the law's very legitimacy—to distinguish between endorsing and advocating an idea and neutrally and objectively discussing and considering it. The commonly understood distinction between discussing a concept or argument "in an objective manner without endorsement," on the one hand, and "espous[ing], promot[ing], advance[ing], [or] inculcate[ing]" it, on the other, FLA. STAT. § 760.10(8)(a) & (b), is not a vague or "impossible" one, App.135. It is a line that appears *throughout* the law[5] and that our legal system trusts its judges, attorneys, and officers to draw *every single day*.

---

[5] *See, e.g.*, 5 U.S.C. § 4302(c)(1); 29 U.S.C. § 1108(b)(19)(H); 42 U.S.C. § 7705c(b); 47 U.S.C. § 1425(b)(1); *School Dist. of Abington Twp. v. Schempp*, 374

Finally, the court suggested that because "[t]he State deems these concepts specters haunting Florida, . . . to simply acknowledge they exist likely constitutes endorsement." App.137. There is no basis for that assertion, and it is plainly contrary to the text of the Act. Section (8)(b)'s exception for "discussion of the concepts . . . in an objective manner without endorsement" would be *rendered a complete and utter nullity* if "simply acknowledge[ing] [that the concepts] exist" was equivalent to "endorsement" of them. *Id.*

## III.  Any Unconstitutional Provisions Are Severable.

Even if Plaintiffs' claims were likely to succeed with respect to any of the Act's provisions, the court below erred in declining to sever them from the remainder of the Act. Severability is "a matter of state law," and in Florida, unconstitutional provisions are severable even in the absence of a severability clause if "(1) they can be separated from the remaining valid provisions; (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void; (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other; and (4) an act complete in itself remains after the invalid provisions are stricken."

---

U.S. 203, 225 (1963) (Establishment Clause allows "study of the Bible or of religion, when presented objectively as part of a secular program of education"); *United States v. Barbour*, 420 F.2d 1319, 1321 (D.C. Cir. 1969) ("the judge must remain a disinterested and objective participant in the proceedings" (quotation marks omitted)).

50

*Wollschlaeger*, 848 F.3d at 1317–18 (cleaned up). Here, each of the provisions of the Act, including each prohibited concept, clearly stands on its own and independently furthers Florida's interests in enacting it. If any portion of the Act is held unconstitutional, it should be severed from the remaining, valid provisions.

The district court concluded that it "need not confront severability because the unconstitutionally vague 'objectivity' requirement . . . governs the entire challenged provision" and "renders the statute as a whole unconstitutionally vague." App.137 n.13. But as discussed above, the Act's exception for discussion of the enumerated concepts "in an objective manner" *is not* unconstitutionally vague. And even if it were, the court below did not explain how the purported vagueness of the Act's *exception*—allowing objective discussion of the concepts—could possibly render unconstitutionally vague the Act's *general rule* prohibiting mandatory trainings that endorse them. For even if it is "impossible" for employers to discern when they are discussing the concepts objectively, App.135, the court *never* claimed that it is impossible for them to discern when they are *endorsing* them. Accordingly, the court erred in declining to conduct a severability analysis.

## IV.   The District Court Erred in Granting a Preliminary Injunction.

The remaining injunction factors likewise militate against granting Plaintiffs the relief they requested. "A showing of irreparable injury is the sine qua non of injunctive relief." *Siegel*, 234 F.3d at 1176 (quotation marks omitted). The district

court's only reason for concluding that Plaintiffs had made such a showing was the rule that "an ongoing First Amendment violation . . . constitutes irreparable injury." App.139. Because Plaintiffs have not shown any likelihood that the Act *actually violates* the First Amendment, this presumption simply does not apply.

The remaining factors—the balance of the equities and the public interest—"merge when . . . the government is the opposing party." *Gonzalez*, 978 F.3d at 1271 (cleaned up). Both favor the State here. As shown above, the State has a compelling—indeed, constitutionally enshrined—interest in ending invidious discrimination, and a preliminary injunction provides judicial sanction to conduct that Florida has determined, in the exercise of its sovereign judgment, to constitute such discrimination. Moreover "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury," *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up), and that is true all the more when the statute at issue furthers an interest as fundamental as the elimination of invidious racial discrimination and hostility.

## CONCLUSION

For the foregoing reasons, the decision of the district court should be reversed and the preliminary injunction should be vacated.

Dated: November 14, 2022                  Respectfully Submitted,

Henry C. Whitaker                         /s/ Charles J. Cooper
*Solicitor General*                       Charles J. Cooper
Timothy L. Newhall                        John D. Ohlendorf
*Special Counsel*                         Megan M. Wold
OFFICE OF THE ATTORNEY GENERAL            John D. Ramer
The Capitol, PL-01                        COOPER & KIRK, PLLC
Tallahassee, FL 32399-1050                1523 New Hampshire Avenue, N.W.
Tel: (850) 717-9310                       Washington, D.C. 20036
henry.whitaker@myfloridalegal.com         Tel: (202) 220-9600
                                          Fax: (202) 220-9601
                                          ccooper@cooperkirk.com

*Attorneys for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B)(i) because this brief contains 12,741 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f) and 11th CIR. R. 32-4.

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: November 14, 2022                          /s/Charles J. Cooper
                                                  Charles J. Cooper
                                                  *Counsel for Defendants-Appellants*