No. 22-13135

# In the United States Court of Appeals for the Eleventh Circuit

HONEYFUND.COM, INC, *et al.*,

*Plaintiffs–Appellees*,

v.

GOVERNOR, STATE OF FLORIDA, *et al.*,

*Defendants–Appellants*.

## BRIEF OF PLAINTIFFS-APPELLEES

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
NO. 4:22-CV-227-MW-MAF

Shalini Goel Agarwal
Fla. Bar No. 90843
THE PROTECT DEMOCRACY PROJECT
Pennsylvania Ave., NW, Suite 163
Washington, DC 20006
Tel: (202) 579-4582
shalini.agarwal@protectdemocracy.org

Sara Chimene-Weiss
THE PROTECT DEMOCRACY PROJECT
7000 N. 16th St., Suite 120, #430
Phoenix, AZ 85020
Tel: (202) 934-4237
sara.chimene-weiss@protectdemocracy.org

Douglas Hallward-Driemeier
ROPES & GRAY LLP
2099 Pennsylvania Ave., NW
Washington, DC 20006-6807
Tel: (202) 508-4776
Douglas.Hallward-
Driemeier@ropesgray.com

Amy Jane Longo
ROPES & GRAY LLP
10250 Constellation Blvd.
Los Angeles, CA 90067
Tel: (310) 975-3269
Amy.Longo@ropesgray.com

John Langford
Rachel Goodman
THE PROTECT DEMOCRACY PROJECT
82 Nassau St., #601
New York, NY 10038
Tel: (202) 579-4582
john.langford@protectdemocracy.org
rachel.goodman@protectdemocracy.org

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellees certify that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1:

1. Agarwal, Shalini G., *Attorney for Plaintiffs-Appellees*

2. Cepero, Monica, Commissioner of the Florida Commission on Human Relations, *Defendant-Appellant*

3. Chimene-Weiss, Sara, *Attorney for Plaintiffs-Appellees*

4. Cooper & Kirk, PLLC, *Attorneys for Defendants-Appellants*

5. Cooper, Charles J., *Attorney for Defendants-Appellants*

6. DeSantis, Ron, Governor of the State of Florida, *Defendant-Appellant*

7. Farmer, Libby, Commissioner of the Florida Commission on Human Relations, *Defendant-Appellant*

8. Florida Attorney General Service, *Attorney for Defendant-Appellant Moody*

9. Garza, Mario, Commissioner of the Florida Commission on Human Relations, *Defendant-Appellant*

10. Goodman, Rachel E., *Attorney for Plaintiffs-Appellees*

11. Hallward-Driemeier, Douglas, *Attorney for Plaintiffs-Appellees*

12. Hanson, Dawn, Commissioner of the Florida Commission on Human Relations, *Defendant-Appellant*

13. Hart, Larry, Commissioner of the Florida Commission on Human Relations, *Defendant-Appellant*

14. Honeyfund.com, Inc., *Plaintiff-Appellee*

i

15.    Langford, John T., *Attorney for Plaintiffs-Appellees*

16.    Longo, Amy Jane, *Attorney for Plaintiffs-Appellees*

17.    Margulis, Sara, *Declarant*

18.    McBroom, Antonio, *Declarant*

19.    McGhee, Darrick, Senior Chair of the Florida Commission on Human Relations, *Defendant-Appellant*

20.    Moody, Ashley, Attorney General of the State of Florida, *Defendant-Appellant*

21.    Moye, Kenyatta, Commissioner of the Florida Commission on Human Relations, *Defendant-Appellant*

22.    Myrtetus, Vivian, Commissioner of the Florida Commission on Human Relations, *Defendant-Appellant*

23.    Newhall, Timothy L., *Attorney for Defendant-Appellant Moody*

24.    Office of the Attorney General of the State of Florida, *Attorneys for Defendants-Appellants*

25.    Ohlendorf, John D., *Attorney for Defendants-Appellants*

26.    Orrin, Chevara, *Plaintiff-Appellee and Declarant*

27.    Payne, Pamela, Commissioner of the Florida Commission on Human Relations, *Defendant-Appellant*

28.    Pichard, Jay, Commissioner of the Florida Commission on Human Relations, *Defendant-Appellant*

29.    Primiano, Angela, Vice Chair and Commissioner of the Florida Commission on Human Relations, *Defendant-Appellant*

30.    Primo Partners III LLC, *Parent Company of Plaintiff-Appellee Primo Tampa LLC*

31.    Primo Partners LLC, *Parent Company of Primo Partners III LLC*

32.    Primo Tampa LLC, *Plaintiff-Appellee*

33. Protect Democracy, *Attorneys for Plaintiffs-Appellees*

34. Ramer, John D., *Attorney for Defendants-Appellants*

35. Ropes & Gray, LLP, *Attorneys for Plaintiffs-Appellees*

36. Whitespace Consulting LLC d/b/a Collective Concepts LLC, *Plaintiff-Appellee*

37. Wold, Megan M., *Attorney for Defendants-Appellants*

Plaintiff-Appellee Primo Tampa LLC is a subsidiary of Primo Partners III LLC, which is a subsidiary of Primo Partners LLC.  No publicly traded company or corporation has an interest in the outcome of this case or appeal.

*/s/ Shalini Goel Agarwal*
Shalini Goel Agarwal

*Counsel for Plaintiffs-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs do not oppose Defendants' request for oral argument.

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES................................................................1

INTRODUCTION ...............................................................................2

STATEMENT OF THE CASE.................................................................3

    I.      LEGISLATIVE HISTORY ........................................................3

    II.     THE DISTRICT COURT'S FACTUAL FINDINGS..........................8

    III.    THE DISTRICT COURT'S LEGAL CONCLUSIONS......................9

STANDARD OF REVIEW ...................................................................11

SUMMARY OF THE ARGUMENT .......................................................12

ARGUMENT .....................................................................................15

    I.      THE DISTRICT COURT DID NOT ABUSE ITS
           DISCRETION IN GRANTING PLAINTIFFS' MOTION FOR
           PRELIMINARY INJUNCTION.........................................................15

          A.    The District Court Did Not Abuse Its Discretion in
                Holding That Plaintiffs Are Likely to Succeed on the
                Merits of Their First Amendment Claim ..................................15

                1.     The Stop WOKE Act Regulates Speech, Not
                        Conduct.................................................................17

                2.     Defendants' "Threshold Inquiry" Argument Lacks
                        Support in the Relevant Case Law. ................................23

                3.     Even if the Act is Found to Regulate Conduct, the
                        "Conduct" Triggering Coverage Consists of
                        Communicating a Message and Therefore Strict
                        Scrutiny Applies. ..........................................................25

                4.     The Stop WOKE Act Discriminates Based Upon
                        Viewpoint and Is Therefore Presumptively
                        Unconstitutional.............................................................27

      5.      Even if Not Per Se Unconstitutional, the Act Fails
Strict Scrutiny, Because Its Content Restrictions
Are Not Narrowly Tailored to Serve Any
Compelling State Interest. ...............................................29

          a)     Captive Audience ..................................................30

          b)     Invidious Discrimination......................................31

B.     The District Court Did Not Abuse Its Discretion in
Holding That Plaintiffs Are Likely to Succeed on the
Merits of Their Fourteenth Amendment Claim ......................38

      1.     The Stop WOKE Act Is Unconstitutionally Vague........38

      2.     In the Alternative, the Stop WOKE Act Is
Overbroad. .....................................................................46

C.     The Act's Provisions Cannot Be Severed................................47

D.     The District Court Did Not Abuse Its Discretion in
Holding That the Remaining Preliminary Injunction
Factors Weigh in Plaintiffs' Favor...........................................49

CONCLUSION .........................................................................................51

# <u>TABLE OF CITATIONS</u>

**Cases**

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004) ......................................................................................12

*Calvary Chapel Dayton Valley v. Sisolak*,
    140 S. Ct. 2603 (2020) ..................................................................................27

*Carey v. Brown*,
    447 U.S. 455 (1980) ..........................................................................24, 25, 38

*City of Austin v. Reagan Nat'l Advert of Austin, LLC*,
    142 S. Ct. 1464 (2022) ...............................................................................25, 29

*Cohen v. California*,
    403 U.S. 15 (1971) ..........................................................................19, 25, 31

*Expressions Hair Designs v. Schneiderman*,
    581 U.S. 37 (2017) ........................................................................................40

*Faragher v. City of Boca Raton*,
    524 U.S. 775 (1998) .....................................................................................35

*Frisby v. Schultz*,
    487 U.S. 474 (1988) .....................................................................................38

*Gentile v. State Bar of Nev.*,
    501 U.S. 1030 (1991) ...................................................................................44

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013), *overruled on other grounds by*
    *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018) ...............................12, 26

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993) ..........................................................................34, 35, 36, 37

*Heyman v. Cooper*,
    31 F.4th 1315 (11th Cir. 2022) ...............................................................40, 41, 42

*High Ol' Times, Inc. v. Busbee*,
    673 F.2d 1225 (11th Cir. 1982) ...................................................................41

*Hill v. Colorado*,
530 U.S. 703 (2000)............................................................................17, 23, 24

*Hishon v. King & Spalding*,
467 U.S. 69 (1984)............................................................................34

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010)............................................................................25, 26

*MidAmerica C2L Inc. v. Siemens Energy Inc.*,
25 F.4th 1312 (11th Cir. 2022) .............................................................46

*Minn. Voters All. v. Mansky*,
138 S. Ct. 1876 (2018)............................................................24, 28, 51

*Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.*,
50 F.4th 1126 (11th Cir. 2022) ............................................................12, 21

*Oncale v. Sundowner Offshore Servs., Inc.*,
523 U.S. 75 (1998)............................................................................35

*Otto v. City of Boca Raton*,
981 F.3d 854 (11th Cir. 2020) ...................................................*passim*

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009)............................................................................28

