CASE NO. 22-13135

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## FOR THE ELEVENTH CIRCUIT

Honeyfund.com, Inc., et al.,

*Plaintiffs–Appellees,*

vs.

Ron DeSantis, in his official Capacity as Governor of Florida, et al.,

*Defendants–Appellants.*

Appeal from the United States District Court for the Northern District of
Florida — No. 4:22-cv-00227-MW-MAF (Honorable Mark E. Walker)

**BRIEF OF *AMICI CURIAE* H&M HENNES & MAURITZ L.P., BEN &
JERRY'S ICE CREAM, CHAMBER OF PROGRESS, ALOHA BAY
CONDOMINIUM ASSOCIATION, INC., FAHERTY BRAND, LLC,
GLOSSIER, INC., LEGACY HOSPITALITY HOLDINGS, INC. AND ITS
SUBSIDIARIES (LEGACY CLUB HOLDINGS, LLC, LEGACY
VACATION CLUB SERVICES, LLC, SALT PALM DEVELOPMENT INC.,
AND FLORIDA FOR GOOD, LLC), LUSH LICENSING, MARA
HOFFMAN, INC., THE FOR GOOD MOVEMENT, INC., RESORT
WORLD OF ORLANDO CONDOMINIUMS SECTION II ASSOCIATION,
INC., THE HARBOR CLUB OWNERS ASSOCIATION, INC., THE OAKS
AT RESORT WORLD CONDOMINIUM ASSOCIATION, INC., THE SPAS
AT RESORT WORLD CONDOMINIUM ASSOCIATION, INC., AND THE
VILLAS AT RESORT WORLD CONDOMINIUM ASSOCIATION, INC.
IN SUPPORT OF APPELLEES**

Wesley Todd Lee Burrell (*pro hac* pending)
Wesley.Burrell@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Tel: (213) 683-9100

Brendan B. Gants
Brendan.Gants@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW, Suite 500 E
Washington, DC 20001
Tel: (202) 220-1100

*Counsel for Amici Curiae H&M Hennes &
Mauritz L.P., Ben & Jerry's Ice Cream,
Chamber of Progress, Aloha Bay
Condominium Association, Inc.,
Faherty Brand, LLC, Glossier, Inc., Legacy
Hospitality Holdings, Inc. and its subsidiaries
(Legacy Club Holdings, LLC, Legacy Vacation
Club Services, LLC, Salt Palm Development
Inc., and Florida for Good, LLC),
Lush Licensing, Mara Hoffman, Inc., Resort
World of Orlando Condominiums Section II
Association, Inc., The For Good Movement,
Inc., The Harbor Club Owners Association,
Inc., The Oaks at Resort World Condominium
Association, Inc., The Spas at Resort World
Condominium Association, Inc., and The Villas
at Resort World Condominium Association,
Inc.*

Case No. 22-13135
*Honeyfund.com, Inc. v. DeSantis*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (CIP)

The undersigned counsel of record certifies that the following listed persons and entities as described in 11th Cir. R. 26.1-2(a) have an interest in the outcome of this case, and were omitted from the Certificates of Interested Persons in briefs that were previously filed per 11th Cir. R. 26.1-2(b).

1.    Aloha Bay Condominium Association, Inc., *Member of Amici Curiae*

2.    Ben & Jerry's Homemade Holdings, Inc. d/b/a Ben & Jerry's Ice Cream, *Member of Amici Curiae*

3.    Burrell, Wesley Todd Lee, *Attorney for Amici Curiae*

4.    Chamber of Progress, *Member of Amici Curiae*

5.    Faherty Brand, LLC, *Member of Amici Curiae*

6.    Florida for Good, LLC, *Member of Amici Curiae*

7.    Gants, Brendan B., *Attorney for Amici Curiae*

8.    Glossier, Inc., *Member of Amici Curiae*

9.    H&M Hennes & Mauritz L.P., *Member of Amici Curiae*

10.   H& M Hennes & Mauritz USA B.V., LLC, H & M Hennes & Mauritz Holding B.V., LLC, and H & M Hennes & Mauritz GBC AB (trading as "HM B" on Nasdaq Stockholm), *Affiliates of a Member of Amici Curiae*

