No. 22-13135

# In the United States Court of Appeals for the Eleventh Circuit

HONEYFUND.COM, INC, *et al.*,

*Plaintiffs–Appellees*,

v.

GOVERNOR, STATE OF FLORIDA, *et al.*,

*Defendants–Appellants*.

## DEFENDANTS-APPELLANTS' REPLY BRIEF

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
No. 4:22-CV-227-MW-MAF

Henry C. Whitaker
*Solicitor General*
Timothy L. Newhall
*Special Counsel*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, FL 32399-1050
Tel: (850) 717-9310
henry.whitaker@myfloridalegal.com

Charles J. Cooper
John D. Ohlendorf
Megan M. Wold
John D. Ramer
COOPER & KIRK, PLLC
1523 New Hampshire Ave.,
N.W.
Washington, DC 20036
Telephone: (202) 220-9660
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Defendants-Appellants*

*Honeyfund.com, Inc. v. Governor,*
*State of Florida*, 22-13135

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. Rule 26.1, I certify that the Certificates of Interested

Persons contained in the Brief of Appellants and the other briefs that have been filed

in this appeal are, to the best of my knowledge, complete.


Dated: February 22, 2023                    Respectfully submitted,

                                            /s/Charles J. Cooper
                                            Charles J. Cooper
                                            *Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ............................................................................1

ARGUMENT ................................................................................3

I.    The Employment Provisions Do Not Violate the First Amendment. .............3

      A.    The Employment Provisions Regulate Non-Expressive Conduct. .......3

      B.    The Employment Provisions Would Also Survive Heightened
            Scrutiny. ............................................................................11

II.   The Employment Provisions Are Not Unconstitutionally Vague or
      Overbroad. ..........................................................................20

      A.    The Challenged Provisions Are Not Unconstitutionally Vague. ........20

      B.    Plaintiffs' Overbreadth Claim Fails. .....................................25

III.  Any Unconstitutional Provisions Should Be Severed. .................................25

IV.   The Remaining Factors Militate Against Preliminary Injunctive Relief. .....26

CONCLUSION ............................................................................27

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975)..............................................3

*Alexander v. United States*, 509 U.S. 544 (1993) ....................................................25

*Arizona Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073 (1983) ................................................................1

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986)......................................15

*Carey v. Brown*, 447 U.S. 455 (1980) .......................................................................7

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464 (2022)......................................................................................7, 8

*Cohen v. California*, 403 U.S. 15 (1971)...............................................................4, 5

\* *Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975)............................15, 16, 18

*Frisby v. Schultz*, 487 U.S. 474 (1988) ....................................................................17

*Granite State Outdoor Advert., Inc. v. City of Clearwater*, 351 F.3d 1112 (11th Cir. 2003) .......................................................................25

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993).....................................................19

\* *Hill v. Colorado*, 530 U.S. 703 (2000)...............................................2, 6, 7, 15, 17

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ....................................4, 5

*LaCroix v. Town of Fort Myers Beach*, 38 F.4th 941 (11th Cir. 2022)....................22

*Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974)..................................15, 16

*NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969) .................................................16

\* *Norwegian Cruise Line Holdings Ltd v. State Surgeon Gen.*, 50 F.4th 1126 (11th Cir. 2022) ...........................................................1, 2, 5, 6, 13

*Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020).........................4, 8, 9, 11

*Rowan v. U.S. Post Office Dept.*, 397 U.S. 728 (1970) ...........................................17

\* *Rumsfeld v. FAIR*, 547 U.S. 47 (2006) ..............................................................6, 10

*Santa Cruz Lesbian & Gay Community Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020).................................................................21

*Snyder v. Phelps*, 562 U.S. 443 (2011) ...................................................................15

*Tracy v. Florida Atl. Univ. Bd. of Trs.*, 980 F.3d 799 (11th Cir. 2020) .................25

ii

*Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982) ....20

*Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015) .......................................14, 15

\* *Wollschlaeger v. Governor of Florida*,
848 F.3d 1293 (11th Cir. 2017) (en banc) ..........................................6, 16, 17, 26

## Statutory Provisions

FLA. STAT.

§ 760.10(8)(a) ...................................................................................19
§ 760.10(8)(a)(1) ............................................................................... 1
§ 760.10(8)(a)(2) .................................................................................22
§ 760.10(8)(a)(3) .................................................................................23
§ 760.10(8)(a)(4) ...........................................................................13, 23
§ 760.10(8)(b) ...............................................................................21, 26

## Other Authorities

*Moral*, MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2007),
https://bit.ly/3v4kc9h ...........................................................................22

**INTRODUCTION**

Florida's Individual Freedom Act (the "Act" or "IFA") serves the State's compelling, constitutionally enshrined interest in "require[ing] employers to treat their employees as *individuals,* not as simply components of a racial, religious, sexual, or national class." *Arizona Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1083 (1983) (cleaned up). Such "[a]nti-discrimination statutes ordinarily regulate non-expressive conduct," *Norwegian Cruise Line Holdings Ltd v. State Surgeon Gen.*, 50 F.4th 1126, 1136 (11th Cir. 2022), and that is the case here. Florida employers remain just as free as they ever were to *speak* about the eight concepts enumerated in the Act—including the odious idea that "[m]embers of one race, color, sex, or national origin are morally superior to members of another race, color, sex, or national origin." FLA. STAT. § 760.10(8)(a)(1). What they may not do, *all* they may not do, is engage in the *conduct* of penalizing those workers who do not wish to hear these ideas and who therefore choose not to attend the workplace training sessions where they are advocated. Accordingly, the Act "do[es] not implicate the First Amendment at all," and Plaintiffs' challenge must fail. *Norwegian*, 50 F.4th 1135 (cleaned up).