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992)............................................................................36

*Red Earth LLC v. United States*,
657 F.3d 138 (2d Cir. 2011) (per curiam) ......................................12

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)............................................................................29, 38

*Reeves v. C.H. Robinson Worldwide, Inc.*,
594 F.3d 798 (11th Cir. 2010) .............................................................35

*Reno v. ACLU*,
521 U.S. 844 (1997)............................................................................39

*Rumsfeld v. FAIR*,
    547 U.S. 47 (2006) ......................................................................*passim*

*Santa Cruz Lesbian & Gay Community Ctr. v. Trump*,
    508 F. Supp. 3d 521 (N.D. Cal. 2020) ................................................45

*Siegel v. LePore*,
    234 F.3d 1163 (11th Cir. 2000) (en banc) ..............................11, 12, 49

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ......................................................................*passim*

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ............................................................................27

*State v. Catalano*,
    104 So. 3d 1069 (Fla. 2012) ..............................................................48

*Texas v. Johnson*,
    491 U.S. 397 (1989) ..............................................................36, 37, 51

*Tonkyro v. Sec'y, Dep't of Veterans Affs.*,
    995 F.3d 828 (11th Cir. 2021) ...........................................................35

*Tracy v. FAU Bd. of Trs.*,
    980 F.3d 799 (11th Cir. 2020) ...........................................................41

*Univ. of Texas v. Camenisch*,
    451 U.S. 390 (1981) ...........................................................................11

*Village of Hoffman Ests. v. Flipside, Hoffman Est., Inc.*,
    455 U.S. 489 (1982) .....................................................................39, 40

*Virginia v. Hicks*,
    539 U.S. 113 (2003) ...........................................................................46

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) .......................................................................2, 38

*Wisconsin v. Mitchell*,
    508 U.S. 476 (1993) ...........................................................................34

ix

*Wollschlaeger v. Governor, Fla.*,
   848 F.3d 1293 (11th Cir. 2017) (en banc) .......................................22, 30, 33, 39

## Constitutional and Statutory Provisions

42 U.S.C. § 2000e-2(a)(1)..........................................................................34

Fla. Stat. § 760.10(2)................................................................................34

Fla. Stat. § 760.10(8)..........................................................................*passim*

U.S. Const. amend. I ..........................................................................*passim*

U.S. Const. amend. XIV .......................................................................1, 3, 14, 38

## STATEMENT OF THE ISSUES

1.     The district court held that the Stop WOKE Act is a "naked viewpoint-based regulation on speech that does not pass strict scrutiny" under the First Amendment, Op. at 2, and is "impermissibly vague in violation of the Due Process Clause of the Fourteenth Amendment," *id.* at 37.  The district court further held that the "remaining preliminary injunction factors . . . weigh in favor of granting Plaintiffs' motion for preliminary injunction." *Id.* at 39.  Given the heightened deference to lower courts' rulings on motions for preliminary injunction involving a close constitutional question, the question presented on appeal is whether the district court abused its discretion in granting Plaintiffs' motion here.

1

## INTRODUCTION

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech."  As Justice Jackson wrote, "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion."  *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  That the government cannot silence speech based on its content or viewpoint, regardless of who dislikes that speech or why, is the First Amendment's most fundamental premise.  Nor does the First Amendment tolerate vague laws that cast a shadow over protected speech; there must be precision of regulation to avoid unnecessarily chilling protected speech.

Florida's House Bill 7, titled the "Individual Freedom Act" and referred to as the "Stop WOKE Act" (or "Act"), violates these core principles by doing exactly what its name declares and preventing employers from advancing "woke" concepts—a far cry from Defendants' caricature that the law protects employees from invidious discrimination.  The Act violates the First Amendment on its face by banning and imposing liability for "espous[ing], promot[ing], advanc[ing], inculcat[ing], or compel[ling belief in]" eight prohibited "concepts."  Fla. Stat. § 760.10(8)(a) (2022).  Moreover, the Act is so vague and overbroad that it is impossible for employers to know how to comply, further chilling their speech.  The

district court agreed with Plaintiffs that the Act is a "naked viewpoint-based regulation on speech that does not pass strict scrutiny" under the First Amendment, Op. at 2, and that it is "impermissibly vague in violation of the Due Process Clause of the Fourteenth Amendment." *Id.* at 37.  In their appeal, Defendants identify no error or abuse of discretion in the district court's reasoning.

Because the State of Florida is not an autocracy, but rather governed by the United States Constitution, the Stop WOKE Act cannot stand.[1]

## STATEMENT OF THE CASE

### I. LEGISLATIVE HISTORY

House Bill 7 was enacted at the urging of Governor Ron DeSantis, who originally dubbed the law the "Stop the Wrongs to Our Kids and Employees" or "Stop W.O.K.E. Act."  He characterized the legislation as a way "to fight back against woke indoctrination" and "take on . . . corporate wokeness."[2]  The term "woke" was initially slang describing awareness of important social issues like racial justice,[3] but in recent years has been co-opted by opponents in Florida and elsewhere

---

[1] While the district court granted the motion for preliminary injunction as to all defendants except Governor DeSantis, *see* Op. at 15, the Governor has joined in this appeal.  *See* Notice of Appeal.

[2] Press Release, Fla. Off. of the Governor, *Governor DeSantis Announces Legislative Proposal to Stop W.O.K.E. Activism and Critical Race Theory in Schools and Corporations* (Dec. 15, 2021), https://www.flgov.com/2021/12/15/governor-desantis-announces-legislative-proposal-to-stop-w-o-k-e-activism-and-critical-race-theory-in-schools-and-corporations/.

[3] "Woke," MERRIAM-WEBSTER, https://www.m-w.com/dictionary/woke.

to belittle the viewpoint that such awareness is desirable. In announcing the legislation, the Governor derisively characterized workplace diversity, equity, and inclusion ("DEI") trainings designed to counteract and sensitize workers to the ongoing effects of centuries of systemic racism, sexism, and homophobia in this country as creating "a hostile work environment" by "attacking people based on their race or telling them that they're privileged or that they're part of oppressive systems."[4] He characterized DEI trainings as "basically corporate sanctioned racism" that employers are "trying to shove . . . down these employees' throats."[5]

Advocating for the Stop WOKE Act in the Florida Legislature, its sponsors underscored its content- and viewpoint-based nature. For example, House sponsor Bryan Avila castigated particular texts with which he disagreed, including Peggy McIntosh's *White Privilege: Unpacking the Invisible Knapsack* and Robin DiAngelo's *White Fragility: Why It's So Hard for White People to Talk About Racism*.[6] When asked whether assigning the *White Privilege* text would be lawful, Representative Avila responded that "if that material in any way, shape, or form, does not align with the principles in this bill, then that material would certainly not

---

[4] Governor Ron DeSantis, *Introducing the Stop W.O.K.E. Act*, at 17:55-18:18, FACEBOOK (Dec. 15, 2021), https://www.facebook.com/GovRonDeSantis/videos/introducing-the-stop-woke-act/877277022969704/.

[5] *Id.* at 18:18-18:30.

[6] Fla. H.R., Recording of Proceedings, at 1:04:49-1:05:40 (Feb. 22, 2022), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=7959.

4

be permissible."[7]    He earlier described *White Privilege* as "absolutely un-American."[8]  And when Senate sponsor Manny Diaz was asked if a company would be prohibited from using the words "white privilege" in a DEI training, he responded that "I would say that there are some very specific topics listed including not imposing privilege or oppression on any particular individual based on race."[9]

The sponsors also emphasized the need for any discussion of prohibited concepts to be "objective."  As Representative Avila described it:

> Whether . . . it's an HR professional in the workplace, everything that is taught should be from an objective standpoint, right?  We're not saying that you can't teach those historical facts. . . . [T]hat is unquestionably what should be taking place, but the manner in which it's done, it needs to be done in an objective manner. . . . [When teaching government class] I don't inject my personal beliefs on public policy . . . because everything is done from an objective manner.[10]

Similarly, Senator Diaz explained that in the context of the Stop WOKE Act, "objective in this case, specifically states the not-imposing responsibility or guilt to

---

[7] *Id.* at 1:38:15-1:39:06.

[8] Fla. H.R., House Educ. & Emp. Comm., Recording of Proceedings, at 00:33:20-00:33:55, 00:50:40-00:50:45 (Feb. 8, 2022), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=7878.

[9] Fla. S., Recording of Proceedings, at 4:15:32-4:16:04 (Mar. 9, 2022), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8067.

[10] Fla. H.R., Recording of Proceedings, at 1:10:12-1:11:20 (Feb. 22, 2022), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=7959.

a person based on the group they belong to for the actions of others."[11]

Upon signing the Stop WOKE Act, Governor DeSantis hailed it as a step towards protecting against "the far-left woke agenda tak[ing] over [Florida's] schools and workplaces."[12]

The Stop WOKE Act modifies the Florida Civil Rights Act's definition of "unlawful employment practices" and "race discrimination" to include "subjecting an individual, as a condition of employment" to "training, instruction, or any other required activity" that "espouses, promotes, advances, inculcates, or compels such individual to believe" any of the following eight prohibited "concepts" that touch upon "race, color, sex, or national origin":

1. Members of one race, color, sex, or national origin are morally superior to members of another race, color, sex, or national origin.

2. An individual, by virtue of his or her race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

3. An individual's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, sex, or national origin.

4. Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to race, color, sex, or national origin.

---

[11] Fla. S., Recording of Proceedings, at 6:13:30-6:13:53 (Mar. 9, 2022), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8067.
[12] Press Release, Fla. Off. of the Governor, *Governor DeSantis Signs Legislation to Protect Floridians from Discrimination and Woke Indoctrination* (Apr. 22, 2022), https://www.flgov.com/2022/04/22/governor-ron-desantis-signs.legislation-to-protect-floridians-from-discrimination-and-woke-indoctrination/.