11.   Legacy Club Holdings, LLC, *Member of Amici Curiae*

Case No. 22-13135

*Honeyfund.com, Inc. v. DeSantis*

12.    Legacy Hospitality Holdings, Inc., *Member of Amici Curiae*

13.    Legacy Vacation Club Services, LLC, *Member of Amici Curiae*

14.    Lush Licensing, *Member of Amici Curiae*

15.    Lush USA and Lush Limited, *Parents of a Member of Amici Curiae*

16.    Mara Hoffman, Inc., *Member of Amici Curiae*

17.    Munger, Tolles & Olson LLP, *Attorneys for Amici Curiae*

18.    Resort World of Orlando Condominiums Section II Association, Inc.,

*Member of Amici Curiae*

19.    Salt Palm Development Inc., *Member of Amici Curiae*

20.    The For Good Movement, Inc., *Member of Amici Curiae*

21.    The Harbor Club Owners Association, Inc., *Member of Amici Curiae*

22.    The Oaks at Resort World Condominium Association, Inc., *Member of Amici Curiae*

23.    The Spas at Resort World Condominium Association, Inc., *Member of Amici Curiae*

24.    The Villas at Resort World Condominium Association, Inc., *Member of Amici Curiae*

25.    Unilever PLC (trading as "ULVR" on the London Stock Exchange, "UNA" on Euronext Amsterdam and "UL" on the New York Stock Exchange) and Unilever N.V., *Parents of a Member of Amici Curiae*

Case No. 22-13135
*Honeyfund.com, Inc. v. DeSantis*

In addition, the undersigned counsel certifies that:

- Aloha Bay Condominium Association, Inc., The Harbor Club Owners Association, Inc., The Spas at Resort World Condominium Association, Inc., The Oaks at Resort World Condominium Association, Inc., The Villas at Resort World Condominium Association, Inc., Resort World of Orlando Condominiums Section II Association, Inc., and The For Good Movement, Inc., are all not-for-profit organizations. They have no parent corporation and no publicly traded corporation owns 10% or more of them.

- Ben & Jerry's Homemade Holdings, Inc. d/b/a Ben & Jerry's Ice Cream is a subsidiary to corporate parents Unilever N.V. and Unilever PLC, which are publicly held and own 10% or more of its stock.

- Faherty Brand, LLC has no parent corporation and no publicly held corporation owns 10% or more of its stock.

- Glossier, Inc has no parent corporation and no publicly held corporation owns 10% or more of its stock.

- H&M Hennes & Mauritz L.P is a privately held Limited Partnership. The Limited Partnership is between H& M Hennes & Mauritz USA B.V., LLC, as the general partner, and H & M Hennes & Mauritz Holding B.V., LLC. H&M Hennes & Mauritz L.P's parent company, H & M Hennes & Mauritz GBC AB, is a publicly held corporation traded on the Nasdaq Stockholm and incorporated in Sweden. No other public company owns more than 10% of H&M's stock.

- Legacy Vacation Club Services, LLC, is a wholly-owned subsidiary of Legacy Club Holdings, LLC, which is in turn a wholly-owned subsidiary of Legacy Hospitality Holdings, Inc. Florida for Good, LLC is a wholly-owned subsidiary of Salt Palm Development Inc., which is in turn a wholly-owned subsidiary of Legacy Hospitality Holdings, Inc. Legacy Hospitality Holdings, Inc. has no parent corporation and no publicly traded corporation owns 10% or more of its stock.

Case No. 22-13135
*Honeyfund.com, Inc. v. DeSantis*

- Lush Licensing is a wholly-owned subsidiary of Lush USA, which is a wholly-owned subsidiary of Lush Limited, and no publicly held corporation owns 10% or more of Lush Limited's stock.

- Mara Hoffman, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

- The Chamber of Progress is a trade group organized under Section 501(c)(6) of the Internal Revenue Code.  It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Wesley T.L. Burrell
 Brendan B. Gants
Counsel for *Amici Curiae H&M Hennes & Mauritz L.P., Ben & Jerry's Ice Cream, Chamber of Progress, Aloha Bay Condominium Association, Inc., Faherty Brand, LLC, Glossier, Inc., Legacy Hospitality Holdings, Inc. and its subsidiaries (Legacy Club Holdings, LLC, Legacy Vacation Club Services, LLC, Salt Palm Development Inc., and Florida for Good, LLC), Lush Licensing, Mara Hoffman, Inc., Resort World of Orlando Condominiums Section II Association, Inc., The For Good Movement, Inc., The Harbor Club Owners Association, Inc., The Oaks at Resort World Condominium Association, Inc., The Spas at Resort World Condominium Association, Inc., and The Villas at Resort World Condominium Association, Inc.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