Plaintiffs, like the district court, argue that the First Amendment applies because the conduct restricted by the Act cannot be identified "without reference to speech." Br. of Pls.-Appellees 19, Doc. 26 (Jan. 11, 2023) ("Appellees' Br."). This

1

argument fails for the reason explained in our opening brief: it is settled law that the First Amendment allows a State "to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct." *Hill v. Colorado*, 530 U.S. 703, 721 (2000). And *every* law that requires this type of threshold inquiry into speech will, by definition, be unable to "explain the punished conduct without reference to speech." Appellees' Br. 19. That was certainly the case in *Norwegian*: the law there only restricted the conduct of denying service if it was based on the customer's refusal to engage in the "communicative exchange" of providing "documentation certifying COVID-19 vaccination," yet this Court upheld it as "an anti-discrimination statute that regulates non-expressive economic conduct." 50 F.4th at 1131, 1136, 1137. Plaintiffs' understanding of the First Amendment, like the district court's, is squarely contrary to *Norwegian*.

Plaintiffs' other arguments all fail in equal measure. None of the words or phrases challenged by Plaintiffs are unconstitutionally vague. The overbreadth doctrine does not apply. Under basic Florida severability principles, any provision of the Act that is unconstitutional (and none are) should be severed from the remainder. And because Plaintiffs' claim of irreparable injury is parasitic on the merits of their Free Speech challenge, it is doomed along with their flawed understanding of the First Amendment.

2

Plaintiffs assert that the IFA "is antithetical to the most fundamental values of a democracy," Appellees' Br. 16, but it is their all-embracing interpretation of the First Amendment that threatens a sea-change in American law, undermining attempts to stamp out "a historic evil of national proportions"—"discriminatory employment practices." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416 (1975). Plaintiffs concede that bedrock workplace anti-discrimination laws like Title VII "can sometimes be applied to reach speech," and that "no court has ever found Title VII to be inconsistent with First Amendment protections." Appellees' Br. 34, 37. Plaintiffs' position would undermine the constitutional basis for such Title VII hostile-environment claims, since the conduct at issue in such a claim is not " 'separately identifiable' from speech," *id.* at 19, and since Plaintiffs (and the district court) reject as illegitimate any state interest in "protecting an individual" from the "psychological distress" of being exposed to speech that is invidiously discriminatory. *id.* at 50–51.

That conclusion cannot be correct. The decision below should be reversed.

## ARGUMENT

### I.    The Employment Provisions Do Not Violate the First Amendment.

### A. The Employment Provisions Regulate Non-Expressive Conduct.

As explained in our opening brief, the Individual Freedom Act does not implicate the First Amendment at all, because it does not regulate the *speech* that

3

goes on at workplace training events, but instead the employer's *conduct* of requiring its employees to attend those events and penalizing those who fail to do so. Plaintiffs resist this conclusion, but they are not able to refute it.

1.    Plaintiffs' primary response on this point is the same as the district court's: the claim that the conduct regulated by the Act is not " 'separately identifiable' from speech." Appellees' Br. 19. We explained in our opening brief why that is not so: the conduct regulated by the Act—mandating attendance at the covered training sessions—is readily identifiable separately from speech. Again, everything that could be said at a workplace training session *before* the Act can still be said *after*, but attendance at the session must be voluntary. Plaintiffs' assertion that the Act "limit[s] the ability of certain speakers . . . to discuss eight prohibited concepts," *id.* at 17, is thus demonstrably false.

Plaintiffs' "separately identifiable from speech" mantra comes from *Cohen v. California*, 403 U.S. 15, 18 (1971), but as the district court's opinion explains, that is a test for identifying those situations where "the only conduct which the State seeks to punish is *the fact of communication.*" App.119, Doc. 20 (Nov. 14, 2022) (quoting *Otto v. City of Boca Raton*, 981 F.3d 854, 866 (11th Cir. 2020) (cleaned up) (emphasis added)). In other words, conduct is not "separately identifiable from speech" when the "conduct" just is *the uttering of the speech* (or the display of profane words on a jacket or some other form of non-verbal expression); *see also*

4

*Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (cited at Appellees' Br. 25) (law regulates speech where "the conduct triggering coverage under the statute consists of communicating a message"). That is not at all the case here.

Plaintiffs argue that the "separately identifiable conduct" test from *Cohen* is met here because one "cannot explain the . . . conduct [restricted by the Act] without reference to speech," since "the Act applies only to sessions where the prohibited speech occurs." Appellees' Br. 19 (cleaned up). This is nothing more than a rephrasing of the district court's argument that the Act must regulate speech because its application is triggered, in part, by an inquiry into the content of speech. And it fails for the same reason: it is squarely contrary to the Supreme Court's and this Court's precedent.