5. An individual, by virtue of his or her race, color, sex, or national origin, bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, sex, or national origin.

6. An individual, by virtue of his or her race, color, sex, or national origin, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7. An individual, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the individual played no part, committed in the past by other members of the same race, color, sex, or national origin.

8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin.

Fla. Stat. § 760.10(8)(a) (2022).

The Stop WOKE Act further provides that its eight restrictions "may not be construed to prohibit discussion of the concepts listed therein as part of a course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts."  Fla. Stat. § 760.10(8)(b) (2022).  The viewpoint-based nature of the law could not be any clearer: employers may offer training that disagrees with these concepts, but any training endorsing the concepts (*i.e.*, advancing "wokeness") is banned.

7

## II.    THE DISTRICT COURT'S FACTUAL FINDINGS

The district court found that Plaintiffs' declarations demonstrated clear injury from the Stop WOKE Act.  Defendants submitted no contrary evidence.  Thus, the uncontested findings below include the following: Honeyfund, a honeymoon registry company based in Clearwater, Florida, and Primo, a Ben & Jerry's franchisee with shops in Clearwater Beach and Tampa, Florida, had each conducted or planned to conduct mandatory DEI trainings for employees or otherwise advance some prohibited concepts at required activities—all of which they put on hold for fear of violating the Stop WOKE Act.  *See* Op. at 7-8.

Plaintiffs' planned DEI activities would violate each of the prohibited concepts.  The topics in Honeyfund's planned trainings included advancing women in business, understanding gender expansiveness, understanding institutional racism, and preventing harassment.  *See* Op. at 8.  Terms and concepts in Primo's trainings included "dominant group," "racial bias," "white man's privilege," "white man's guilt," systemic racism, oppression, and intersectionality.  *Id.*  Both companies planned to change or limit these activities or make them voluntary to steer clear of the statute.  *See id.* at 8-9.  Likewise, Chevara Orrin, a DEI expert, and her consulting company, Collective Concepts, provide trainings to employees on topics including historical and structural racism, unconscious bias, and diversity and inclusion.  *See id.* at 10-11.  Because of the Act, Orrin has been asked by clients to

change the language of some trainings; other clients have stalled on moving forward with contracts; and others who had earlier expressed interest would no longer pursue DEI training.  *See id.* at 11.

## III.    THE DISTRICT COURT'S LEGAL CONCLUSIONS

The district court found that Plaintiffs had shown a substantial likelihood of success on the merits.

As to the First Amendment claim, the court held that the Act regulates speech, not conduct, as it bans mandatory trainings and other required activities—including phone calls, assignments, discussions, or the like—in which an employer endorses the prohibited concepts.  *See* Op. at 17.  As the court recognized, the Act "grants employers free rein to hold mandatory trainings addressing any of the eight concepts so long as those trainings condemn or take no position on the concepts," and "the *only* way to determine whether the [Act] bars a mandatory activity is to look to the viewpoint expressed at that activity."  *Id.*  The district court noted this Court's instruction that "where 'the only conduct which the State [seeks] to punish [is] the fact of communication,' the statute regulates speech, not conduct."  *Id.* at 19 (quoting *Otto v. City of Boca Raton*, 981 F.3d 854, 866 (11th Cir. 2020)).

Accordingly, the court held that the Act is a viewpoint-based speech restriction, triggering strict scrutiny.  *See* Op. at 23.  The court concluded that the State's "interest in preventing employers from 'foisting speech that the State finds

9

repugnant on a "captive audience" of employees'" is not compelling, and that even assuming the interest were compelling, the Act is not narrowly tailored to achieve its aim, as existing antidiscrimination laws already prohibit the strawman erected by Defendants—DEI trainings so offensive that they create a hostile work environment. *Id.* at 25-26. The district court rejected Defendants' attempt to otherwise equate the Stop WOKE Act with Title VII. It concluded that the statutes are "inverse" with respect to speech because Title VII, on its face, "does not regulate speech," but rather "targets conduct" in prohibiting employment discrimination and "only incidentally burdens speech"; the Stop WOKE Act, by contrast, directly regulates speech and only incidentally burdens conduct. *Id.* at 23-24.

As to the Due Process claim, the district court held that some of the prohibited concepts "certainly are" vague, as is evident when trying to apply them to commonly addressed workplace topics. Op. at 31. The court provided examples that showcase the law's vagueness, including an employer conducting mandatory sexual harassment training that "cites statistics that women are the most common victims of workplace sexual harassment and only provides examples of men sexually harassing women," and rhetorically asked "have they 'advanced' the belief that women are morally superior to men?" *Id.* at 32. Likewise, given the prohibited concept that individuals cannot and should not attempt to treat others with respect to race, color, sex, or national origin, the court asked, "Can employers acknowledge

10

their employees' differing cultural backgrounds?" *Id.* at 33.  The court concluded that the statute as a whole is vague because the provision allowing "discussion in an objective manner without endorsement of the concepts" lacks clear standards and invites arbitrary and discriminatory enforcement.  *See id.* at 37.

The court further concluded that the remaining preliminary injunction factors were intertwined with the merits and weighed in favor of Plaintiffs.  *Id.* at 39.

## STANDARD OF REVIEW

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  To obtain injunctive relief, the moving party must show that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest."  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).  Because Plaintiffs overwhelmingly met that burden, the district court preliminarily enjoined the Act, which it recognized as a "naked viewpoint-based regulation on speech that does not pass strict scrutiny."  Op. at 2.

A grant of a preliminary injunction is reviewed under an abuse of discretion standard, with conclusions of law reviewed de novo and findings of fact reviewed

for clear error. *See Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.*, 50 F.4th 1126, 1134 (11th Cir. 2022) (citation omitted). This Court has described such review as "highly deferential" and "extremely narrow in scope." *Siegel,* 234 F.3d at 1178 (citation omitted).

Moreover, the Supreme Court has held that this deference is heightened when constitutional rights are at stake, writing, "[i]f the underlying constitutional question is close . . . we should uphold the injunction and remand for trial on the merits." *Ashcroft v. ACLU*, 542 U.S. 656, 664-65 (2004); *see also Red Earth LLC v. United States*, 657 F.3d 138, 145 (2d Cir. 2011) (per curiam) ("Because the district court reached a reasonable conclusion on a close question of [constitutional] law, there is no need for us to decide the merits at this preliminary stage."). At this stage, appellate courts "must refrain from resolving novel and difficult constitutional questions" and instead "leav[e] them to be settled at a later stage, with the benefit of further factual and legal development." *Gordon v. Holder*, 721 F.3d 638, 644 (D.C. Cir. 2013), *overruled on other grounds by South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2099 (2018). Defendants can hardly dispute that their arguments at best present close constitutional questions.

## SUMMARY OF THE ARGUMENT

The district court did not err in holding that Plaintiffs are likely to succeed on their First Amendment claim; nor did it abuse its discretion in granting Plaintiffs'

motion for preliminary injunction. The Stop WOKE Act is textbook viewpoint discrimination. The Act enumerates eight concepts and prohibits employers from endorsing them, while permitting speech that criticizes those concepts. Defendants' pretense that the law targets conduct rather than speech is demonstrably incorrect: a mandatory workplace training (or any other "required activity") proclaiming that implicit biases are a "woke" figment of imagination is permissible, whereas a mandatory training asking people to examine their own implicit biases that lead them to treat others inequitably would violate the statute. Even assuming Defendants' erroneous premise that an employer mandating DEI training engages in conduct rather than speech, such conduct still communicates a message: that the employer prioritizes diversity, equity, and inclusion. As such, strict scrutiny would still apply.

At a minimum, the Stop WOKE Act is a content-based regulation that fails strict scrutiny because it is not narrowly tailored to serve a compelling governmental interest. The interests proffered by Defendants—protecting a "captive audience" of employees from being forced to listen to unwanted speech and protecting the workplace from invidious discrimination—are inapposite. Under this Court's precedent, the captive audience doctrine does not apply to workplace meetings. And if the Act does encompass, in certain extreme examples, properly proscribable invidious discrimination in the workplace, it is exceptionally poorly tailored to that purpose; it would also outlaw a wide swath of core protected speech, including DEI

13

trainings designed to *prevent* workplace discrimination.  Defendants' attempt to equate the Stop WOKE Act with Title VII hostile work environment claims fails. The Stop WOKE Act on its face targets speech, without any requirement of impact on the listener, whereas Title VII prohibits adverse employment *actions* and reaches speech only where that speech is so egregious as to constitute such an action.

Nor did the district court abuse its discretion in holding that Plaintiffs are likely to succeed on their Fourteenth Amendment claim that the Stop WOKE Act is void for vagueness.  As demonstrated below, each prohibited concept has uncertain application to common workplace initiatives and training methods.  More generally, the hazy line between "endorsement" and "objective discussion" fails to provide adequate warning to employers of what speech will subject them to liability.

Alternatively, the Stop WOKE Act is unconstitutionally overbroad because it prohibits a substantial amount of protected speech—advocacy of ideas the State disagrees with—in relation to any legitimate sweep of the law.

In addition, the district court correctly concluded that the law cannot be severed, as each concept is unconstitutionally vague, the attempted safe harbor allowing objective discussion without endorsement is also vague, and the law's sponsors were clear that the objectivity provision was a critical provision of the law.

Finally, the remaining preliminary injunction requirements weigh in favor of Plaintiffs, as irreparable injury is presumed when speech is chilled, and Defendants

have no legitimate interest in enforcing an unconstitutional law. Plaintiffs, meanwhile, have a substantial interest in engaging in speech that forms a core part of their businesses.

## ARGUMENT

## I.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION.

### A.   The District Court Did Not Abuse Its Discretion in Holding That Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claim.