IDENTITY AND INTEREST OF THE *AMICI CURIAE* ..........................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................3

ARGUMENT ..................................................................................................4

I.    DEI PROGRAMING IMPROVES BUSINESS PERFORMANCE AND IS CONSTITUTIONALLY PROTECTED EXPRESSION ................4

    A.    DEI Training Enhances Business Performance ...................................5

    B.    DEI Programing Is a Constitutionally-Protected Expression of an Employer's Values ........................................................................10

II.    THE STOP WOKE ACT IMPOSES SIGNIFICANT RISK OF LIABILITY FOR COMMONPLACE EMPLOYER-EMPLOYEE COMMUNICATIONS AND CHILLS SPEECH NATIONWIDE ..............12

    A.    The Stop WOKE Act Significantly Limits Amici's Ability to Communicate with Their Employees on DEI-Related Topics ...........12

    B.    The Stop WOKE Act Chills Speech in States Outside of Florida ......15

CONCLUSION ...............................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Bolger v. Youngs Drug Prods. Corp.*,
   463 U.S. 60 (1983)...................................................................................6

*Citizens United v. Fed. Election Comm'n*,
   558 U.S. 310 (2010)...............................................................................11

*Edenfield v. Fane*,
   507 U.S. 761 (1993)...............................................................................12

*Honeyfund.com, Inc. v. DeSantis*,
   No. 4:22-cv-227-MW/MAF, 2022 WL 3486962 (N.D. Fla. Aug.
   18, 2022) ......................................................................................6, 12, 14

*Williams-Boldware v. Denton County, Tex.*,
   741 F.3d 635 (5th Cir. 2014) ...................................................................7

**STATUTES**

Fla. Stat. § 607.602(5)...............................................................................1, 11

Fla. Stat. § 760.10(8).................................................................................13, 14

**RULES**

Fed. R. App. P. 29(a)(4)(E)..............................................................................2

**OTHER AUTHORITIES**

Al Baker, "Confronting Implicit Bias in the New York Police
   Department," *N.Y. Times* (July 15, 2018), available at
   https://www.nytimes.com/2018/07/15/nyregion/bias-training-
   police.html ..............................................................................................13

American Business Roundtable's Statement on the Purpose of a
   Corporation, August 19, 2019,
   https://opportunity.businessroundtable.org/ourcommitment/............................11

Edward Connor & Marian Crowley-Henry, *Exploring the Relationship Between Exclusive Talent Management, Perceived Organizational Justice and Employee Engagement*, 142 Journal of Bus. Ethics, No. 1 (2017), https://link.springer.com/article/10.1007/s10551-017-3543-1 ...........................10

Francesca Gino & Katherine Coffman, *Unconscious Bias Training That Works*, Harvard Bus. Rev. 99, No. 5 (2021), https://hbr.org/2021/09/unconscious-bias-training-that-works ........................5, 9

Hidden Brain, "The Mind of the Village: Understanding Our Implicit Biases," National Public Radio, available at https://www.npr.org/2020/06/20/880379282/the-mind-of-the-village-understanding-our-implicit-biases;.........................................................13

Implicit Bias, *National Institutes of Health*, available at https://diversity.nih.gov/sociocultural-factors/implicit-bias..............................13

Jeffrey A. Flory et al., *Increasing Workplace Diversity: Evidence From a Recruiting Experiment at a Fortune 500 Company*, 56 Journal of Human Resources 73 (2021), https://scholarsarchive.byu.edu/cgi/viewcontent.cgi?article=6703&context=facpub....................................................................................................7

Katerina Bezrukova et al., *A Meta-Analytical Integration of Over 40 Years of Research on Diversity Training Evaluation*, 142 Psych. Bulletin 1227, 14 (2016), https://ecommons.cornell.edu/handle/1813/71443 ...............................................6

Katherine W. Phillips, *How Diversity Makes Us Smarter*, Sci. Am. (Oct. 1, 2014), https://www.scientificamerican.com/article/how-diversity-makes-us-smarter/...................................................................................8

Matt Krentz et al., *Diversity Is Just the First Step. Inclusion Comes Next.*, BCG (Apr. 24, 2019), https://www.bcg.com/publications/2019/diversity-first-step-inclusion-comes-next .....................................................................................8, 9