This Court's recent decision in *Norwegian Cruise Line* is directly on point. The conduct restricted by the State in *Norwegian* —refusing service to customers— could not be "explain[ed] . . . without reference to speech." Appellees' Br. 19. The only reason that Norwegian could not refuse service under the challenged law was a customer's refusal "to provide any documentation certifying COVID-19 vaccination"—the refusal, as Norwegian put it, to engage in a particular "communicative exchange." 50 F.4th at 1131, 1137. Yet this Court upheld the law in *Norwegian* because it regulated conduct, not speech. And the reason for that conclusion is the same as here: businesses were just as free to "*ask[ ]* customers

about their vaccination status" as they ever were, so long as they refrained from the ensuing *conduct* of refusing service if the customer failed to respond. 50 F.4th at 1137.

Plaintiffs' attempt to sweep *Norwegian* to the side is unpersuasive. They say that *Norwegian* "is easily distinguishable" because "the relevant statute 'limited no communications between customers and businesses.' " Appellees' Br. 21 (quoting *Norwegian*, 50 F.4th at 1137). But that is true here too. Nor is *Norwegian* distinguishable because it involved "the conduct of granting equal access to physical spaces." Appellees' Br. 21–22. Yes, that was the particular conduct at issue in *Norwegian*, but so what? Nothing in the Court's reasoning limited the decision to that gerrymandered subset of cases. To the contrary, the Court drew support from precedent involving entirely different types of conduct. *Norwegian*, 50 F.4th at 1137 (citing, e.g*., Greater Philadelphia Chamber of Com. v. City of Philadelphia*, 949 F.3d 116 (3d Cir. 2020), upholding a wage regulation). Plaintiffs' attempts to distinguish *Rumsfeld v. FAIR*, 547 U.S. 47 (2006), and *Wollschlaeger v. Governor of Florida*, 848 F.3d 1293 (11th Cir. 2017) (en banc), all fail for similar reasons. *See* Appellees' Br. 20–22.

Nor can Plaintiffs square their argument with the Supreme Court's explicit statement, in *Hill*, that "[w]e have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a

6

rule of law applies to a course of conduct." 530 U.S. at 721. When one can "determine whether a rule of law applies to a course of conduct" only by "look[ing] at the content" of speech, *id.*, it will *never* be possible to "explain the punished conduct without reference to speech," Appellees' Br. 23. Plaintiffs try to distinguish *Hill* based on the Court's observation that "it is unlikely that there would often be any need to know exactly what words were spoken in order to determine whether sidewalk counselors are engaging in oral protest, education, or counseling rather than social or random conversation"—the particular activities regulated by the law there. *Hill*, 530 U.S. at 704. But once again, that is true in this case as well. While both the statute in *Hill* and the IFA look at the content of speech to "determine whether [they] appl[y] to a course of conduct," in neither case would it generally be necessary to "know exactly what words were spoken,"—*i.e.*, the precise words or phraseology used. *Hill*, 530 U.S. at 704, 721.

Plaintiffs also note that *Hill* "reaffirmed *Carey v. Brown*, [447 U.S. 455 (1980),] which struck down as unconstitutional a statute that generally prohibited peaceful picketing, but exempted labor picketing at a workplace." Appellees' Br. 24. *Carey* is completely irrelevant. That case involved a general restriction on peaceful picketing in a public forum—not private non-expressive conduct.

The Supreme Court reaffirmed this proposition from *Hill* just last term, explaining in *City of Austin v. Reagan National Advertising of Austin, LLC*, that its

7

precedent "reject[s] . . . the view that *any* examination of speech or expression inherently triggers heightened First Amendment concern." 142 S. Ct. 1464, 1474 (2022). Plaintiffs try to escape that statement by downshifting their argument, insisting that they "do not argue that any examination of speech triggers the First Amendment, but rather that in this case, where such examination of speech is both central to and inseparable from the statute, heightened First Amendment concerns are raised." Appellees' Br. 25 n.15. Much the same could be said of any number of laws that regulate conduct rather than speech, Appellants' Br. at 22–24, and Plaintiffs offer no doctrinal basis for that ad hoc distinction between any garden variety "examination of speech" and one that is "central to and inseparable from the statute," Appellees' Br. 25 n.15. Again, the threshold examination of speech required by the IFA is indistinguishable from the threshold examination of speech in *Hill* and *Norwegian*, so Plaintiffs' theory that it renders the IFA unconstitutional under the First Amendment simply cannot be squared with those decisions.

2.    Plaintiffs' remaining attempts to show that the Act implicates the First Amendment all fail.[1] They invoke this Court's warning in *Otto* against "the enterprise of labeling certain verbal or written communications 'speech' and others

---

[1] One of Plaintiffs' amici, the Pen American Center, argues at length that the educational provisions of the IFA violate the First Amendment. Br. for Amicus Pen Am. Ctr., Doc. 30-1 (Jan. 18, 2023). Since Plaintiffs have not challenged the Act's educational provisions, this argument is completely irrelevant.