The district court correctly held that the Stop WOKE Act is a "naked viewpoint-based regulation on speech," Op. at 2—a fact evident on the statute's face. The statute lists eight prohibited "concepts" that an employer cannot "espouse[], promote[], advance[], inculcate[], or compel[] [an] individual to believe" at a mandatory training or other required activity. To further confirm the viewpoint discriminatory nature of the Act, the law selectively allows and does not "prohibit discussion of the concepts," provided the "instruction is given in an objective manner *without endorsement of the concepts*." Fla. Stat. § 760.10(8)(b) (2022) (emphasis added). This type of viewpoint discrimination is presumptively (and perhaps even per se) unconstitutional under the First Amendment. Even if it were not viewpoint-discriminatory, the Stop WOKE Act's provisions would still clearly be content-based and not narrowly tailored to achieving a compelling state interest.

15

Defendants' counterarguments are woefully deficient. Because the statute only forbids certain speech at mandatory trainings or "other required employment activities," Br. at 13, Defendants argue that the Stop WOKE Act regulates *conduct* rather than speech, but this Court has expressly and definitively rejected such attempts at manipulating the speech/conduct distinction. Defendants fail to explain how the Act regulates conduct "separately identifiable" from speech; indeed, it is impossible to apply the Act's restrictions without reference to the underlying speech that the Act explicitly targets. The Act does not prohibit any kind of mandatory or required activity, *unless* that required activity addresses a forbidden "concept," and only then if the employer demonstrates "endorsement of the concepts." Fla. Stat. § 760.10(8)(b) (2022). An employer may with impunity require, on pain of termination, that employees attend mandatory sessions lambasting "WOKE" concepts like "structural racism," "White privilege," or "restorative justice." As long as the employer espouses the State's party-line, she is fine. It is only if the employer strays from that message during these required activities that she is subject to punishment. This is the stuff of autocrats and totalitarian regimes; it is antithetical to the most fundamental values of a democracy, as enshrined in the First Amendment.

None of the cases Defendants cite suggests a different result. Defendants' argument that "a threshold inquiry into the content of speech is not itself a regulation

16

of speech," Br. at 13, finds no support in the law. The principal case they cite, *Hill v. Colorado*, 530 U.S. 703 (2000), actually contradicts their position—unlike here, there was no need in *Hill* to examine the exact words spoken to ascertain whether a violation occurred. Defendants' reliance on *Rumsfeld v. FAIR*, 547 U.S. 47 (2006), is likewise misplaced. In *FAIR*, the mandated conduct—making space available in a non-discriminatory manner—neither itself involved communication nor constrained the schools' right to communicate their message. It is thus inapposite here, where the supposed "conduct triggering coverage under the statute"—requiring employees to listen to the employer's message—itself "consists of communicating a message," *i.e.*, that the "concepts" advanced are important to the employer. None of Defendants' arguments overcome the Act's facial unconstitutionality as a viewpoint-based and content-based regulation on speech, and the district court did not abuse its discretion in so holding.

### 1.    The Stop WOKE Act Regulates Speech, Not Conduct.

The Act squarely regulates "speech" within the meaning of the First Amendment by limiting the ability of certain speakers—including private employers like Honeyfund and Primo, and DEI trainers like Ms. Orrin—to discuss eight prohibited concepts. Its central inquiry (indeed, its only inquiry) is whether a mandatory training "or any other required activity" "espouses, promotes, advances, inculcates, or compels [an] individual to believe" any of the eight prohibited

concepts. Fla. Stat. § 760.10(8)(a) (2022). The only way one can "espouse[], promote[], advance[], inculcate[], or compel[] [an] individual to believe" such a concept is through speech or expression, and Defendants do not contend otherwise. As this Court has cautioned, "If speaking to clients is not speech, the world is truly upside down . . . 'Saying that restrictions on writing and speaking are merely incidental to speech is like saying that limitations on walking and running are merely incidental to ambulation.'" *Otto*, 981 F.3d at 866 (quoting *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1308 (11th Cir. 2017) (en banc)).

Defendants insist nonetheless that a restriction on speaking is merely incidental to speech, arguing that the Stop WOKE Act "regulates nonspeech conduct: an employer's action of mandating attendance at certain training sessions or other required employment activities and sanctioning employees who disobey." Br. at 13. This Court "has already rejected the practice of relabeling controversial speech as conduct," *Otto*, 981 F.3d at 861; in so doing, the Court "laid down an important marker: 'the enterprise of labeling certain verbal or written communications 'speech' and others 'conduct' is unprincipled and susceptible to manipulation.'" *Id.* (quoting *Wollschlaeger*, 848 F.3d at 1308). Defendants' brief is rife with such manipulation. *Id.*

As the district court correctly noted, the Stop WOKE Act's restrictions "cannot be understood without reference to the underlying speech's content," Op. at

20, and "the only conduct which the State [seeks] to punish [is] the fact of communication," *id.* at 19 (quoting *Otto*, 981 F.3d at 866).  Violations of the Act do not arise from any conduct that is "*separately identifiable*" from speech.  *Cohen v. California*, 403 U.S. 15, 18 (1971) (emphasis added).  "[I]n *Cohen*, the problem was not that the defendant wore a jacket to court (conduct), but that the jacket said, 'F*** the Draft' on it (speech)."  Op. at 19.  Similarly, it is not a violation of the Act for employers to hold mandatory trainings or other required activities (conduct); the Act is violated if and only if those trainings or activities involve *endorsement* of any prohibited concepts (speech).  *See id*.  So, for example, a CEO offering extemporaneous remarks about her vision for the company at an annual meeting that employees are required to attend would have to self-censor to ensure that her words don't violate the Act—a tightrope act that would be even more precarious if the company's mission involves a prohibited concept like dismantling white privilege.

Defendants attempt to argue that "what the Act punishes is conduct that is quite readily 'separately identifiable' from speech: mandating attendance of unwilling employees at the sessions where the speech occurs."  Br. at 22 (cleaned up).  But Defendants cannot explain the punished conduct without reference to speech—as they concede, the Act applies only to sessions "where the [prohibited] speech occurs."  *See also id.* at 20 ("All businesses may not do is require their employees to attend training sessions or activities *where the prohibited ideas are*

19

*espoused*." (cleaned up) (emphasis added)); *id.* at 21 (noting that the "Act's employment provisions, by their plain terms, apply only to the non-expressive conduct of requiring employees to attend training sessions *where the kind of speech identified by the Act occurs*" (emphasis added)). Mandatory meetings—even those touching on the same subjects—are *not* prohibited, as long as those meetings espouse the State's preferred views. Defendants' own characterization belies their argument that the Act punishes conduct separately identifiable from speech.

Defendants' citation to decisions of the Supreme Court and this Court where speech is only incidentally burdened do not suggest a different result. Defendants first rehash their attempt below to analogize this case to *Rumsfeld v. FAIR*, 547 U.S. 47 (2006), arguing that in both cases speech is affected, but only incidentally to the regulation of conduct. *See* Br. at 19. But affording equal access to military recruiters is conduct that does not regulate speech at all: "The Solomon Amendment neither limits what law schools may say nor requires them to say anything . . . the Solomon Amendment regulates conduct, not speech. It affects what law schools must do— afford equal access to military recruiters—not what they may or may not say." *FAIR*, 547 U.S. at 60. The same cannot be said of the Stop WOKE Act; the supposed "conduct" here is not simply mandating trainings, but mandating trainings *where*

*certain concepts are espoused.  See* Br. at 22.  And as discussed, such espousal can only be effected through speech/expression.[13]

Defendants also mistakenly rely on this Court's recent decision in *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.*, which involves "a Florida statute that prohibits all businesses operating in the state from requiring customers to provide documentary proof that they are vaccinated against COVID-19."  50 F.4th 1126, 1130 (11th Cir. 2022); *see* Br. at 20.  That case is easily distinguishable; *Norwegian Cruise Line* was clear that the relevant statute "limit[ed] no communications between customers and businesses" and neither "prohibit[ed] businesses from *asking* customers about their vaccination status" nor "prohibit[ed] customers from *responding*—orally or in writing—with that information and proof." *Norwegian Cruise Line*, 50 F.4th at 1137.  The Court further noted that unlike some "cases at the margin" where it "may sometimes be difficult to figure out what constitutes speech," *Norwegian Cruise Line* was not a "hard case in that respect." *Id.* at 1135.  Both *FAIR* and *Norwegian Cruise Line* concerned the conduct of

---

[13] Defendants also point to an example in *FAIR*, in which the Supreme Court explained that a law prohibiting employers from discriminating in hiring on the basis of race, which would "require an employer to take down a sign reading 'White Applicants Only,'" does not mean the law should be analyzed as regulating speech rather than conduct.  *FAIR*, 547 U.S. at 62.  However, that anti-discrimination provision targets the separately identifiable conduct of racial discrimination in hiring, while the "White Applicants Only" sign is a mere reflection of the targeted conduct/policy.  Here, speech is the central target of the Act, a reality that Defendants' preferred label of "conduct" attempts unsuccessfully to obscure.

granting equal access to physical spaces—equal access for military recruiters (relative to other employers) and equal access for unvaccinated individuals (relative to vaccinated individuals). In contrast, DEI trainings consist entirely of *actual* speech and expression. *Cf. Otto*, 981 F.3d at 865-66 ("[T]he law does not require us to flip back and forth between perspectives [concerning speech versus conduct] until our eyes hurt. Our precedent says the opposite: 'Speech is speech, and it must be analyzed as such for purposes of the First Amendment.'" (quoting *Wollschlaeger*, 848 F.3d at 1307)).

Similarly, Defendants cannot rely on this Court's en banc decision in *Wollschlaeger*. *See* Br. at 21. In *Wollschlaeger*, this Court struck down every provision that imposed speech-based restrictions on doctors, notwithstanding Florida's attempt to recharacterize them as conduct restrictions. *See* 848 F.3d at 1319. It upheld one anti-discrimination provision, and even then *only after* imposing a limiting construction such that the provision encompassed solely *non-expressive conduct* and posed "no First Amendment problem," as the plaintiffs themselves acknowledged. *Id.* at 1317. Here, no construction could limit the Stop WOKE Act to only non-expressive conduct because, as discussed, the prohibition is specifically defined in terms of Plaintiffs' speech/expression.