McKinsey & Co., *Diversity Wins: How Inclusion Matters* (May 2020), https://www.mckinsey.com/~/media/mckinsey/featured%20insights/diversity%20and%20inclusion/diversity%20wins%20how%20inclusion%20matters/diversity-wins-how-inclusion-matters-vf.pdf .....................10

McKinsey & Co., *Why Diversity Matters* (Jan. 2015), https://www.mckinsey.com/capabilities/people-and-organizational-performance/our-insights/why-diversity-matters ..................................8

Meghan M. Biro, *Onboarding Empathy: 12 Best Practices for DEI Training*, Fortune (July 20, 2022), https://www.forbes.com/sites/meghanbiro/2022/07/20/onboarding-empathy-12-best-practices-for-dei-training......................................................4, 5

Oriane Georgeac & Aneeta Rattan, *Stop Making the Business Case for Diversity*, Harvard Bus. Rev. (June 15, 2022), https://hbr.org/2022/06/stop-making-the-business-case-for-diversity.....................................................................................10

Patricia G. Devine & Tory L. Ash, *Diversity Training Goals, Limitations, and Promise: A Review of the Multidisciplinary Literature*, 73 Annual Rev. of Psychol. 403 (2022), https://www.annualreviews.org/doi/pdf/10.1146/annurev-psych-060221-122215 .....................................................................................5

Raphael S. Diller & Arthur J. Grund., *Employee Diversity and Organizational Performance*, Journal of Human Resource & Leadership, Vol. 6, Issue 3 (Aug. 2022), https://doi.org/10.53819/81018102t5093 ..............................................9

Rocío Lorenzo et al., *How Diverse Leadership Teams Boost Innovation*, BCG (Jan. 23, 2018), https://www.bcg.com/publications/2018/how-diverse-leadership-teams-boost-innovation........................................................8

Roger Mayer et al., *Do Pro-Diversity Policies Improve Corporate Innovation?*, 47 Fin. Mgmt. 617 (2018), https://www.jstor.org/stable/45091126..........................................................7, 9

Usmani Sania et al., *Diversity, Employee Morale and Customer Satisfaction: The Three Musketeers*, J. of Econ., Bus, and Management, Vol. 3, No. 1 (Jan. 2015), http://www.joebm.com/papers/147-W00006.pdf ................................................9

**IDENTITY AND INTEREST OF THE *AMICI CURIAE***

Amici represent businesses that operate across the United States, including many in Florida, in a range of industries, including fashion, hospitality, real estate, cosmetics, technology, non-profit, and more.  Together, they employ thousands of individuals and serve millions of customers and clients.

Amici recognize the role that the private businesses should play in advancing justice and equity in society.  As employers and stakeholders in the broader communities in which they operate, Amici are committed to using their institutional roles to promote diversity in the workforce.

Amici include:

- Major national retailers;

- Three entities legally organized as benefit corporations, including two organized as Florida benefit corporations whose state-sanctioned purpose is to create "material, positive effect on society . . . ," *see* Fla. Stat. § 607.602(5);

- A tech industry coalition devoted to a progressive society, economy, workforce, and consumer climate; and

- Several non-profit organizations.

This case presents questions of significant importance to Amici concerning the circumstances under which the state may prohibit the speech of corporate entities and businesses and control employers' communications promoting diversity, equity, and inclusion among their employees.  The First Amendment's protections are integral to the work of American businesses, including its

1

protection of their right to control messaging to employees.  Employers face a serious threat if, as Florida's governmental Appellants argue here, the government can control the messages businesses deliver to their employees during trainings. Amici have a vital interest in ensuring that businesses are afforded the protections guaranteed by the First Amendment against overreaching government speech requirements.  Amici also have a fundamental interest in ensuring that the First Amendment's boundaries are clear and that its standards are not eroded by the adoption of government speech codes controlling the viewpoints they may express.