'conduct.' " *Otto v. City of Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020). But as we demonstrated in our opening brief (at 21), since no one disputes that an employer's action in sanctioning workers who do not attend a training session is not "verbal or written communication[ ]," *id.*, this principle simply does not apply. Plaintiffs offer no response to this point.

Plaintiffs also repeatedly reiterate the district court's conclusion that the Act draws lines that are "viewpoint-based." *See* Appellees' Br. 7, 11, 15*;* App.117–18 & n.4. But they do not explain why this feature of the law somehow renders it a restriction on speech rather than conduct. Whether the Act's regulation of conduct is triggered by an inquiry into the *viewpoint* of speech, not just its *content*, is thus irrelevant for the reasons we have explained, *see* Appellants' Br. 25–28: because *what follows* from the Act's inquiry into speech *is not* a restriction on the content *or viewpoints* of that speech, which can continue to be freely expressed. What follows from the threshold inquiry into speech is merely a *restriction on the employer's conduct.* The First Amendment thus has nothing to say about it.

Finally, Plaintiffs seek refuge in the argument—articulated by the district court in a footnote—that an employer's action in requiring attendance at the training sessions in question is "expressive conduct." App.120 n.7. Appellees' Br. 26. We refuted this argument in our opening brief, too. The test for whether conduct is "inherently expressive"—and thus protected by the First Amendment—is whether a

reasonable "observer" who views the conduct would necessarily conclude that it was meant to express some message. *FAIR*, 547 U.S. at 66. Here, the mandatory training sessions barred by the Individual Freedom Act are not expressive. We do not doubt that *some* employers—perhaps including Plaintiffs and their amici—intend to "express their values" by mandating attendance at the trainings subject to the Act. Br. of Amicus Curiae H&M Hennes & Mauritz L.P., *et al.* at 10, Doc. 34 (Jan. 18, 2023) ("H&M Amicus Br."). But an observer who sees a mandatory workplace training session has no way of knowing whether the employer, in holding the training, is "communicat[ing] the importance that [it] places on the topics," Appellees' Br. 26, without further "explanatory speech," *FAIR*, 547 U.S. at 66; *see* Appellants' Br. 30–31; H&M Amicus Br., *supra*, at 7 (noting case law holding that mandatory diversity training can avoid Title VII liability).

Plaintiffs' only response to this dispositive point is to claim that making a training session mandatory "signals the priority the employer puts on the content," regardless of "[w]hether that priority results from business strategy, the business's values, its leadership's assessment of liability risk, or some combination of these factors." Appellees' Br. 27 n.16. But this argument nullifies the line between expressive and non-expressive conduct. For an employer that holds a mandatory training session solely to avoid the risk of liability even though it vehemently *disagrees* with the message conveyed at the session has in no *meaningful* sense

10

"communicates the importance" that it places on the topics discussed. *Id*. at 26. And if the *meaningless* "message" communicated by mandating the session suffices to make that conduct expressive, *id.* at 26–27, then *FAIR* quite obviously was wrongly decided. For the conduct there, too, communicated "a message" on Plaintiffs' understanding, *id.*: the message that for whatever reason, it was a priority for the military to hold recruitment interviews off campus. That utterly vacuous "message" was not enough in *FAIR*, and it is not enough here.

### B. The Employment Provisions Would Also Survive Heightened Scrutiny.

Even if the First Amendment applied, the IFA's employment provisions would pass any standard of scrutiny, including strict scrutiny.

1.    Plaintiffs suggest at the threshold that because the Act purportedly "restrict[s] speech based on the viewpoint it expresses," it may be "unconstitutional per se." Appellees' Br. 27. The district court correctly rejected this argument. App.125 n.8. Plaintiffs cite this Court's decision in *Otto*, but *Otto* in fact held that "the Supreme Court has not explicitly adopted a per se rule, and we have no need to do so here." 981 F.3d at 864. Instead, the Court in *Otto* applied the ordinary tiers-of-scrutiny framework.

2.    The challenged employment provisions survive heightened constitutional scrutiny, assuming it applies at all, because they are narrowly tailored to serve two vital and compelling state interests. First, these provisions serve the

11

State's critical interest in preventing workplace racial discrimination. Plaintiffs acknowledge that this "is surely a compelling state interest," Appellees' Br. 31, and their attempts to show that the Act is not properly tailored to advance it fall short.

Plaintiffs claim the Act is "plainly overinclusive" because it bars mandatory trainings espousing the enumerated concepts without requiring "proof of any adverse impact on the listener." Appellees' Br. 31, 38. This argument appears to be based on the peculiar notion that the State's interest in preventing racial discrimination in the workplace somehow disappears if those being discriminated against *welcome* the discrimination. Thus, Plaintiffs would apparently conclude that the State has no interest in preventing an employer from lecturing employees of one race that they are morally inferior solely because of their race, so long as those employees *like* being called morally inferior. Plaintiffs cite no authority for this bizarre understanding of the State's interest in preventing racial discrimination. And even if the argument were valid in principle, it would not apply here because the Act is limited to *mandatory* trainings. Employees who suffer no "adverse impact" from the advocacy of the concepts remain entirely free to attend the training sessions. That some employees would prefer not to endure such lectures is proof enough of the adverse impact on them.