In sum, there is nothing incidental about the Stop WOKE Act's burden on speech: its very core is a list of "prohibited concepts." The Act targets no separately

identifiable conduct and cannot be understood without reference to speech. Because the Act regulates speech, not conduct, it is subject to First Amendment scrutiny.

### 2.    Defendants' "Threshold Inquiry" Argument Lacks Support in the Relevant Case Law.

After arguing that the Act regulates conduct, Defendants advance a somewhat different argument that "a threshold inquiry into the content of speech is not itself a regulation of speech" and that the Act poses no First Amendment problem because the "purpose of looking at the content of speech is to restrict non-speech conduct." Br. at 13. This contention finds no support in the law.

Defendants repeatedly cite the Supreme Court's pronouncement in *Hill v. Colorado*, 530 U.S. 703, 721 (2000), that it has "never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct." *See* Br. at 3, 24, 26. But Defendants ignore the (directly adjacent) language that distinguishes the circumstances of *Hill* from those of this case: "With respect to the conduct that is the focus of the Colorado statute, *it is unlikely that there would often be any need to know exactly what words were spoken* in order to determine whether 'sidewalk counselors' are engaging in 'oral protest, education, or counseling' rather than pure social or random conversation." *Hill*, 530 U.S. at 721 (emphasis added).[14]    Thus,

---

[14] At issue in *Hill* was a Colorado statute that made it unlawful—within 100 feet of a health care facility entrance—for any person to "knowingly approach" within eight

*Hill* might apply if the Stop WOKE Act prohibited all "mandatory employee trainings" regardless of content, even if courts had to assess whether the activities constituted "training" (without regard to its specific subject). But that is the opposite of how the Act works. Applying the Stop WOKE Act—determining whether the employer espoused a prohibited concept—requires knowing exactly what words were spoken in a required activity. The need to assess the content of the speech is even more acute when applying the Act's distinction between "discussion" and "endorsement."

Notably, *Hill* reaffirmed *Carey v. Brown*, which struck down as unconstitutional a statute that generally prohibited peaceful picketing, but exempted labor picketing at a workplace. The statute impermissibly "accorded preferential treatment to expression concerning one particular subject matter—labor disputes— while prohibiting discussion of all other issues," which was "constitutionally repugnant." *Hill*, 530 U.S. at 722-23 (citing *Carey v. Brown*, 447 U.S. 455, 462 n.6

---

feet of another person (without that person's consent) "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person." *Hill*, 530 U.S. at 707 (quoting Colo. Rev. Stat. § 18-9-122(3) (1999)). The *Hill* court considered whether the statute's terms of "oral protest, education, or counseling" were broad enough to encompass *all* communication, as the Colorado Attorney General had argued and as the Colorado Supreme Court had essentially ruled, thereby obviating any need to examine the exact words spoken. *See id.* at 720-21 & n.29. (As the *Hill* court found that the petitioners had likely waived any argument to the contrary, the court instead opted to rule against petitioners on other grounds. *See id.* at 721.)

(1980)).  The Stop WOKE Act embodies the same "constitutionally repugnant" differential treatment among topics as did *Carey*.[15]

### 3.    Even if the Act is Found to Regulate Conduct, the "Conduct" Triggering Coverage Consists of Communicating a Message and Therefore Strict Scrutiny Applies.

While Defendants are wrong that the Act regulates conduct, even if that were correct, it would regulate conduct solely based on the message it communicates, which would also be subject to heightened First Amendment scrutiny.  The Supreme Court in *Holder v. Humanitarian Law Project* explained that certain "law[s] . . . may be described as directed at conduct, as the law in *Cohen* was directed at breaches of the peace, but as applied to plaintiffs the *conduct triggering coverage under the statute consists of communicating a message*."  561 U.S. 1, 28 (2010) (emphasis added) ("[W]e recognized that the generally applicable law was directed at Cohen because of what his speech communicated—he violated the breach of the peace statute because of the offensive content of his particular message.").  In this scenario,

---

[15] Defendants also cite the Supreme Court's recent opinion in *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, characterizing that opinion as "rejecting 'the view that *any* examination of speech or expression inherently triggers heightened First Amendment concern.'"  Br. at 24 (quoting 142 S. Ct. 1464, 1474 (2022)).  But that strawman argument mischaracterizes Plaintiffs' position: Plaintiffs do not argue that *any* examination of speech triggers the First Amendment, but rather that in this case, where such examination of speech is both central to and inseparable from the statute, heightened First Amendment concerns are raised.

the Supreme Court applies "a more demanding standard," namely strict scrutiny. *Id.* (citation omitted).

*Holder* is relevant in two ways here. First, while Defendants attempt to describe the Stop WOKE Act as directed at conduct, an employer triggers the Act not by holding mandatory trainings or activities (wearing the jacket to court), but by espousing a particular message ("F*** the Draft"). For Plaintiffs, the "conduct" that triggers coverage under the Stop WOKE Act consists of communicating one or more of eight specific messages, which are singled out on the face of the statute for punishment.

Second, even if one were to accept Defendants' framing of the conduct at issue ("an employer's action of mandating attendance at certain training sessions or other required employment activities and sanctioning employees who disobey," Br. at 13), that conduct too "consists of communicating a message." *Holder*, 561 U.S. at 28. As the district court correctly noted, Plaintiffs plainly are not required by law to hold DEI trainings, and thus doing so and making them mandatory communicates the importance that the employer places on the topics that will be addressed. *See* Op. at 20-21 n.7. Nothing in *FAIR* suggests a contrary conclusion. Unlike the observers in *FAIR* who would "ha[ve] no way of knowing whether [a] law school is expressing its disapproval of the military" when they see the military "interviewing away from the law school," *FAIR*, 547 U.S. at 66, employees readily understand the

26

message conveyed by an employer who makes certain DEI trainings "mandatory" or certain DEI-related activities "required."[16]

### 4. The Stop WOKE Act Discriminates Based Upon Viewpoint and Is Therefore Presumptively Unconstitutional.

The First Amendment prohibits the government from "engag[ing] in 'bias, censorship or preference regarding [another] speaker's point of view." *Otto,* 981 F.3d at 864 (citation omitted). "The State may not burden the speech of others in order to tilt public debate in a preferred direction." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578-79 (2011). Consequently, "[l]aws that restrict speech based on the viewpoint it expresses are presumptively unconstitutional." *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2607 (2020). Indeed, the Supreme Court has indicated that finding a statute "viewpoint discriminatory" is "all but dispositive" in a First Amendment challenge, *Sorrell*, 564 U.S. at 571, leading this Court to suggest that such laws may be "unconstitutional per se," *Otto*, 981 F.3d at 864.

The statute's prohibition against "espous[ing], promot[ing], advanc[ing], inculcat[ing], or compel[ling belief in]" any of eight "concepts" targets not only those concepts, but also the viewpoint that favors them. The Act underscores its

---

[16] As Plaintiffs briefed below, the message communicated when an employer makes a training or other activity mandatory is that it signals the priority the employer puts on the content. Whether that priority results from business strategy, the business's values, its leadership's assessment of liability risk, or some combination of these factors, it is nonetheless a message.

viewpoint discrimination by clarifying that the law does *not* "prohibit discussion of the concepts" as long as the "instruction is given in an objective manner *without endorsement of the concepts*." Fla. Stat. § 760.10(8)(b) (2022) (emphasis added).

The relevant "question is whether a speaker's viewpoint determines his license to speak." *Otto*, 981 F.3d at 864. By its express terms, the Act allows an employer to offer (and require) training (or any other "activity") that disagrees with the eight concepts, but bans any mandatory training or activity at which those concepts are endorsed. The Act is therefore presumptively—if not per se— unconstitutional.

Contrary to Defendants' contentions, it does not matter that Plaintiffs remain free to espouse the disfavored concepts in their cars to themselves, or to others in different circumstances. What matters is that an employer's ability to hold a mandatory employee meeting depends entirely upon the viewpoint the employer will espouse on topics of central public import. While the availability of alternative times or places to communicate are relevant considerations, even time, place, and manner restrictions are subject to strict scrutiny when based on the content of speech, and such restrictions based on viewpoint are prohibited altogether. *E.g.*, *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018); *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). The Stop WOKE Act is precisely the opposite of viewpoint-neutral.

28

**5. Even if Not Per Se Unconstitutional, the Act Fails Strict Scrutiny, Because Its Content Restrictions Are Not Narrowly Tailored to Serve Any Compelling State Interest.**

Even if not viewpoint-based, the Stop WOKE Act plainly constitutes content-based speech discrimination because the Act distinguishes permissible from impermissible speech at mandatory trainings and other required activities "based on 'the topic discussed or the idea or message expressed.'" *City of Austin*, 142 S. Ct. at 1474 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 171(2015)); *see also Otto*, 981 F.3d at 862.

A law is content-based where it "single[s] out specific subject matter for differential treatment." *City of Austin*, 142 S. Ct. at 1471 (citation omitted). The Stop WOKE Act, which singles out eight prohibited concepts for differential treatment and prohibits endorsement of those concepts, while allowing speech that is critical of the concepts, clearly qualifies. As a content-based restriction, the Act is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. "Laws or regulations *almost never* survive this demanding test." *Otto*, 981 F.3d at 862 (emphasis added).

Defendants articulate two purported state interests: "(1) protecting Florida's workers from being conscripted into a captive audience and forced to listen to speech they do not want to hear, and (2) protecting the workplace from speech that

29

inviduously discriminates on the basis of race, color, sex, or national origin."  Br. at 14.  Neither justifies the Act's restrictions on core protected speech.