Pursuant to Fed. R. App. P. 29(a)(4)(E), Amici here state that (1) no party's counsel has authored this amicus curiae brief in whole or in part; (2) no party or party's counsel has contributed money intended to fund the preparation or submission of this brief; and (3) no person other than Amici, their members, and their counsel have contributed money intended to fund the preparation or submission of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

**I.**  Amici know from experience what studies have consistently shown: companies that cultivate diversity and promote cultures of equity and inclusion benefit from enhanced business performance and improved employee morale. These benefits include more successful recruitment and retention of top talent, increased innovation and creativity, higher employee morale, and a reduction in insidious instances of discrimination.  The benefits are best achieved by implementing programs and trainings designed to promote DEI that are central to and integral with their employees' responsibilities—the kind that Florida's Stop WOKE Act prohibits as so-called "discrimination."  In short, diversity, equity, and inclusion ("DEI") training creates a number of tangible benefits that positively affect Amici's bottom lines.

**II.**  Beyond the business case for pro-DEI policies and training, Amici have an interest in promoting DEI as an expression of their companies' values. Diversity, equity, and inclusion are components of a just society and essential to the public good.  Amici believe they have an ethical responsibility to cultivate DEI initiatives to produce thoughtfully diverse and inclusive workplace cultures that positively impact the wider communities in which they operate.  Under both federal and Florida law, it is Amici's right to do so.

3

**III.**  As the District Court rightly concluded, the challenged provision of the Stop WOKE Act is naked viewpoint-based regulation that cannot survive strict scrutiny.  The statute chills businesses' ability to train their employees adequately and foster a collaborative and inclusive culture.  The Stop WOKE Act should be understood for what it is:  an attempt to silence businesses and hamper their ability to self-define their own workplace culture, substituting the Florida Legislature's viewpoint on the role that DEI should (or, more aptly, should *not*) play in their workplaces for their own.  The Court should affirm the district court's judgment.

## ARGUMENT

## I.  DEI PROGRAMING IMPROVES BUSINESS PERFORMANCE AND IS CONSTITUTIONALLY PROTECTED EXPRESSION

Few dispute that people of every race, sex, ethnicity, and national origin deserve equal opportunities to be involved and supported in the workplace.  It is a simple matter of justice, which is reason enough to support DEI-related initiatives.  But these initiatives yield other, research-backed, tangible benefits as well.

Those tangible benefits, along with the ethical imperative to achieve greater diversity, equity, and inclusion for all, have made DEI programs the norm in businesses across America.  Nearly every *Fortune* 500 company offers them. Meghan M. Biro, *Onboarding Empathy: 12 Best Practices for DEI Training*,

4

Fortune (July 20, 2022).[1]  Businesses, including Amici, are committed to DEI programing as an investment in both their business operations and the communities wherein they operate.

Moreover, to maximize success, Amici choose to "make a real, long-term commitment" to pursue DEI as a central feature of their corporate culture rather than an ancillary "check-the-box exercise."  *See* Francesca Gino & Katherine Coffman, *Unconscious Bias Training That Works*, Harvard Bus. Rev. 99, No. 5, at 2 (2021).[2]  Additionally, as not all DEI programing is equally effective, Amici take into account the specific conditions of their respective businesses, customers, and markets to decide how best to implement it with "the overarching goal of fostering an inclusive company climate" that will last.  *See* Patricia G. Devine & Tory L. Ash, *Diversity Training Goals, Limitations, and Promise: A Review of the Multidisciplinary Literature*, 73 Annual Rev. of Psychol. 403, 407 (2022).[3]

## A. DEI Training Enhances Business Performance

Social science research corroborates Amici's experience that there is a strong business case favoring mandatory DEI training.  Mandatory training is

---

[1] Available at https://www.forbes.com/sites/meghanbiro/2022/07/20/onboarding-empathy-12-best-practices-for-dei-training.

[2] Available at https://hbr.org/2021/09/unconscious-bias-training-that-works.

[3] Available at https://www.annualreviews.org/doi/pdf/10.1146/annurev-psych-060221-122215.

especially effective because "it sends a message that the organization is truly committed to diversity, thus increasing trainees' motivation to learn." *See* Katerina Bezrukova et al., *A Meta-Analytical Integration of Over 40 Years of Research on Diversity Training Evaluation*, 142 Psych. Bulletin 1227, 14 (2016) ("[M]andatory attendance was positively associated with all learning outcomes.").[4]  Additionally, mandatory attendance achieves greater outcomes because the full workforce participates, not just those who self-select into the program.  *Id.* at 42-43.