Echoing the district court, Plaintiffs next assert that the Act is overinclusive because many instances of race and sex discrimination are "already illegal,"

App.126, under "both Florida and federal law," Appellees' Br. 33. Our opening brief already explained why this argument fails: (1) all agree that the Act's employment provisions reach some conduct not covered by existing anti-discrimination law, so the relevant question is whether Florida has an interest in curbing *these additional* instances of discrimination (it does); (2) Plaintiffs' argument bizarrely privileges *judicial* determinations of what discriminatory conduct should be unlawful over *legislative* ones; and (3) in all events, it is settled law that "[d]ifferent statutes can target different instances of the same kind of evil. And governments need not eliminate all discrimination whenever they wish to eliminate any." *Norwegian*, 50 F.4th at 1138.

Plaintiffs also argue that the challenged provisions "go[ ] far, far beyond 'invidious discrimination" by, for example, purportedly barring "mandatory trainings endorsing the notion of cultural competency." Appellees' Br. 32. But Plaintiffs do not explain how or why teaching about the "different perspectives" of those "coming from different backgrounds," *id.*, somehow constitutes advocating that "[m]embers of one race . . . cannot and should not attempt to treat others without respect to race." FLA. STAT. § 760.10(8)(a)(4). The same is true for a mentorship program for junior employees. Even farther afield is the bizarre notion that espousing the view that "America is the greatest nation on Earth" somehow advocates one or more of the prohibited concepts. Appellees' Br. 32.

13

Plaintiffs' difficulty in contriving a reasonable-sounding hypothetical that *actually* falls afoul of one of the eight concepts is revealing. What Florida has sought to prohibit—and what Plaintiffs assert a federal constitutional right to do—are mandatory trainings in which white employees, as a condition of employment, are criticized as morally inferior because of their race, instructed that they are from birth inherently racist, and told that they must feel a sense of guilt and mental anguish over the racist sins of earlier generations. Yet Plaintiffs do not highlight *those* types of trainings—likely because they would so clearly illustrate the *strength of Florida's interest in preventing invidious discrimination in the workplace*. The closest they come is their example of teaching in a mandatory training session that "Germans should feel guilty and remorseful for the Holocaust." Yes, that would plainly violate Concept 7, and so would be prohibited by the Act.

Unable to show that the Act is *over*-inclusive, Plaintiffs contend that it is *under*-inclusive. There is nothing to this. As an initial matter, "the First Amendment imposes no freestanding underinclusiveness limitation." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015) (cleaned up). "A State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." *Id.* Nor does the fact that the Act's employment provisions "stop at mandatory meetings," "rais[e] doubts about whether the government is in fact pursuing the interest it invokes." Appellees Br. 32–33. For as we have explained, the

challenged provisions do not serve *only* the State's interest in preventing workplace discrimination; they *also* serve the State's independent interest in protecting unwilling employees from being conscripted into a captive audience for the views the State has deemed invidiously discriminatory. The fact that Florida focused on this "most pressing" instance of discrimination in the workplace, *Williams-Yulee*, 575 U.S. at 449, does not *undermine* the Act's tailoring—it *confirms* it.

3.    As just noted, the Act's employment provisions also serve the State's vital interest in "protect[ing] its citizens against unwilling exposure to materials that may be offensive" in those situations where "the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 208–09 (1975). Plaintiffs' efforts to sweep aside this compelling interest fail, too.

Plaintiffs cite dicta suggesting that "[a]s a general matter" the captive audience doctrine applies "only sparingly," to situations where "substantial privacy interests are being invaded in an essentially intolerable manner." *Snyder v. Phelps*, 562 U.S. 443, 459 (2011); *see* Appellees' Br. 30–31. This intimation that the doctrine is limited to the home and its environs is flatly contrary to repeated Supreme Court holdings, which have invoked the doctrine in such public locations as a high school auditorium, *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 677–78, 684 (1986), sidewalks outside clinics, *Hill*, 530 U.S. at 707, 718, and subway cars, *Lehman v.*

*City of Shaker Heights*, 418 U.S. 298, 299 (1974) (plurality). The canonical statement of the doctrine—as applying where "the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure" *Erznoznik*, 422 U.S. at 209—plainly extends to workplace trainings that employees are required to attend as a condition of keeping their jobs.

Plaintiffs resist this conclusion, arguing that we "point to no authority for the[ ] proposition that 'the economic dependence of the employees on their employers' trumps First Amendment principles." Appellees' Br. 30 (quoting Appellants' Br. 36). But putting aside the point that the verb "trumps" overstates our argument, the very Supreme Court precedent from which our opening brief reproduced this quoted language *concerned the context of the First Amendment*, and it said this:

> an employer's free speech right to communicate his views to his employees . . . must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear.

*NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969).