> ### a)    *Captive Audience*

Defendants' invocation of the captive audience doctrine is misplaced.  As this Court observed in *Wollschlaeger*, "where adults are concerned[,] the Supreme Court has never used a vulnerable listener/captive audience rationale to uphold speaker-focused and content-based restrictions on speech."  848 F.3d at 1315.  Accordingly, the district court correctly held that the captive audience doctrine does not apply to the employment context, and even if it did, strict scrutiny would still govern because the Act is content-based (not to mention viewpoint-discriminatory).  *See* Op. at 21-22.

Defendants point to no authority for their proposition that "the economic dependence of the employees on their employers," Br. at 36, trumps First Amendment principles.  To the contrary, like this Court, the Supreme Court has cautioned that the captive audience doctrine has been applied "only sparingly," and specifically with reference to the home, based on privacy interests (*e.g.*, delivering offensive mail, picketing outside an individual's home).  *Snyder v. Phelps*, 562 U.S. 443, 459 (2011) (holding that doctrine did not justify silencing protestors picketing a funeral).  "[T]he ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is . . . dependent upon a showing

that *substantial privacy interests* are being invaded in an *essentially intolerable manner*." *Id.* (emphases added) (quoting *Cohen*, 403 U.S. at 21). Workplace trainings—even required ones—hardly rise to this level. Defendants' attempt to expand the captive audience doctrine would have the very effect against which *Cohen* warned: it "would effectively empower a majority to silence dissidents simply as a matter of personal predilections." 403 U.S. at 21.

### b)    Invidious Discrimination

Preventing invidious discrimination, Defendants' second purported interest, is surely a compelling state interest. But as the district court held, Defendants in no way demonstrate how the Stop WOKE Act is narrowly tailored to achieving that interest. Op. at 26.

In the narrow tailoring analysis, "[a] law fails to survive if it is either underinclusive (that is, if it does not regulate enough conduct) or overinclusive (if it regulates too much conduct)." *Otto*, 981 F.3d at 879. The Stop WOKE Act is both.

The Act is plainly overinclusive. To begin, the Act prohibits espousing the prohibited concepts, independent of any impact on the listener. Even if every member of the audience was grateful for gaining a better understanding of the systemic nature of racism, sexism, or homophobia and how the audience members may, unintentionally, be contributing to such discrimination, and even if this understanding reduced instances of workplace discrimination, the employer would

31

still have violated the Act by espousing the concepts, simply because the government disagrees with those ideas.

Likewise, the substantive sweep of the Act goes far, far beyond "invidious discrimination." For instance, concept 4 prohibits mandatory trainings endorsing the notion of cultural competency—*i.e.*, that employees should recognize that others may be coming from different backgrounds and to appreciate those different perspectives in how employees interact with them. Far from invidious discrimination, such trainings are geared toward *preventing* invidious discrimination. The same is true of a mandatory training, for example, at which senior employees are encouraged to mentor junior employees who are members of historically underrepresented communities or women, which is common of many workplaces; this too would run afoul of the same prohibited concept that members of one race or sex should not attempt to treat others without respect to race or sex. In fact, as detailed below, the Act sweeps far broader still, prohibiting employers from endorsing views such as "America is the greatest nation on Earth," "men should be handicapped when competing with women in sports," and "Germans should feel guilty and remorseful for the Holocaust." *See infra* Section I.B.2.

The Act is also underinclusive, "rais[ing] doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Otto*, 981 F.3d at 879 (quoting *Williams-Yulee v.*

32

*Fla. Bar*, 575 U.S. 433, 444 (2015)).  If subjecting employees to the prohibited concepts truly constituted the kind of invidious discrimination Defendants assert, then the Act would presumably also have prohibited employers from posting them on a sign at the workers' entrance (as in the *FAIR* example prohibiting a "White Applicants Only" sign).  Yet Defendants cite as a virtue that nothing in the Act prevents employers from endorsing the prohibited concepts at work, so long as they do not do so in a "required activity."  *See* Br. at 2, 37-38.  If the goal of the Stop WOKE Act is to stamp out speech that constitutes invidious discrimination in the workplace, it makes no sense that its prohibitions would stop at mandatory meetings.

Further undermining Defendants' narrow tailoring argument is the fact that both Florida and federal law *already* prohibit actual invidious discrimination.  *See Wollschlaeger*, 848 F.3d at 1314 (explaining that a law failed narrow tailoring where the interests it purportedly served were already tended to by other laws).  As the district court noted, the Florida Civil Rights Act "already prohibit[s] much of what Defendants claim the [the Stop WOKE Act] aims to prohibit," such as "a diversity and inclusion training . . . so offensive, and so hostile to White employees, that it could create a hostile work environment."  Op. at 26.  As described below, existing anti-discrimination law is narrower than the Stop WOKE Act, because it only captures speech so severe or pervasive that it alters the terms and conditions of employment.  And existing discrimination laws are broader than the Act because

they do not stop at mandatory meetings; instead, they prohibit workplace conduct that amounts to invidious discrimination, wherever and whenever it occurs. *See* Fla. Stat. § 760.10(2); 42 U.S.C. § 2000e-2(a)(1).

Defendants' strained attempt to equate the Stop WOKE Act with Title VII only underscores the Act's flaws. The Act on its face and by its express terms prohibits the communication of certain ideas (independent on any effect that those ideas may have on listeners); Title VII does not do so—let alone prohibit specific messages. Instead, as the district court rightly noted, Title VII prohibits employers from discriminating against employees and job applicants in the "terms" and "conditions" of their employment on the basis of their race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2(a)(1); Op. at 23. It is accordingly a "content-neutral regulation of conduct" on its face, *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993), and the conduct it prohibits—"[i]nvidious private discrimination"—"has never been accorded affirmative constitutional protections," *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (citation omitted).

The Supreme Court has held that Title VII can sometimes be applied to reach speech that contributes to or amounts to unlawful discrimination. But speech creates a hostile work environment under Title VII only when it is "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive.'" *Harris v.*

34

*Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). It must be so "extreme" as "to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Moreover, the "victim" must also "subjectively perceive the environment to be abusive." *Harris*, 510 U.S. at 21.

Both the Supreme Court and this Court have explained that "[t]he standards for judging hostility are intended to be 'sufficiently demanding to ensure that Title VII does *not* become a general civility code.'" *Tonkyro v. Sec'y, Dep't of Veterans Affs.*, 995 F.3d 828, 837 (11th Cir. 2021) (quoting *Faragher*, 524 U.S. at 788) (emphasis added); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (detailing that the limits on hostile workplace claims are aimed at "prevent[ing] Title VII from expanding into a general civility code"). Thus, contrary to Defendants' suggestion, Title VII does not outlaw certain words, independent of their context: this Court has held that, in and of itself, "[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Tonkyro*, 995 F.3d at 837 (quoting *Harris*, 510 U.S. at 21). Rather, quite unlike the Act, "the *context* of offending words or conduct is essential to the Title VII analysis." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 810 (11th Cir. 2010) (emphasis added).

In contrast, through the Stop WOKE Act, Florida has made it illegal for words expressing verboten ideas to leave employers' mouths, regardless of context and

regardless of any impact on the listener or conditions of employment. Nor is the Act a nuanced legislative attempt to "refine[]" workplace discrimination law. Br. at 39. One might imagine, at least in theory, a law that, with care, works to identify and prohibit discrete words and phrases that amount to "fighting words" in certain, very narrowly cabined employment contexts. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992). But that is not what the Stop WOKE Act does.[17] Instead, as Defendants trumpet, "[t]he Act . . . represents the Florida Legislature's determination that forcing employees *to hear the advocacy of certain ideas* as a condition of employment constitutes actionable employment discrimination." Br. at 39 (emphasis added). That runs headlong into "a bedrock principle underlying the First Amendment . . . that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989); *see also Snyder*, 562 U.S. at 458 ("[S]peech cannot be restricted simply because it is upsetting or arouses contempt.").

---

[17] The Stop WOKE Act plainly goes far beyond speech that would give rise to a hostile workplace claim under existing anti-discrimination laws. Most of the targeted speech in the Stop WOKE Act would fail to meet the majority (if any) of the factors ordinarily considered: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *See Harris*, 510 U.S. at 23. The prohibited speech would be even more plainly deficient in meeting Title VII's subjective requirement. While hostile work environment claims look to the *impact of the speech* on the victimized employee (subjective perception), the Stop WOKE Act is violated *once the words leave the mouth*, without *any consideration* of the impact of that speech.

Stripped of inapt comparisons and misreadings of Title VII precedent, the core of Defendants' argument is that there *could be* some interpretations of Title VII that might trigger heightened scrutiny under the First Amendment. But that hypothetical proposition proves nothing; no court has ever found Title VII to be inconsistent with First Amendment protections. By contrast, *every* application of the Stop WOKE Act violates the First Amendment, precisely because it is the idea expressed, divorced from any effect, that violates the Act. *Harris*, repeatedly cited by Defendants, is not an edge case, and there is no need for the Court to consider hypothetical edge cases under Title VII here.[18]

Nor, finally, does the combination of Defendants' two inadequate interests, *see* Br. at 14, satisfy strict scrutiny. First, the Supreme Court has made clear that even restrictions protecting the quintessential captive audience—the home-dweller—must be content-neutral, and the Court has invalidated content-based

---

[18] In *Harris*, the president of Forklift Systems both said and did the following to Harris, a manager at Forklift: (1) "You're a woman, what do you know"; (2) "We need a man as the rental manager"; (3) "[D]umb ass woman"; (4) "[G]o to the Holiday Inn to negotiate [Harris's] raise"; (5) "What did you do, promise the guy . . . some [sex] Saturday night?"; (6) the president would throw objects on the ground in front of Harris and other women and ask them to pick them up; and (7) the president would make sexual innuendos about Harris's and other women's clothing. 510 U.S. at 19. There is a clear difference between this type of speech that is "severe or pervasive enough to create an objectively hostile or abusive work environment" and the type of speech that the Supreme Court in cases like *Johnson* and *Snyder* explained is protected by the First Amendment, in spite of the fact that it is upsetting to some or arouses contempt.

proscriptions.  *Compare Carey*, 447 U.S. at 471 (striking down content-based ban on picketing outside homes) *with Frisby v. Schultz*, 487 U.S. 474, 488 (1988) (upholding content-neutral ban on picketing outside homes).  In any event, even if the Act's viewpoint- and content-based nature were permissible under the captive audience doctrine, the Act's prohibitions would still fail narrow tailoring because they capture far more speech than necessary to serve either interest, as demonstrated by the fact that the Act's application does not depend on proof of *any* adverse impact on the listener.  *See Reed*, 576 U.S. at 163.