**Increased Recruitment and Retention.**  Amici recognize that their employees are their greatest business assets.  Adopting pro-DEI policies, including mandatory DEI training, enables companies to attract and retain top employees who seek inclusive and supportive environments to develop their careers.  *See* Roger Mayer et al., *Do Pro-Diversity Policies Improve Corporate Innovation?*, 47 Fin. Mgmt. 617, 619 (2018).[5]  Increasingly, diverse recruits and employees look for DEI programs and other tangible commitments to diversity in deciding where to work.  One recent study found that by explicitly signaling interest in employee diversity, a major financial services company more than doubled its recruitment interest among racial minority candidates.  Jeffrey A. Flory et al., *Increasing Workplace Diversity: Evidence From a Recruiting Experiment at a Fortune 500*

---

[4] Available at https://ecommons.cornell.edu/handle/1813/71443.

[5] Available at https://www.jstor.org/stable/45091126.

*Company*, 56 Journal of Human Resources 73, 73 (2021).[6] DEI initiatives thus give Amici a competitive edge in recruiting and retaining top talent.

**Enhanced Compliance with Anti-Discrimination Law.** Mandatory DEI training helps businesses comply with federal and most states' anti-discrimination law. *See, e.g.*, *Williams-Boldware v. Denton County, Tex.*, 741 F.3d 635, 641-42 (5th Cir. 2014) (holding that mandatory diversity training was proper remedial action to avoid Title VII liability). It helps reduce instances of discrimination, particularly when mandatory for those who would otherwise opt-out. By declaring certain anti-discriminatory concepts to be *per se* discrimination, however, the Stop WOKE Act creates a world in which Amici are damned if they do and damned if they do not: they could be penalized under one anti-discrimination law for proactively seeking to train their employees so as to avoid liability under another.

**Improved Innovation, Creativity, and Morale.** Multiple studies have shown that workforces with greater diversity consistently outperform those with less. *See, e.g.*, McKinsey & Co., *Why Diversity Matters* (Jan. 2015) (study of 366 public companies showing greater diversity in management resulted in greater financial returns);[7] Katherine W. Phillips, *How Diversity Makes Us Smarter*, Sci. Am. (Oct.

---

[6] Available at https://scholarsarchive.byu.edu/cgi/viewcontent.cgi?article=6703&context=facpub.

[7] Available at https://www.mckinsey.com/capabilities/people-and-organizational-performance/our-insights/why-diversity-matters.

1, 2014) (finding greater employee diversity resulted in better exchange of ideas and information).[8]  People of "different backgrounds and experiences often see the same problem in different ways and come up with different solutions, increasing the odds that one of those solutions will be a hit."  Rocío Lorenzo et al., *How Diverse Leadership Teams Boost Innovation*, BCG (Jan. 23, 2018).[9]  But diversified workforces must cultivate inclusive cultures to achieve peak performance because otherwise, diverse employees "feel far less able . . . to share their views at work."  Matt Krentz et al., *Diversity Is Just the First Step. Inclusion Comes Next.*, BCG, at 3 (Apr. 24, 2019).[10]  For this reason, "firms that promote a pro-diversity workplace are rewarded by greater innovative efficiency" than those without such policies.  *Mayer et al.*, *supra* note 6, at 619.[11]

Consistent with these findings, employee morale also increases with increased diversity, as long as the diverse workspace is properly managed with respect to equity and inclusion.  Raphael S. Diller & Arthur J. Grund., *Employee Diversity and Organizational Performance*, Journal of Human Resource &

---

[8] Available at https://www.scientificamerican.com/article/how-diversity-makes-us-smarter/.

[9] Available at https://www.bcg.com/publications/2018/how-diverse-leadership-teams-boost-innovation.

[10] Available at https://www.bcg.com/publications/2019/diversity-first-step-inclusion-comes-next.

[11] Available at https://www.jstor.org/stable/45091126.

Leadership, Vol. 6, Issue 3, at 1 (Aug. 2022) ("Diversity in the workplace increases employee morale.").[12]  Yet, if issues of equity and inclusion are not addressed, workspaces with greater diversity may counterproductively lead to greater stress, negative working relationships, and poorer morale.  Usmani Sania et al., *Diversity, Employee Morale and Customer Satisfaction: The Three Musketeers*, J. of Econ., Bus, and Management, Vol. 3, No. 1 (Jan. 2015).[13]

DEI training counteracts these effects.  Successful DEI training helps employees "better understand others' experiences and feel more motivated to be inclusive."  *Gino & Coffman*, *supra* note 2, at 2.  Because "employees' experience of inclusion in their workplace matters enormously to them," the resulting inclusive work culture "enables individuals both to shine in their own right and to pull together as a team."  McKinsey & Co., *Diversity Wins: How Inclusion Matters*, at 32, 47 (May 2020).[14]  Positive perception that a workspace is fair and inclusive also generates better employee engagement and performance outcomes. Edward Connor & Marian Crowley-Henry, *Exploring the Relationship Between Exclusive Talent Management, Perceived Organizational Justice and Employee*

---

[12] Available at https://doi.org/10.53819/81018102t5093.