Plaintiffs also incant this Court's observation in *Wollschlaeger* that "where adults are concerned the Supreme Court has never used a vulnerable listener/captive audience rationale to uphold speaker-focused and content-based restrictions on speech." Appellees' Br. 30 (quoting *Wollschlaeger*, 848 F.3d at 1315). This

16

statement was unnecessary to the Court's holding in *Wollschlaeger*, so it is dicta. *See Wollschlaeger*, 848 F.3d at 1315 (independently rejecting any captive audience argument because patients remain free "to refuse to answer questions about firearm ownership" or "to choose another medical provider"). With respect, it is also incorrect. The Supreme Court has repeatedly applied the doctrine, "where adults are concerned," to "uphold speaker-focused . . . restrictions." *Id.*; *see Frisby v. Schultz*, 487 U.S. 474, 477 (1988) (restriction on speakers "engage[d] in picketing before or about [a] residence"); *Hill*, 530 U.S. at 707 (restriction on speakers "engaging in oral protest, education, or counseling" with individuals outside health care facilities.) And the restriction upheld in *Rowan v. U.S. Post Office Dept.* was also *content*-based: it applied only to mail that a homeowner found "erotically arousing or sexually provocative." 397 U.S. 728, 730 (1970).

Finally, Plaintiffs rehash their argument that the challenged employment provisions are "viewpoint- and content-based," and, they say, Supreme Court precedent holds that such restrictions are not exempt from First Amendment scrutiny under the captive audience doctrine. Appellees' Br. 37–38. But we have not argued that the Act's employment provisions may be upheld under the captive-audience doctrine *simpliciter*—upheld, that is, without further constitutional scrutiny. Instead we have only invoked the Supreme Court's captive-audience cases for the modest purpose of demonstrating that they recognize *the State's compelling interest*, as part

17

of the ordinary strict-scrutiny analysis, in protecting the "unwilling viewers or auditors" from exposure to unwelcome and offensive speech where "the degree of captivity makes it impractical for [him] to avoid exposure." *Erznoznik*, 422 U.S. at 208–09. And that interest—in "shield[ing] the public from some kinds of speech on the ground that they are more offensive than others," *id.*—plainly does not evaporate when the State's reasons for finding that speech more offensive are *based on the speech's content*.

4.     Finally, Plaintiffs—like the district court—fail in their effort to prevent their First Amendment argument from crashing into speech-based hostile environment claims under Title VII. Again like the district court, Plaintiffs concede that hostile environment claims can be based on pure speech. *See* Appellees' Br. 34. But they initially contend that the Act is distinguishable because it limits speech "by its express terms" and "on its face," while Title VII "on its face" appears to be only a "regulation of conduct." Appellees' Br. 34. Setting aside the point that the IFA regulates only conduct rather than speech, *see supra* Part I.A., this argument is a variation of—and equally untenable as—the district court's attempt to show that Title VII "targets conduct" and "only incidentally burdens speech," while the Act "targets speech" and "only incidentally burdens conduct." App.123–24; *see* Appellant's Br. 41–42. Surely First Amendment analysis cannot turn on whether a law *masks its application to speech rather than wearing it on its face*.

18

Plaintiffs seek solace in the rule that only "severe or pervasive" discriminatory speech is actionable under Title VII, Appellees' Br. 34, but they do not surmount the fundamental problem that our opening brief identified (at 42–43) with this argument: this "severe or pervasive" requirement has nothing to do with the First Amendment. Instead, it arises out of Title VII's limitation to workplace conditions that "alter the conditions of the victim's employment," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)—a limitation that the IFA *shares*, *see* FLA. STAT. § 760.10(8)(a). Neither the district court nor Plaintiffs grapple with this basic difficulty with their argument.

Lastly, Plaintiffs argue that even if "there could be some interpretations of Title VII that might trigger heightened scrutiny under the First Amendment," this Court should not trouble its mind with such "edge cases," given that "no court has ever found Title VII to be inconsistent with First Amendment protections." Appellees' Br. 37. That fails to grapple with the logic of the district court's reasoning and Plaintiffs' own submission. The district court held and Plaintiffs maintain that (1) the Act must undergo First Amendment scrutiny because one must look at "the underlying speech's content" to see if its conduct restrictions apply, and (2) the State has "*no legitimate interest*" in curbing expressions of racism "simply because society finds the idea itself offensive or disagreeable." Appellees' Br. 18–19, 36, 38 (emphasis added). Plaintiffs' reasoning thus calls into question whether Title VII

19

*could ever* be constitutionally applied to hostile-environment claims based on "speech that contributes to or amounts to unlawful discrimination." *Id.* at 34.

Plaintiffs' observation that "no court has ever found Title VII to be inconsistent with First Amendment protections," *id.* at 37, is thus *precisely* the point that confirms that the district court's invalidation of the Act under the First Amendment cannot be correct.

## II.    The Employment Provisions Are Not Unconstitutionally Vague or Overbroad.

### A. The Challenged Provisions Are Not Unconstitutionally Vague.

Plaintiffs' attempts to defend the district court's vagueness analysis are equally unavailing. They begin by disputing that the "less stringent vagueness test" for economic regulations articulated in *Hoffman Estates* applies here, citing a passage later in the case suggesting that laws "interfere[ing] with the right of free speech" should be subject to a higher standard. Appellees' Br. 40 (quoting *Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982)). But even if the IFA interfered with free speech rather than conduct, *see supra*, Part I.A, all of the considerations set forth in *Hoffman Estates* supporting a less stringent standard for business regulations *also* apply: just as in that case, the plaintiffs here "face economic demands to plan behavior carefully, [and] can be expected to consult relevant legislation in advance of action." 455 U.S. at 498.