* * *

In sum, none of Defendants' arguments against the Act's failure to withstand strict scrutiny holds water.  The State has no legitimate interest in suppressing the viewpoints of its citizens, as the Act does.  While Defendants are free to advocate their own views of the eight "concepts," they are not free to punish those who refuse to abide by government-proscribed orthodoxy.  *See Barnette*, 319 U.S. at 642.

### B.    The District Court Did Not Abuse Its Discretion in Holding That Plaintiffs Are Likely to Succeed on the Merits of Their Fourteenth Amendment Claim.

#### 1.    The Stop WOKE Act Is Unconstitutionally Vague.

The Stop WOKE Act—which regulates employer speech advancing such nebulous concepts as implicit bias, privilege, moral superiority, and guilt or anguish because of the actions of others—is void for vagueness under the Due Process

38

Clause.  A law "can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."  *Wollschlaeger*, 848 F.3d at 1319 (quoting *Hill*, 530 U.S. at 732).  The Stop WOKE Act fails on both grounds.

The "vagueness" of "content-based regulation of speech" notably "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997)*.*  Vague laws force would-be speakers to "steer far wider of the unlawful zone" and "thus silenc[e] more speech than intended."  *Wollschlaeger*, 848 F.3d at 1320.

Defendants' attempt to argue for a less stringent vagueness test on the ground that the Stop WOKE Act is an "economic regulation," Br. at 45, fails.  In *Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, on which Defendants rely, the Court merely concluded that the law, which targeted the display of items along with literature encouraging illegal drug use, was not vague.  455 U.S. 489, 492, 503 (1982).  The Court observed that several factors influence the vagueness inquiry, including whether the enactment regulates businesses who have the opportunity to clarify its meaning in advance, whether a law imposes civil rather than criminal penalties, and whether there is a scienter requirement that can mitigate the law's vagueness.  *Id.* at 498-99.  The Court noted that "perhaps the most important factor

affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights," and that "[i]f, for example, the law interferes with the right of free speech, . . . a *more stringent* vagueness test should apply." *Hoffman Ests.*, 455 U.S. at 499 (emphasis added). The Stop WOKE Act targets speech at the heart of the First Amendment's protections, rather than mere regulation of commercial activity. *Cf. Expressions Hair Designs v. Schneiderman*, 581 U.S. 37 (2017) (noting that law prohibiting credit card surcharges, but not cash discounts, targeted "speech," because it did not regulate the price of goods, but how the price was communicated). A heightened vagueness standard should therefore apply.

The "concepts" prohibited by the Stop WOKE Act are not set forth in a manner that makes reasonably understandable the scope of the prohibited conduct, and they lack "clearly perceived boundaries." *See Heyman v. Cooper*, 31 F.4th 1315, 1323 (11th Cir. 2022). As the district court correctly recognized, the fact that the statute uses words defined in a dictionary (as all statutes do) does not cure it of vagueness. Op. at 30. Vague terms abound among the eight prohibited concepts, from what it means to be "morally superior" in prohibited concept 1, what counts as "unconsciously" "inherently" biased in prohibited concept 2, what constitutes being "necessarily" "privileged" in prohibited concept 3, what "without respect to" the listed criteria means in prohibited concept 4, what "responsibility" in prohibited

concept 5 encompasses, what "other forms of psychological distress" are covered or what "must feel" means in prohibited concept 7,  to what is intended by "created … to oppress" in prohibited concept 8.

Moreover, the authorities upon which Defendants rely for the proposition that statutes cannot be vague if dictionaries are available are inapposite, as those cases all involved terms that were much more concrete and less abstract than those employed in the Stop WOKE Act's prohibited concepts.  *See, e.g.*, *Tracy v. FAU Bd. of Trs.*, 980 F.3d 799, 807-08 (11th Cir. 2020) (defining "professional practice" as "activity characteristic of one's profession"); *High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1230-31 (11th Cir. 1982) (regulating the sale of "drug related object[s]" as those "designed or marketed as useful primarily for" use with controlled substances).  For example, in *Heyman*, in interpreting a local ordinance barring short-term rentals and leases, this Court defined "lease" and "rental" as synonyms. *See* 31 F.4th at 1322-23.  *Heyman* distinguished between uncertainty resulting from "verbal ambiguity" and from "verbal vagueness," and observed, "'A word or phrase is ambiguous when the question is which of two or more meanings applies; it is vague when its unquestionable meaning has uncertain application to various factual situations.'"  *Id.* at 1323 n.6 (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 32-33 (2012)).

Whether a lease means the same thing as a rental is a wholly different type of question than the uncertainty as to whether the prohibited concepts apply to various factual situations.  *See Heyman*, 31 F.4th at 1323 n.6.  For example, it is uncertain whether mandatory trainings encouraging law firm partners to expend additional efforts to mentor women or individuals from communities of color underrepresented among the partnership would violate prohibited concept 6 by "discriminating" based on "sex" or "race" "to achieve diversity, equity, or inclusion."  Nor is it obvious whether trainings encouraging "cultural competence"—*e.g.*, understanding that the race of a co-worker may affect how they experience different events or actions— would violate prohibited concept 4 by advancing the idea that people "should not attempt to treat others without respect to race."  Similarly thorny is determining whether an employer, after noticing that only women had been asked to take notes at meetings, could instruct employees to be mindful of gender dynamics without violating prohibited concept 4 by inculcating that they "should not attempt to treat others without respect to . . . sex."  Supp. App. 3.

Defendants try to defend two of the eight prohibited concepts as not being vague, IB 46-48, but as Plaintiffs demonstrated in their uncontested factual showing below, *each* of the eight prohibited concepts is abstract and susceptible to arbitrary enforcement:

- As to concept 1, Orrin in her DEI trainings regularly uses the terms "dominant groups" and "subordinated groups" to describe "power

42

relationships that often map onto race or sex." Supp. App. 15-16. It is unclear if these terms convey the type of "moral superiority" that would violate the Act.

- As to concept 2, Orrin's "entire framework" is to honestly convey "the reality that all of us have unconscious biases by virtue of the culture in which we are steeped." Supp. App. 4. Whether this framework advances the idea that an individual, by virtue of national origin, is "inherently . . . oppressive . . . , whether consciously or unconsciously," is not clear.

- As to concept 3, Orrin in her DEI sessions often uses the exercise of a "privilege wheel" based on protected characteristics "for participants to visualize those in their organizations with the most and the least power" and to better understand their own privilege. Supp. App. 16-17. It is hard to discern whether this exercise promotes that a person's "status as either privilege or oppressed is necessarily determined by . . . sex" in a way that violates the Act.

- As to concept 4, Orrin gives a presentation titled "*Beyond Empathy: A Call for White Humility in Response to Black Rage and Resistance*" about the impact of centuries of anti-Black violence in the United States. Supp. App. 16. Again, it is not clear whether this presentation—acknowledging a history of violence directed at one race and conveying that individuals belonging to the race that historically perpetuated the violence and those of the race that were the targets of the violence should reflect on their relative privilege— amounts to promoting that members of one race "cannot and should not attempt to treat others without respect to . . . race."

- As to concepts 5 and 6, Orrin conducts a presentation titled "*Corporate Complicity: A Case Study in Restorative Justice*" which "ask[s] participants to think about how 'your own institutions have been involved in larger systemic oppression'" and how the institution could engage in corrective actions, endorsing "reparations." Supp. App. 17-18. It is difficult to determine whether this presentation amounts to espousing that an individual by virtue of race, "bears responsibility for" past actions by others of the same race or that individuals of one race should "receive adverse treatment to achieve diversity, equity, or inclusion."

43

- As to concept 7, Orrin in her DEI sessions has participants "reflect on historical wrongs" after which they "routinely" tell her that they feel guilt about, for example, "exclusion of women from traditionally male fields like science and technology," and that, in her view "[p]sychological unease or guilt may be a necessary part of growth." Supp. App. 18. It is not clear whether these sessions advance the idea that a person by virtue of sex "bears personal responsibility for" and "must feel . . . psychological distress" because of actions by others of the same sex.

- Finally, as to concept 8, Orrin tries to help companies "recognize when they have set u[p] systems of reward based on white normative culture" that, for example, informs what qualifies as "professional." Supp. App. 18-19. Whether this strays into espousing that "such virtues as merit, excellence, . . . and racial colorblindness are racist" is unclear.