[13] Available at http://www.joebm.com/papers/147-W00006.pdf.

[14] Available at https://www.mckinsey.com/~/media/mckinsey/featured%20insights/diversity%20and%20inclusion/diversity%20wins%20how%20inclusion%20matters/diversity-wins-how-inclusion-matters-vf.pdf.

*Engagement*, 142 Journal of Bus. Ethics, No. 1 (2017).[15]  DEI training, thus, leads to greater workforce innovation, creativity, and morale.

**B.  DEI Programing Is a Constitutionally-Protected Expression of an Employer's Values**

Apart from the business benefits of DEI training, Amici support DEI-related speech because it is the right thing to do.  *See* Oriane Georgeac & Aneeta Rattan, *Stop Making the Business Case for Diversity*, Harvard Bus. Rev. (June 15, 2022).[16] DEI programing is an effective way for businesses like Amici to articulate and actualize their commitment to diversity.  It is not merely something incidental to their businesses but a core aspect of who they are.

Through DEI training, Amici are able to both express their values and pursue, within their own workforce, that positive change that they wish to see made in the wider communities in which they operate.  Amici thereby contribute to the larger cultural conversation about how to make society more inclusive and accessible for those from diverse backgrounds, as it their constitutionally protected right.  *See generally Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 343 (2010) ("Corporations and other associations, like individuals, contribute to the discussion, debate, and the dissemination of information and ideas that the First

---

[15] Available at https://link.springer.com/article/10.1007/s10551-017-3543-1.

[16] Available at https://hbr.org/2022/06/stop-making-the-business-case-for-diversity.

Amendment seeks to foster." (internal quotation marks omitted)).  Two Amici are, in fact, organized as Florida benefit corporations, meaning that the State of Florida has endorsed their commitment to producing "a material, positive effect on society . . . ." *See* Fla. Stat. § 607.602(5).  In arguing that this Court should lift the injunction against enforcement of the Stop WOKE Act, Appellants seek to muzzle Amici and other businesses from expressing their vision for what that positive effect should be.

All American companies have a legitimate business purpose to promote communities of equity and inclusion both internally and externally.  As 181 chief executive officers of America's leading companies recently recognized, American businesses have a broad interest to act ethically for their employees and "the communities in which we work," including by "supporting [our employees] through training and education" and "foster[ing] diversity and inclusion, dignity and respect."  American Business Roundtable's Statement on the Purpose of a Corporation, August 19, 2019.[17]  Amici share in this commitment and purpose.

It is the prerogative, responsibility, and right of Amici and similarly situated businesses to express their corporate values by implementing DEI programing for the common good of their employees and communities.  Florida may not quell that

---

[17] Available at https://opportunity.businessroundtable.org/ourcommitment/.

11

right.  As the Supreme Court has observed, "[t]he commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish."  *Edenfield v. Fane*, 507 U.S. 761, 767 (1993).

## II.    THE STOP WOKE ACT IMPOSES SIGNIFICANT RISK OF LIABILITY FOR COMMONPLACE EMPLOYER-EMPLOYEE COMMUNICATIONS AND CHILLS SPEECH NATIONWIDE

The Stop WOKE Act significantly and unconstitutionally limits the DEI training that businesses—in their business judgment—have determined to be appropriate for their employees.  If allowed to stand, its expansive statutory language and sweeping liability regime will accomplish the statute's intended goal: to chill employers' speech concerning diversity, equity, and inclusion and disrupt employers' ability to determine how best to train their employees.

### A.    The Stop WOKE Act Significantly Limits Amici's Ability to Communicate with Their Employees on DEI-Related Topics

The Stop WOKE Act creates a minefield of potential lawsuits for any business seeking to promote diversity, equity, and inclusion in its workforce.  Its language is so "mired in obscurity" and impermissibly vague that it will inevitably lead employers to "self-censor their speech."  *Honeyfund.com, Inc. v. DeSantis*, No. 4:22-cv-227-MW/MAF, 2022 WL 3486962, at *12-13 (N.D. Fla. Aug. 18, 2022).