20

Whatever the standard, the challenged provisions of the Act are not unconstitutionally vague. The district court's principal target for finding the Act vague was the Act's exception for "discussion of the [eight] concepts . . . in an *objective manner* without endorsement." FLA. STAT. § 760.10(8)(b) (emphasis added). Our opening brief explained (at 48–50) the myriad problems with the court's conclusion that "objectivity" is "inherently vague," App.137, and Plaintiffs entirely fail to engage with our extended discussion of the issue. The only argument they offer on this point is a citation to an out-of-circuit district court's preliminary conclusion that a differently worded federal Executive Order was likely unconstitutionally vague. Appellees' Br. 45 (citing *Santa Cruz Lesbian & Gay Community Ctr. v. Trump*, 508 F. Supp. 3d 521, 544 (N.D. Cal. 2020)). That decision is irrelevant here, since its reasoning was principally based on language in a Department of Labor FAQ that drew a "murky" line between "teaching" and "implying" certain concepts—not any text that is shared by the Executive Order and the Act. *See Santa Cruz*, 508 F. Supp. 3d at 544–45.

Rather than trying to defend the district court's actual reasoning, Plaintiffs engage in a bullet-point-style forced march through all eight of the Act's enumerated concepts—most of which the district court did not address at all. *See* App.131–33 (discussing only Concepts One and Four). This Court should not address them either, since Plaintiffs' discussion of each concept is too cursory to properly present any

challenge to them. *See LaCroix v. Town of Fort Myers Beach*, 38 F.4th 941, 947 n.1 (11th Cir. 2022) ("Because the Officers make only a passing reference to this argument in a footnote of the Town's brief, it is waived.") And each of Plaintiffs' rapid-fire vagueness arguments also fails on the merits:

1.    Plaintiffs suggest that Plaintiff Orrin's use of "the terms 'dominant groups' and 'subordinated groups' to describe 'power relationships that often map onto race or sex' " could run afoul of Concept One, Appellees' Br. 42–43, but given that these terms have nothing to do with the comparative moral values of different races or sexes—their ability to "conform[ ] to a standard of right behavior," *Moral*, MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2007), https://bit.ly/3v4kc9h—Orrin's use of these terms, standing alone, does not come anywhere close to Concept One.

2.    Nor does Plaintiff Orrin's advocacy of the idea that "all of us have unconscious biases by virtue of the culture in which we are steeped," Appellees' Br. 43, run afoul of Concept Two. That provision bars mandatory trainings espousing the concept that an individual, at birth, is "inherently racist, sexist, or oppressive" solely "by virtue of his or her *race, color, sex, or national origin*," FLA. STAT. § 760.10(8)(a)(2) (emphasis added)—not by virtue of being "steeped" in a particular "culture," Appellees' Br. 43.

3.    We agree that Orrin's use "of a 'privilege wheel' based on protected characteristics" violates the Act. *Id.* To the extent that Orrin's use of her "privilege

wheel" endorses the idea an individual's "status as either privileged or oppressed is necessarily determined by his or her race, color, sex, or national origin," FLA. STAT. § 760.10(8)(a)(3)—which it certainly appears to, based on Plaintiffs' brief description—then yes, it is contrary to Concept Three, and employers may not make attendance at such a training session mandatory.

4.    "[T]rainings encouraging 'cultural competence'—e.g., understanding that the race of a co-worker may affect how they experience different events or actions," Appellees' Br. 42—clearly do not fall within Concept Four, for the reasons discussed above, *see supra*, p. 13. Nor would an employer be acting contrary to this provision by "instruct[ing] employees to be mindful of gender dynamics" "after noticing that only women had been asked to take notes at meetings." *Id*. Rather such an employer would merely be admonishing its employees to *treat one another without respect to sex*—precisely what Concept Four endorses. Finally, there is no difficulty in determining whether Plaintiff Orrin's presentation "acknowledging a history of violence directed at one race" by another and asking members of both races to "reflect on their relative privilege" violates Concept Four, *id.* at 43, since acknowledging deplorable historical instances of racist violence, or urging self-reflection, do not amount to teaching that individuals "cannot and should not attempt to treat others without respect to race," FLA. STAT. § 760.10(8)(a)(4).

5 & 6. There is likewise no uncertainty about whether Plaintiff Orrin's endorsement of institutional "reparations" based on an institution's past participation in "larger systemic oppression" violates Concepts Five and Six. Appellees' Br. 43. It plainly does, and under the Act, employers simply cannot require their workers to attend a presentation endorsing this concept.

7.      Plaintiff Orrin's suggestion that employees attending her trainings should "reflect on historical wrongs," by contrast, plainly does not violate Concept Seven, even for any employees who happen to "feel guilt" or "psychological unease" as a result of the reflection. Appellees' Br. 44. As the district court correctly recognized in another, related case challenging the Act, this concept "does not bar instruction that incidentally makes students feel bad; it bars *instructing* students that they '*must* feel guilt, anguish, or other forms of psychological distress for actions, in which he or she played no part, committed in the past by other members of the same race or sex.' " Order at 9-10, *Falls v. DeSantis*, Doc. 68, No.22-cv-166 (N.D. Fla. July 8, 2022).