Moreover, even if any of the individual concepts were not vague, the entire statute is unconstitutionally vague, because one cannot discern "endorsement" of a prohibited concept, as opposed to "objective discussion" of the same. Fundamentally, the Stop WOKE Act's hazy line between objective discussion and endorsement cannot provide an effective safe harbor. *See Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048. 1051 (1991) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 112 (1972)) (striking bar rule as impermissibly vague where target of discipline had reviewed the rule, tried to comply, but did not properly guess at the safe harbor's contours; concluding that such a rule "fails to provide 'fair notice to those to whom it is directed'" and is "so imprecise that discriminatory enforcement is a real possibility"). Each of Plaintiffs has expressed that this line is unworkable—once they raise the notion that implicit bias or privilege exists, they feel ethically

obligated to also advance the view that we should try to overcome these blind spots and prejudices, both to ensure a healthy workplace culture and to be true to their organizational values. *See* Supp. App. 4-5, 12, 20. Defendants again turn to the dictionary to explain that objective discussion means "without distortion by . . . interpretation," Br. at 48—an explanation that is itself vague and clears up nothing. A training, meeting, or conversation that attempts to "discuss" a concept may well interpret that same concept, but this too may run afoul of the Act. To steer clear of endorsement, Plaintiffs will be forced to self-censor. In enjoining a nearly identical executive order issued by then-President Trump, a federal court observed that "[t]he line between teaching or implying (prohibited) and informing (not prohibited) 'is so murky, enforcement of the ordinance poses a danger of arbitrary and discriminatory application.'" *Santa Cruz Lesbian & Gay Community Ctr. v. Trump*, 508 F. Supp. 3d 521, 544 (N.D. Cal. 2020) (quoting *Hunt v. City of L.A.*, 638 F.3d 703, 712 (9th Cir. 2011)).

Because the Act's inherent vagueness—both as to the prohibited concepts and as to the "safe harbor" for objective discussion—invites discriminatory enforcement against those with whom the government disagrees, the district court correctly held that it violates due process.

## 2.    In the Alternative, the Stop WOKE Act Is Overbroad.

In the alternative, to the extent that this Court concludes that the Stop WOKE Act is not a viewpoint restriction or impermissibly vague, the statute is overbroad. *See MidAmerica C2L Inc. v. Siemens Energy Inc.*, 25 F.4th 1312, 1331 (11th Cir. 2022) (appellate court can affirm on any basis in the record).  A law that punishes "a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep'" must be invalidated as overbroad. *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (citation omitted).  This broad remedy arises "out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech," as many people "will choose simply to abstain from protected speech, harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Id.* at 119 (internal citations omitted).

Even assuming that the Stop WOKE Act has some legitimate sweep—such as Defendants' alleged interest in preventing discrimination— the law is substantially overbroad.  The First Amendment requires the State to regulate with greater precision to achieve its purpose.  Much of what the Act prohibits is not actual conduct, but rather is pure speech—advocacy of concepts with which the State disagrees.  These would include, for example: speech advancing the idea that because women and people of color face disadvantages or are expected to fill certain

46

roles in the workplace, special efforts to counteract these effects must also take into account the gender or race of the participants; sexual harassment trainings that inculcate that employees should not engage in certain negative behaviors, and that what is negative may vary based on the sex of the recipient, *see* Supp. App. 3; and honest discussions "endorsing the idea that 'unconscious bias' or 'implicit bias' exist" and are informed by our own race or gender, Supp. App. 11. As such, the Act is unconstitutionally overbroad.

### C.    The Act's Provisions Cannot Be Severed.

As explained above, every one of the concepts prohibited by the Act is unconstitutionally vague—consequently, Defendants cannot credibly claim that the invalid parts of the statute can be severed from the valid provisions. *See* Br. at 50.

Second, the district court was correct that the vagueness inherent in subsection (b) of the Act, which provides that the earlier provisions "may not be construed to prohibit discussion of the concepts listed as part of a course of training or instruction . . . in an objective manner without endorsement of the concepts," renders the whole statute unconstitutional. While Defendants incorrectly insinuate that severance is still possible by omitting the phrase "in an objective manner," the rest of the provision cannot stand without it.

As the Florida Supreme Court has explained, a statute is severable only if the unconstitutional provisions can be separated from the valid provisions, the

47

legislative purpose can still be accomplished, the valid and invalid provisions are not inseparable, and the statute remains complete after the invalid provisions are stricken. *See State v. Catalano*, 104 So. 3d 1069, 1081 (Fla. 2012) (refusing to sever provisions of 25-foot noise ordinance for motor vehicles that would have removed legislatively intended exemption for commercial and political vehicles, based on these factors).

These factors foreclose severance here, as the sponsors of the Stop WOKE Act spoke at length about the need to permit discussion of the concepts in an objective manner. Representative Avila emphasized that for "an HR professional in the workplace, everything that is taught should be from an objective standpoint" and that the teaching of historical facts "needs to be done in an objective manner," just as he himself instructs students in an introduction to government class: "I don't inject my personal beliefs on public policy . . . because everything is done from an objective manner."[19] Likewise, Senator Diaz explained that "objective," in the context of the Stop WOKE Act, means "the not-imposing responsibility or guilt to a person based on the group they belong to for the actions of others."[20] Omitting the objectivity clause would extend the statute beyond what the Florida Legislature

---

[19] Fla. H.R., Recording of Proceedings, at 1:10:12-1:11:20 (Feb. 22, 2022), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=7959.

[20] Fla. S., Recording of Proceedings, at 6:13:30-6:13:53 (Mar. 9, 2022), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8067.

48

intended.  Because subsection (b) applies to all eight concepts, the district court correctly concluded that the statute could not be severed.

### D.  The District Court Did Not Abuse Its Discretion in Holding That the Remaining Preliminary Injunction Factors Weigh in Plaintiffs' Favor.

Because Plaintiffs are likely to succeed on the merits, "[t]hey also meet the remaining requirements [for a preliminary injunction] as a necessary legal consequence."  *Otto*, 981 F.3d at 870.

As to the second requirement, irreparable injury is presumed where there is a First Amendment claim "establishing an imminent likelihood that pure speech will be chilled or prevented altogether."  *Siegel*, 234 F.3d at 1178; *see also Otto*, 981 F.3d at 870 ("continued enforcement" of "an unconstitutional 'direct penalization' of protected speech," "for even minimal periods of time, constitutes a per se irreparable injury") (internal citations omitted).

Here, the Act imminently chills the speech of Plaintiffs.  Plaintiffs Honeyfund and Primo both had to put their planned and ongoing DEI trainings on hold when the law was enacted.  *See* Supp. App. 6, 10.  And the CEOs of both companies have had great difficulty in trying to decipher what they can and cannot say to their employees in mandatory meetings.  *See* Supp. App. 4-6, 12.  Both also anticipate harm to their business interests if they cannot foster diversity in their workforce or attract a diverse clientele because of the Stop WOKE Act's restrictions.  *See* Supp.

App. 2, 9-11.  Likewise, the speech of Orrin and Collective Concepts, who arguably advance every one of the prohibited concepts in their DEI trainings, is significantly chilled.  Existing clients have narrowed the scope of their trainings or postponed them to avoid becoming the next "Disney," and some have canceled their contracts entirely.  *See* Supp. App. 15, 19-20.  Defendants addressed none of these examples of irreparable injury below or on appeal.

As to the third and fourth factors—injury to the opposing party and the public interest—the balance of equities favors Plaintiffs.  Plaintiffs detail substantial chilling of their speech that is critical to their businesses and livelihoods.  This injury far outweighs any damage to Defendants.  As this Court has recognized, "It is clear that neither the government nor the public has any legitimate interest in enforcing an unconstitutional ordinance."  *See Otto*, 981 F.3d at 870.  Defendants' repetition of the mantra that the Stop WOKE Act aims to end "invidious racial discrimination and hostility," Br. at 52, cannot distract from the fact that it goes far beyond any legitimate state purpose (which is already protected by existing anti-discrimination laws) and its effect will be to chill employers seeking to prevent and address workplace racial discrimination, albeit using concepts that the State finds objectionable.  The State's only articulated purpose is to protect employees from the theoretical possibility that these efforts might cause them "psychological distress," but when it comes to the free exchange of ideas, protecting an individual from being

50

confronted with uncomfortable truths is not a legitimate state purpose.  *See Johnson*, 491 U.S. at 414; *Snyder*, 562 U.S. at 458.   The preliminary injunction factors therefore *all* weigh in Plaintiffs' favor.

## CONCLUSION

Because the district court did not abuse its discretion in preliminarily enjoining the Stop WOKE Act, the order and injunction should be affirmed.

Dated: January 11, 2023

Respectfully submitted,

By: */s/ Shalini Goel Agarwal*

Shalini Goel Agarwal
Fla. Bar No. 90843
THE PROTECT DEMOCRACY
PROJECT
Pennsylvania Ave., NW, Suite 163
Washington, DC  20006
Tel: (202) 579-4582
shalini.agarwal@protectdemocracy.org

Sara Chimene-Weiss
THE PROTECT DEMOCRACY
PROJECT
7000 N. 16th St., Suite 120, #430
Phoenix, AZ 85020
Tel: (202) 934-4237
sara.chimene-
weiss@protectdemocracy.org

John Langford
Rachel Goodman
THE PROTECT DEMOCRACY
PROJECT
82 Nassau St., #601

New York, NY 10038
Tel: (202) 579-4582
john.langford@protectdemocracy.org
rachel.goodman@protectdemocracy.org

Douglas Hallward-Driemeier
ROPES & GRAY LLP
2099 Pennsylvania Ave., NW
Washington, DC 20006-6807
Tel: (202) 508-4776
Douglas.Hallward-
Driemeier@ropesgray.com

Amy Jane Longo
ROPES & GRAY LLP
10250 Constellation Blvd.
Los Angeles, CA 90067
Tel: (310) 975-3269
Amy.Longo@ropesgray.com

***Counsel for Plaintiffs-Appellees***

## <u>CERTIFICATE OF COMPLIANCE</u>

On behalf of Plaintiffs-Appellees, I hereby certify pursuant to Federal Rule of Appellate Procedure 32(g)(1) that the attached motion is proportionally spaced, has a typeface of 14 points or more, and contains 12,289 words.

<u>*/s/ Shalini Goel Agarwal*</u>
Shalini Goel Agarwal

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 11, 2023, I electronically filed the foregoing with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Shalini Goel Agarwal*
Shalini Goel Agarwal