Under the Stop WOKE Act, businesses in Florida face significant liability for promoting widely accepted concepts that are central to most DEI training

programs.  The statute takes aim at concepts like implicit bias, gender- and race-based privilege, and race-consciousness—all of which have become mainstream both on Wall Street and Main Street.[18]  For example, the concept "implicit bias"—the tendency for people to unconsciously associate members of certain social groups with positive or negative stereotypes—has been extensively documented by researchers, is a key element of DEI curricula, and has become mainstream outside of human resources offices and the academy.[19]  But the Stop WOKE Act would prohibit businesses from training their employees that implicit bias exists and from attempting to train employees on how to disrupt it.

Moreover, the Stop WOKE Act covers more than mandatory trainings.  It "bars '*any* . . . required activity' at which the eight forbidden 'concepts' are discussed and endorsed," presumably including "trainings, phone calls, assignments, discussions—anything that is required and endorses the concepts," *Honeyfund.com*, 2022 WL 3486962, at *7.  Because the Act reaches so broadly and labels certain concepts *per se* discrimination, many businesses will have no

---

[18] *See* Fla. Stat. § 760.10(8)(a)(2), (a)(3), (a)(4).

[19] *See, e.g.*, "Implicit Bias," *National Institutes of Health*, available at https://diversity.nih.gov/sociocultural-factors/implicit-bias; Hidden Brain, "The Mind of the Village: Understanding Our Implicit Biases," National Public Radio, available at https://www.npr.org/2020/06/20/880379282/the-mind-of-the-village-understanding-our-implicit-biases; Al Baker, "Confronting Implicit Bias in the New York Police Department," *N.Y. Times* (July 15, 2018), available at https://www.nytimes.com/2018/07/15/nyregion/bias-training-police.html.

practical means of avoiding potential liability. A book publisher, for example, could face exposure for requiring its editor to proofread a manuscript if that manuscript promotes implicit bias. Similarly, a web-design company may face a lawsuit for requiring an illustrator to design a client website that discusses white privilege.

Businesses like Amici also will be forced to censor trainings that arguably fall outside the scope of the Act. The concepts prohibited under the Act are so vague that it is impossible for businesses to predict whether a training would be found to promote one of the prohibited concepts implicitly, simply because it addresses related subject matter. For example, a training that asks employees to examine the role that their race has played in their professional experiences—a common training exercise—may be deemed too risky in light of Section 760.10(8)(a)(3)'s prohibition on training that promotes the idea that "[a]n individual's . . . privilege[] . . . is necessarily determined by his or her race." In this case, an employer—on pain of sweeping civil liability—will be discouraged from advancing the training exercise based on the fear that it may be inferred that the training necessarily endorses the notion of race-based privilege. In this way, the statute chills a mass of diversity and inclusion training. It opens employers to potential exposure for discussions and exercises that merely touch on concepts like privilege, implicit bias, or race consciousness *regardless* of how exactly those

14

concepts are actually addressed in the training. Employers will have no choice but to self-censor.

### B.    <u>The Stop WOKE Act Chills Speech in States Outside of Florida</u>

Moreover, these chilling effects will likely extend far outside Florida. Many of Florida's large employers, including some of the Amici, are national businesses that run nationwide employee-training programs. Under the Stop WOKE Act's regime, they would be required to expend additional resources either to create Florida-specific training or conform nationwide training to accommodate the Act's onerous restrictions.

### CONCLUSION

In sum, the Stop WOKE Act would unreasonably interfere with businesses' ability to instruct their employees as they see fit in their own business judgement. The Court should affirm the district court's order and grant of a preliminary injunction in favor of Appellees.

Respectfully submitted,

DATED: January 18, 2023          MUNGER, TOLLES & OLSON LLP
Wesley T.L. Burrell
Brendan B. Gants

By: _____

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations contained in Federal Rule of Appellate Procedure 29(a)(5) because, excluding the portions exempted by Rule 32(f), the brief contains 2,963 words, as determined by the Microsoft Word program used to prepare it.

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

DATED:  January 18, 2023        MUNGER, TOLLES & OLSON LLP
                                Wesley T.L. Burrell
                                Brendan B. Gants


                                By: _____

                                Counsel for *Amici Curiae*