8.      Finally, it is not "unclear" whether Orrin's criticism of "white normative culture"—including the "ideas . . . of white people" about what behavior is "effective" or "professional" and the "myth of meritocracy"—violates Concept Eight. Appellees' Br. 44; Supp.App.18–19. These ideas are plainly contrary to the Act, and employers cannot require attendance at training sessions that endorse them.

Accordingly, even if Plaintiffs' staccato attacks on the eight concepts were properly before the Court, they fail on the merits. The Act uses plain language in its "ordinary or natural meaning," *Tracy v. Florida Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 807 (11th Cir. 2020); it is not unconstitutionally vague.

### B. Plaintiffs' Overbreadth Claim Fails.

Plaintiffs briefly argue "[i]n the alternative" that even if the Act "is not a viewpoint restriction or impermissibly vague," it "is substantially overbroad" in relation to any "legitimate sweep . . . in preventing discrimination." Appellees' Br. 46. The district court correctly determined that "the overbreadth doctrine does not apply" here. App.138. Overbreadth "is a departure from traditional rules of standing" that allows a party "to make a facial challenge to an overly broad statute restricting speech, even if he himself has engaged in speech that could be regulated under a more narrowly drawn statute." *Alexander v. United States*, 509 U.S. 544, 555 (1993); *see also Granite State Outdoor Advert., Inc. v. City of Clearwater*, 351 F.3d 1112, 1116 (11th Cir. 2003). Plaintiffs identify no basis for concluding that (1) *their own* speech in violation of the Act *can* constitutionally be restricted, but (2) the speech of *third parties cannot*. Accordingly, the overbreadth doctrine does not apply.

### III.  Any Unconstitutional Provisions Should Be Severed.

Even if some provisions of the IFA are unconstitutional, the district court erred in enjoying the Act in its entirety rather than severing the unconstitutional

provisions. Once again, Plaintiffs do not attempt to defend the district court's actual reasoning on this score: the notion that "the unconstitutionally vague 'objectivity' requirement . . . governs the entire challenged provision," App.137, even though the Act's reference to "objective" instruction appears only in *an exception* to its operative requirements, *see* Appellants' Br. 48.

Instead, Plaintiffs argue that the exception for instruction "given in an objective manner without endorsement of the concepts," FLA. STAT. § 760.10(8)(b), is not severable from the remainder of the Act's employment provisions because "[o]mitting the objectivity clause would extend the statute beyond what the Florida Legislature intended." Appellees' Br. 48–49. That is so, Plaintiffs say, because "the sponsors of the Stop WOKE Act spoke at length about the need to permit discussion of the concepts in an objective manner." *Id.* at 48. But the most that shows is that the legislature thought the exception for objective discussion was important; it does not show that "the legislative purpose expressed in the valid provisions" cannot be "accomplished independently" if the exception is stricken, or that "the Legislature would [not] have passed the one without the other." *Wollschlaeger*, 848 F.3d at 1318 (cleaned up).

## IV.    The Remaining Factors Militate Against Preliminary Injunctive Relief.

Finally, Plaintiffs set forth several purported "examples" of "speech" that has been "imminently chill[ed]," Appellees' Br. 49–50, but the Act's application to those

examples only amounts to irreparable injury if it is *contrary to the First Amendment*. As Plaintiffs ultimately acknowledge, then, the existence of irreparable injury here is entirely parasitic on the merits. *Id.* at 49. And since their First Amendment claim fails on the merits, so does their allegation of irreparable injury. So, too, does their attempt to diminish the State's compelling interest in enforcing the Act: Plaintiffs say that "neither the government nor the public has any legitimate interest in enforcing an unconstitutional ordinance." *Id.* at 50. True enough, but that contention collapses along with the merits of their argument that the IFA is unconstitutional in the first place.

## CONCLUSION

This Court should reverse the decision of the district court and vacate the preliminary injunction.

Dated: February 22, 2023                    Respectfully Submitted,

Henry C. Whitaker                           /s/ Charles J. Cooper
*Solicitor General*                         Charles J. Cooper
Timothy L. Newhall                          John D. Ohlendorf
*Special Counsel*                           Megan M. Wold
OFFICE OF THE ATTORNEY GENERAL              John D. Ramer
The Capitol, PL-01                          COOPER & KIRK, PLLC
Tallahassee, FL 32399-1050                  1523 New Hampshire Avenue, N.W.
Tel: (850) 717-9310                         Washington, D.C. 20036
henry.whitaker@myfloridalegal.com           Tel: (202) 220-9600
                                            Fax: (202) 220-9601
                                            ccooper@cooperkirk.com

*Attorneys for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B)(ii) because this brief contains 6,435 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f) and 11th CIR. R. 32-4.

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: February 22, 2023                /s/Charles J. Cooper
                                         Charles J. Cooper
                                         *Counsel for Defendants-Appellants*